No. 22-2606

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

IN RE: AEARO TECHNOLOGIES, LLC, et al.

_____

AEARO TECHNOLOGIES, LLC, ET AL.,

*Debtors-Appellants,*

v.

THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT AND
JOHN & JANE DOES, 1-1000,

*Appellees.*

_____

On Direct Appeal from the United States Bankruptcy Court
for the Southern District of Indiana, Indianapolis Division
No. 22-2890, Adv. No. 22-50059

_____

## OPENING BRIEF FOR DEBTORS-APPELLANTS
_____

GEORGE W. HICKS, JR.
AARON L. NIELSON
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

PAUL D. CLEMENT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22134
(202) 742-8900
paul.clement@clementmurphy.com

CHAD J. HUSNICK
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Counsel for Debtors-Appellants*

December 12, 2022

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. 26.1 and Circuit Rule 26.1, undersigned

counsel provides the following information:

1.    The full name of every party that the attorney represents in the case:

Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and 3M Occupational Safety LLC.

2.    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the bankruptcy court, district court, or before an administrative agency) or are expected to appear for the party in this court:

Kirkland & Ellis LLP; Ice Miller LLP; McDonald Hopkins LLC; Clement & Murphy, PLLC

3.    Any parent corporation of a party, or any publicly held company that owns 10% or more of the party's stock:

3M Company.

4.    Debtor information required by Fed. R. App. P. 26.1(c) 1 & 2:

Debtors are Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, 3M Occupational Safety LLC, Cabot Safety Intermediate LLC, and Aearo Mexico Holding Corp.  For all Debtors, 3M Company is a parent corporation or owns 10% or more of the debtor's stock.

December 12, 2022

s/ Paul D. Clement
Paul D. Clement
*Counsel for Debtors-Appellants*

**TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENT ........................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT CONCERNING ORAL ARGUMENT .............................. xi

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT .............................................................. 4

STATEMENT OF ISSUES ............................................................................ 4

STATEMENT OF THE CASE AND THE FACTS ..................................... 5

    A.    Aearo, 3M, and CAEv2 Earplugs ............................................ 5

    B.    The CAEv2 Litigation ............................................................... 8

    C.    Aearo's Chapter 11 Petition .................................................... 11

    D.    Aearo's Motion to Stay or Enjoin the CAEv2 Litigation and the Bankruptcy Court's Decision ................................... 13

    E.    Subsequent Events in the CAEv2 Litigation ........................ 18

SUMMARY OF ARGUMENT .................................................................... 20

STANDARD OF REVIEW .......................................................................... 25

ARGUMENT ................................................................................................ 26

I.    Section 362(a)(1)'s Automatic Stay Applies To The CAEv2 Litigation Against 3M. ........................................................................ 26

    A.    Section 362(a)(1) Can Apply to Non-Debtors in Certain Circumstances. ....................................................... 26

    B.    Under the Circumstances Here, Section 362(a)(1) Applies to the CAEv2 Litigation Against 3M. ...................... 35

II.    Section 362(a)(3)'s Automatic Stay Applies To The CAEv2
       Litigation Against 3M. ................................................................ 45

       A.    Section 362(a)(3) Stays the CAEv2 Litigation Against
             3M Because 3M Will Pursue Coverage Under
             Insurance Policies Shared With Aearo That are Estate
             Property. ............................................................................ 45

       B.    The Bankruptcy Court's Contrary Determination Is
             Erroneous. .......................................................................... 48

III.   The CAEv2 Litigation Against 3M Should Be Enjoined
       Under 11 U.S.C. §105(a). ............................................................ 53

       A.    Courts Regularly Grant §105(a) Relief to Enjoin
             Litigation Against Non-Debtors Under the
             Circumstances Here. ........................................................... 54

       B.    The Bankruptcy Court Erred in Concluding That It
             Lacked Jurisdiction to Issue §105(a) Relief. ...................... 60

CONCLUSION ................................................................................. 72

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CIRCUIT RULE 30(A) SHORT APPENDIX

CIRCUIT RULE 30(D) STATEMENT

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re A.H. Robins Co., Inc.*,
    788 F.2d 994 (4th Cir. 1986) ...................................................... *passim*

*In re A.H. Robins Co. Inc.*,
    828 F.2d 1023 (4th Cir. 1987) ............................................................. 42

*ACandS, Inc. v. Travelers Cas. & Sur. Co.*,
    435 F.3d 252 (3rd Cir. 2006) .............................................................. 47

*In re Airadigm Commc'ns., Inc.*,
    519 F.3d 640 (7th Cir. 2008) .............................................................. 54

In re *Aldrich Pump LLC*,
    2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) ....... 38, 40, 42, 55

*Arnold v. Garlock, Inc.*,
    278 F.3d 426 (5th Cir. 2001) .......................................................... 29, 41

*In re Bestwall LLC*,
    606 B.R. 243 (W.D.N.C. 2019) ....................................................... 55, 60

*Bush v. United States*,
    939 F.3d 839 (7th Cir. 2019) ...................................................... *passim*

*In re Caesars Ent. Operating Co., Inc.*,
    808 F.3d 1186 (7th Cir. 2015) .................................................... *passim*

*In re Caesars Entm't Operating Co., Inc.*,
    561 B.R. 441 (Bankr. N.D. Ill. 2016) ............................................. 56, 60

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995) .................................................................... *passim*

*City of Chicago v. Fulton*,
    141 S.Ct. 585 (2021) ........................................................................ 27

*In re Colonial Realty Co.*,
    980 F.2d 125 (2d Cir. 1992) .................................................. 34

*In re DBMP LLC*,
    2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ......................... 39

*In re Dow Corning Corp.*
    86 F.3d 482 (6th Cir. 1996) .................................................. 59

*In re Eagle-Picher Industries, Inc.*,
    963 F.2d 855 (6th Cir. 1992) .................................................. 56

*Edwards v. McElliotts Trucking, LLC*,
    2017 WL 5559921 (S.D. W. Va. Nov. 17, 2017) ................................ 42

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ................................................. 59

*F.M. v. Walden*,
    2013 WL 8481607 (D.N.M. Aug. 6, 2013) ...................................... 39

*In re FedPak Sys., Inc.*,
    80 F.3d 207 (7th Cir. 1996) ............................................. 62, 64

*In re Fernstrom Storage & Van Co.*,
    938 F.2d 731 (7th Cir. 1991) ......................................... *passim*

*Fisher v. Apostolou*,
    155 F.3d 876 (7th Cir. 1998) ....................................... 56, 59, 60

*Fox Valley Construction Workers Fringe Benefit Funds v.*
    *Pride of the Fox Masonry & Expert Restorations*,
    140 F.3d 661 (7th Cir. 1998) ......................................... *passim*

*In re Gander Partners LLC*,
    432 B.R. 781 (Bankr. N.D. Ill. 2010) ......................................... 56

*In re Grede Foundries, Inc.*,
    651 F.3d 786 (7th Cir. 2011) ....................................... 25, 27

*Gulfmark Offshore, Inc. v. Bender Shipbuilding & Repair Co.*,
   2009 WL 2413664 (S.D. Ala. Aug. 3, 2009) ........................................ 42

*Hamilton v. Am. Corrective Counseling Services, Inc.*,
   2009 WL 973447 (N.D. Ind. Apr. 8, 2009) ........................................... 30

*Hart v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*,
   360 F.3d 674 (7th Cir. 2004) ................................................................. 33

*Herrera v. Wyoming*,
   139 S.Ct. 1686 (2019) ............................................................................ 34

*Hetherington v. Dawn's Dreams of Wellness Co., Inc.*,
   2011 WL 13298567 (M.D. Fla. Sept. 27, 2011) ................................... 39

*Home Ins. Co. v. Cooper & Cooper Ltd.*,
   889 F.2d 746 (7th Cir. 1989) ......................................................... 46, 62

*In re IFC Credit Corp.*,
   422 B.R. 659 (Bankr. N.D. Ill. 2010) .................................................. 56

*In re Johns Manville Corp.*,
   33 B.R. 254 (Bankr. S.D.N.Y. 1983) .................................................... 47

*Kimbrell v. Brown*,
   651 F.3d 752 (7th Cir. 2011) ......................................................... 27, 41

*Klein v. Perry*,
   216 F.3d 571 (7th Cir. 2000) ................................................................ 71

*In re Kmart Corp.*,
   285 B.R. 679 (Bankr. N.D. Ill. 2002) ............................................ 56, 57

*In re Koeberer*,
   632 B.R. 680 (B.A.P. 9th Cir. 2021) .................................................... 34

*Kress v. CCA of Tenn., LLC*,
   694 F.3d 890 (7th Cir. 2012) ................................................................ 26

*In re L & S Indus., Inc.*,
   989 F.2d 929 (7th Cir. 1993) ................................................................ 56

*Lee v. RCN Corp.*,
    2004 WL 2108577 (N.D. Ill. Sept. 20, 2004) ...................................... 30

*In re LTL Mgmt.*,
    638 B.R. 291 (Bankr. D.N.J. 2022)............................................. *passim*

*In re Lyondell Chem. Co.*,
    402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................ 59

In re *Mallinckrodt*,
    639 B.R. 837 (Bankr. D. Del 2022) ................................................... 59

*In re Marcus-Rehtmeyer*,
    784 F.3d 430 (7th Cir. 2015).............................................................. 25

*McCartney v. Integra National Bank North*,
    106 F.3d 506 (3d Cir. 1997) ........................................................ 28, 41

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ........................................................................... 61

*Nat'l Tax Credit Partners, L.P. v. Havlik*,
    20 F.3d 705 (7th Cir. 1994)............................................. 46, 50, 51, 52

*In re Newman*,
    903 F.2d 1150 (7th Cir. 1990)............................................................ 46

*Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*,
    24 F.3d 136 (10th Cir. 1994)............................................................. 29

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) ........................................................ 61, 62

*Philadelphia Indem. Ins. Co. v. Specialty Contracting, Inc.*,
    2019 WL 13210052 (S.D. Ill. Mar. 27, 2019) ...................................... 30

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) .............................................................. 25

*Pitts v. Unarco Indus., Inc.*,
    698 F.2d 313 (7th Cir. 1983).............................................................. 27

*In re Prince*,
  85 F.3d 314 (7th Cir. 1996) ................................................................ 46

*In re Prudential Lines Inc.*,
  928 F.2d 565 (2d Cir. 1991) ............................................................. 48

*In re Purdue Pharms. L.P.*,
  619 B.R. 38 (S.D.N.Y. 2020) ....................................................... 55, 59

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d Cir. 2003) ............................................................. 29

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012) ...................................................... 54, 55, 56

*Reliant Energy Services, Inc. v. Enron Canada Corp.*,
  349 F.3d 816 (5th Cir. 2003) ............................................................ 29

*In re Rimsat, Ltd.*,
  212 F.3d 1039 (7th Cir. 2000) ......................................................... 26

*Ritchie Cap. Mgmt., L.L.C. v. Jeffries*,
  653 F.3d 755 (8th Cir. 2011) ............................................................ 29

*Roadway Exp., Inc. v. U.S. Dept. of Labor*,
  612 F.3d 660 (7th Cir. 2010) ............................................................ 33

*Savory v. Cannon*,
  947 F.3d 409 (7th Cir. 2020) ............................................................ 33

*In re Specialty Equip. Cos., Inc.*,
  3 F.3d 1043 (7th Cir. 1993) ............................................................. 65

*In re Stinnett*,
  465 F.3d 309 (7th Cir. 2006) .................................................. 46, 50, 51

*Trimec, Inc. v. Zale Corp.*,
  150 B.R. 685 (N.D. Ill. 1993) .......................................................... 43

*United States v. Crawley*,
  837 F.2d 291 (7th Cir. 1988) ...................................................... 31, 32

*United States v. Stevens*,
  997 F.3d 1307 (11th Cir. 2021) ........................................................... 71

*United States v. Whiting Pools, Inc.*,
  462 U.S. 198 (1983) ........................................................................... 34

*In re USA Gymnastics*,
  No. 18-09108, Adv. No. 19-50075 (Bankr. S.D. Ind. Apr.
  22, 2019) ........................................................................................... 55

*Victor J. Salgado & Assoc. Inc. v. Cestero-Lopategui*,
  34 F.4th 49 (1st Cir. 2022) ................................................................. 42

*In re W.R. Grace & Co.*,
  115 F.App'x. 565 (3d Cir. 2004) ............................................. 40, 55, 57

*In re W.R. Grace & Co.*,
  2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ............................... 43

*In re W.R. Grace & Co.*,
  386 B.R. 17 (Bankr. D. Del. 2008) ..................................................... 60

*In re W.R. Grace & Co.*,
  591 F.3d 164 (3rd Cir. 2009) ............................................................. 61

*Walter J. Raudonis 2016 Revocable Tr. v. RealtyShares, Inc.*,
  507 F.Supp.3d 378 (D. Mass. 2020) ................................................... 39

*Whetsel v. Network Prop. Services, LLC*,
  246 F.3d 897 (7th Cir. 2001) ............................................................. 31

*In re Xonics, Inc.*,
  813 F.2d 127 (7th Cir. 1987) ................................................. 62, 64, 66

## Statutes

11 U.S.C. §105 .................................................................................... 54

11 U.S.C. §105(a) ........................................................................ *passim*

11 U.S.C. §362 ...................................................................................... 1

11 U.S.C. §362(a) ................................................................. 25, 42

11 U.S.C. §362(a)(1) ................................................................. *passim*

11 U.S.C. §362(a)(3) ................................................................. *passim*

11 U.S.C. §541(a)(1) ................................................................. 45

28 U.S.C. §157 ................................................................. 4

28 U.S.C. §158(d)(2) ................................................................. 4, 18

28 U.S.C. §1334 ................................................................. 1, 4

28 U.S.C. §1334(a)-(b) ................................................................. 61

28 U.S.C. §1334(b) ................................................................. 16, 17

## STATEMENT CONCERNING ORAL ARGUMENT

Appellants Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and 3M Occupational Safety LLC respectfully request oral argument.  This appeal relates to the largest multi-district litigation in history and involves important questions of bankruptcy law.  Oral argument will aid the Court's resolution of those questions.

## INTRODUCTION

The fundamental goal of Chapter 11 is to facilitate successful reorganizations of debtors while maximizing the value of their assets for stakeholders.  To accomplish that objective, Congress gave bankruptcy courts important tools, including exclusive jurisdiction over debtors and their property, *see* 28 U.S.C. §1334, automatic stays, *see* 11 U.S.C. §362, and broad equitable powers, *see* 11 U.S.C. §105(a).  Bankruptcy courts regularly employ this suite of provisions to efficiently and fairly resolve mass-tort litigation that would otherwise be intractable, value-destroying, and inequitable to creditors and debtors alike.

This is a paradigmatic case for Chapter 11 and the use of those tools.  Appellants Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and 3M Occupational Safety LLC ("Aearo") are defendants in multi-district litigation alleging that Aearo designed, tested, manufactured, and marketed defective earplugs used by members of the U.S. military.  That litigation is the largest MDL in history, having swelled to over 290,000 claims.  Aearo's co-defendant in these claims is its parent, 3M Company.  Aearo is obligated to indemnify 3M for losses related to the litigation, and Aearo and 3M share insurance

policies worth more than $1 billion.  Following sixteen bellwether trials, the MDL continues to grind onward and consume immense resources.

Given the significant burden, uncertainty, and extraordinary exposure of continued litigation, Aearo sought Chapter 11 relief.  Aearo immediately benefited from an automatic stay, and it moved the bankruptcy court to recognize the stay's application to earplug-related litigation against 3M or to otherwise preliminarily enjoin that litigation. Like many similarly situated parties that have successfully obtained such relief, Aearo explained that pausing litigation against its non-debtor affiliate during the Chapter 11 process would enhance the prospects for its successful reorganization, including the establishment of a fund to equitably compensate claimants entitled to payment.

Nonetheless, the bankruptcy court denied the motion.  It did not dispute that continued litigation against 3M would impede Aearo's reorganization efforts.  Nor did it disagree that courts around the country routinely grant similar motions.  Instead, the bankruptcy court parted ways with those decisions based on purely legal concerns that do not withstand scrutiny.  The court held that the automatic stay of §362(a)(1) is categorically inapplicable to claims against non-debtors—even though

this Court has already recognized to the contrary. The bankruptcy court then held that the automatic stay of §362(a)(3), which precludes suits seeking to exercise control over estate property, does not apply if the debtor can access other property to make up for a depletion in estate property—a rule with no grounding in the statute or this Court's cases. The bankruptcy court finally held that it lacked even the most broadly available form of bankruptcy jurisdiction to enter §105(a) relief enjoining litigation against 3M—but only after applying an outdated test that this Court has rejected and failing to grapple with undisputed evidence.

The bankruptcy court's many errors make this a straightforward case for reversal. Continued CAEv2 litigation against 3M—in which Aearo's actions in designing, testing, manufacturing, and marketing the earplugs are front and center—will adversely affect Aearo and endanger the prospects of a prompt, successful reorganization. These are precisely the circumstances where the automatic stay applies or a preliminary injunction is warranted—either of which will increase the likelihood of a speedy reorganization benefiting all stakeholders, including every claimant entitled to compensation. Accordingly, the Court should reverse the bankruptcy court and stay or enjoin the CAEv2 litigation against 3M.

## JURISDICTIONAL STATEMENT

The bankruptcy court had jurisdiction over Aearo's Chapter 11 cases and this adversary proceeding under 28 U.S.C. §§1334 and 157. On August 26, 2022, the bankruptcy court entered an order denying Aearo's requested relief. SA.1.[1] On August 29, Aearo filed a timely notice of appeal, and on September 13, the bankruptcy court certified its order for direct appeal under 28 U.S.C. §158(d)(2). A.431. This Court authorized direct appeal on October 12. A.441. This Court has jurisdiction under 28 U.S.C. §158(d)(2).

## STATEMENT OF ISSUES

1.     Whether the bankruptcy court erred in concluding that the automatic stay of 11 U.S.C. §362(a)(1) categorically cannot apply to actions against a non-debtor, even when (1) there is such an identity between the non-debtor and the debtor that a judgment against the non-debtor would effectively be a judgment against the debtor, or (2) litigation against the non-debtor would cause the debtor irreparable harm.

---

[1]  "SA" refers to Aearo's short appendix; "A" refers to Aearo's separate appendix.

2.     Whether the bankruptcy court erred in concluding that the automatic stay of 11 U.S.C. §362(a)(3) does not apply to actions against a non-debtor resulting in diminishment of estate property provided the debtor can purportedly replenish those assets with other assets.

3.     Whether the bankruptcy court erred in concluding that courts lack "related to" bankruptcy jurisdiction to preliminarily enjoin a pending action under 11 U.S.C. §105(a) unless the debtor shows that continuation of the action will have an "actual economic effect" on the estate, rather than a "potential effect."

## STATEMENT OF THE CASE AND THE FACTS

### A.     Aearo, 3M, and CAEv2 Earplugs

Aearo has been based in Indianapolis for more than 40 years. SA.3.[2]    Aearo manufactures and sells noise, vibration, and shock protection solutions for various industries.    *Id.*   It has manufacturing facilities in Indianapolis, Delaware, and Mexico.  A.190 (60:17-22).  Aearo has approximately 330 employees and earned $108 million in sales in 2021.  SA.3.

---

[2] As noted, "Aearo" refers to all five appellants.  For clarity, this brief treats Aearo as a single entity, except where specifically noted.

In the late 1990s, Aearo—working with the U.S. military—developed, tested, manufactured, and began marketing an earplug known as Combat Arms Earplugs version 2 ("CAEv2"). *Id.* Aearo began selling the CAEv2 earplugs in 2000, including to the military. SA.3-4.

3M is a multinational technology and manufacturing company. SA.4. 3M acquired Aearo through a stock purchase in April 2008—after Aearo and the military developed the CAEv2 earplugs and almost a decade after their introduction into the marketplace. *Id.* Within 3M's corporate structure, the five Aearo entities are limited liability companies. A.303; A.322; A.341; A.360; A.380; A.400. The sole member of each LLC is the LLC above it, with 3M at the top:



A.423.   Each Aearo LLC agreement contains an indemnification provision defining "Covered Person" to include the LLC's member and providing that "a Covered Person shall be entitled to indemnification from the [LLC] for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the [LLC] and in a manner reasonably believed to be within the scope of the authority conferred" by the LLC agreement.  A.194 (83:3-14), A.386-87.

On April 1, 2008, 3M and Aearo entered into a "Support Services Agreement" ("SSA") under which 3M provides, *inter alia*, legal, accounting, and insurance services to Aearo.  SA.4-5.  In 2010, Aearo transferred the CAEv2 business to 3M, and 3M continued selling CAEv2 earplugs until 2015.  SA.4.

Aearo and 3M share insurance coverage.  They are named insureds on dozens of insurance policies together providing over $1 billion in coverage.  SA.12.  The "3M Tower" policies provide $1.05 billion in coverage.  *Id.*  Both 3M and Aearo are named insureds under the 3M Tower; 3M is the primary insured, and Aearo is an additional insured.  *Id.*  The 3M Tower policies extend to any judgments, settlements, defense

costs, and other expenses relating to the defense and resolution of personal injury claims.  A.221 (225:2-16).  Separately, the "Aearo Legacy" policies provide $550 million in coverage.  SA.12.  Aearo is a named insured under the Aearo Legacy program, and an Aearo Legacy insurer has tendered payment to 3M for claims under the program.  *Id.*; A.240-41 (267:19-268:2); n.3, *infra*.

### B.     The CAEv2 Litigation

Since April 2019, Aearo and 3M have been co-defendants in a MDL in the Northern District of Florida involving claims that CAEv2 earplugs are defective.  *See In re Combat Arms Earplug Products Liability Litig.*, MDL No. 2885 (N.D. Fla.); SA.5.  This "epic" litigation is "the largest MDL in history by an order of magnitude," reaching over 290,000 claims and representing "a staggering 30% of cases currently pending in the federal district courts."  SA.5-6.  Another 2,000 claims are pending in Minnesota state court.  SA.5.  The MDL and the Minnesota litigation are together referred to as the "CAEv2 litigation" or the "CAEv2 claims."

The alleged CAEv2 design flaws at issue in the CAEv2 litigation "date to a period prior to 3M's acquisition of Aearo."  SA.6.  The CAEv2's design did not change after 3M's acquisition of Aearo, A.251 (110:16-18),

and the cornerstone of every trial has been an exhibit referred to as the "Flange Report"—a July 2000 internal Aearo report purportedly indicating that Aearo concealed certain CAEv2 defects, A.116-129 (Nos. 67-99). Nevertheless, MDL plaintiffs have consistently argued that, although there are multiple defendants, "they're all one and the same." A.106-07 (No. 40); *see also* A.107-08, 110 (Nos. 41, 43, 49). Likewise, the MDL court has instructed juries that although plaintiffs have "sued several defendants," the court would "collectively refer to the defendants as" a single entity. A.110 (No. 51). And "most … of the claims filed" assert that Aearo and 3M are jointly and severally liable for CAEv2 claims. SA.5-6.

In 2019, 3M provided notice of the CAEv2 claims to the 3M Tower and Aearo Legacy insurers. SA.12. There are no other claims or demands pending against those policies, and no insurer is denying coverage for the CAEv2 litigation. A.229, 233 (239:5-12, 246:12-16). 3M will continue to pursue coverage under these policies as long as the CAEv2 litigation continues. A.235-36 (248:23-249:1-14).[3]

---

[3] Thus far, one insurer has tendered payment. In February 2022, an Aearo Legacy insurer issued four $1 million checks to 3M as partial payment to 3M of a trial verdict. SA.12; A.240 (267:19-268:2). 3M and

Soon after the MDL's establishment, the MDL court ordered bellwether trials in hopes of valuing the plaintiffs' claims and facilitating a global settlement. SA.6. But by July 2022, the 27 cases selected had produced highly divergent results. Eight cases were dismissed before trial. *Id.* Six trials ended with complete defense verdicts, despite defendants' being precluded from mounting critical defenses. *Id.* The remaining ten trials (for 12 claimants) ended with plaintiff's verdicts, with awards ranging from $1.7 million to as high as $77.5 million to a single plaintiff. *Id.*; A.225 (231:3-5). At least ten appeals are pending in the Eleventh Circuit. SA.6.

Nearly 1,600 additional cases grouped into four "waves" are currently subject to discovery orders in preparation for trials on remand. A.444; SA.6. Eventually, as the MDL court observed, each of the nation's 94 federal districts will face an average of "approximately 2,500 cases" remanded for trial. A.159-60 (No. 168). The "amount of judicial resources required to handle this number of cases is staggering," and it is "likely no district will be spared the burden." *Id.*

---

the insurer are disputing the amount, so these checks have not yet been deposited. SA.12-13; A.235, 242-43 (248:9-11, 269:22-270:5).

## C.    Aearo's Chapter 11 Petition

Given the lack of clarity provided by the bellwether process, as well as the significant burden, uncertainty, and anticipated duration of the hundreds of thousands of remaining cases, Aearo—which designed and tested the CAEv2 earplugs, made key early decisions challenged by plaintiffs, and sold about 80% of the earplugs before 3M acquired it—concluded that continued litigation could not bring an efficient, equitable, or expeditious resolution to the CAEv2 claims asserted against it.  A.420; A.255-56 (114:17-115:1).    Accordingly, Aearo filed for Chapter 11 protection on July 26, 2022.  SA.3, 5.

Shortly before filing for Chapter 11 protection, Aearo negotiated and executed an agreement with 3M to obtain financing to fund the Chapter 11 process, including professional fees and a claims trust for CAEv2 claims (the "Funding Agreement").  SA.7-9.   The Funding Agreement was negotiated by two disinterested, independent directors on Aearo's board of directors, Jeffrey Stein and Roger Meltzer.  SA.7. Negotiations between Aearo's independent directors and 3M were "vigorous" and resulted in a number of "significant concessions" for Aearo from 3M.  SA.7-8.  Aearo's independent directors approved the Funding

Agreement on July 23, 2022, and Aearo and 3M executed it on July 25, 2022. SA.9.

Under the Funding Agreement, 3M agreed, upon Aearo's exhaustion of its own cash and the satisfaction of certain other conditions, to fund Aearo's operating and administrative costs during the Chapter 11 process and, upon confirmation of a reorganization plan, to contribute to a trust to fund payments to claimants. *Id.* More specifically, 3M committed $1.24 billion to satisfy a "funding request" by Aearo for a "permitted funding use," which included Aearo's operations and costs associated with administering the Chapter 11 cases and establishing one or more trusts, provided Aearo had already expended its own assets, such as cash reserves and insurance payments, to satisfy those amounts. SA.8-9, 11; A.278, 281-82, 284; A.211-14 (114:7-117:16); A.265 (239:2-17). 3M committed to satisfying any funding request even if the $1.24 billion commitment were exceeded, making its funding commitment "uncapped." SA.8-9; A.278, 282. In exchange, Aearo agreed to indemnify 3M for losses related to the CAEv2 litigation. SA.9; A.276, 285. Aearo can make a funding request to satisfy payment of an indemnification obligation owed to 3M, and Aearo is not obligated to

repay any funding received from 3M.  SA.9-10; A.282, 285.  3M also agreed to continue providing services to Aearo pursuant to the SSA. A.289-90.

### D.  Aearo's Motion to Stay or Enjoin the CAEv2 Litigation and the Bankruptcy Court's Decision

On the same day that Aearo sought Chapter 11 protection, it filed an adversary complaint and motion in the bankruptcy court seeking (1) a determination that the automatic stay of 11 U.S.C. §362(a)(1) and §362(a)(3) applies to CAEv2 claims against 3M; or (2) a preliminary injunction under 11 U.S.C. §105(a) enjoining continued prosecution of CAEv2 claims against 3M during the Chapter 11 cases.  SA.13. Numerous law firms representing CAEv2 plaintiffs objected, and the bankruptcy court held an evidentiary hearing from August 15-17, 2022. SA.2.

The bankruptcy court denied Aearo's motion.  At the outset, the court observed that the Aearo entities "are appropriate debtors with cognizable liabilities under the Bankruptcy Code."  SA.17.  The Aearo entities have "operat[ed] in Indiana" both "currently" and "historically," and had been "named as defendants in most, if not nearly all, of the Pending Actions for their role in designing, manufacturing and selling

13

the CAEv2 both prior to and after their purchase by 3M." SA.16-17. Thus, the court stated, "this Court has jurisdiction to at least consider whether an injunction of the Pending Actions … is necessary or appropriate." SA.17.

Nonetheless, the bankruptcy court rejected Aearo's request for §362(a)(1), §362(a)(3), and §105(a) relief vis-à-vis 3M. The court first held that it was "reluctant to conclude" that §362(a)(1) has "any direct applicability—at least within governing Seventh Circuit law—to non-debtors." SA.19-20. The court acknowledged "ample case law holding otherwise," and it cited numerous decisions—including the Fourth Circuit's seminal decision in *In re A.H. Robins Co., Inc.*, 788 F.2d 994 (4th Cir. 1986)—concluding that §362(a)(1) can apply to non-debtors if (1) "there is such identity between the debtor and third-party defendant where a judgment against the third-party defendant will in effect be a judgment against the debtor"; or (2) "the pending litigation, though not brought against the debtor, would cause the debtor irreparable harm." SA.20.

In the court's view, however, this Court has not yet adopted the approach endorsed by *Robins* and numerous other courts. SA.21. And

14

"[w]ithout more explicit guidance from the Seventh Circuit," the court declined to adopt that approach itself.  SA.22.  On that basis alone, the bankruptcy court refused to apply §362(a)(1)'s automatic stay to CAEv2 claims against 3M.  *Id.*

Next, the bankruptcy court declined to apply the automatic stay to CAEv2 claims against 3M under §362(a)(3).  The bankruptcy court acknowledged that §362(a)(3) applies "to the extent [a] non-debtor third party seeks to exercise control over property of a debtor's estate."  SA.22-23.  It observed that Aearo's contention that its insurance policies are estate property is "in line with Seventh Circuit caselaw."  SA.23-24.  And it noted that 3M "will seek reimbursement from" those same policies if judgments are "entered against it and Aearo in the Pending Actions."  SA.24.

Nevertheless, without denying that CAEv2 litigation against 3M would deplete Aearo's insurance policies, the bankruptcy court declined to apply §362(a)(3).  Construing this Court's cases as requiring "a pecuniary effect on the estate," the court held that §362(a)(3) did not apply because "3M will fully fund any liability incurred by Aearo relating to the [CAEv2 claims] pursuant to the Funding Agreement."  SA.25-26.

Because "the Funding Agreement operates as a complete, uncapped backstop to the insurance policies," the court concluded, "tapping the insurance policies to cover" 3M's liabilities in the CAEv2 litigation "does not affect the amount of money Aearo can pay its creditors," defeating §362(a)(3)'s application.  SA.26.

Finally, the bankruptcy court determined that it lacked jurisdiction to preliminarily enjoin CAEv2 claims against 3M under §105(a)—despite earlier stating that it "has jurisdiction to … consider whether an injunction of the Pending Actions is necessary or appropriate" under §105(a), SA.17, and even though some objecting parties had conceded that the court "absolutely" had "related to" jurisdiction under 28 U.S.C. §1334(b), A.272 (233:14-20).  The court based its conclusion on its belief that, contrary to nine other courts of appeals, this Court has adopted a "more constrained approach" to "related to" bankruptcy jurisdiction that requires an "*actual* economic effect" on the estate.  SA.32 (court's emphasis).

The court acknowledged that, even under that "limited view" of "related to" jurisdiction, "common sense would seem to readily support" jurisdiction to enjoin the CAEv2 claims.  SA.30.  But because 3M agreed

to fund Aearo's liabilities on an uncapped basis, the court determined that litigation against 3M would not "affect the amount of property for distribution or the allocation of property among creditors." SA.32. The court conceded that "[a] number of other courts have extended the stay notwithstanding the existence of an uncapped funding agreement," but it could not "follow suit" given what it viewed as this Court's uniquely restrictive approach to "related to" jurisdiction focusing on the "*actual* economic effect" on Aearo's estate. *Id.*

The court further recognized that, even under its constrained approach, 3M's inability "to honor its commitment under the Funding Agreement" would produce an "actual economic effect" justifying "related to" jurisdiction. SA.33. But the court declined to recognize evidence to that end. It ignored Stein's testimony that *none* of Aearo's funding resources—its own cash flow, its insurance policies, or 3M's commitment under the Funding Agreement—is "riskless." A.265-66 (239:5-240:14). The court also acknowledged that if 3M's liability for the CAEv2 litigation were sufficiently large, "continuation of the [CAEv2 litigation] as to 3M would have a significant, if not disastrous, effect on Aearo's bankruptcy, notwithstanding 3M's commitment under the Funding Agreement."

17

SA.33. Nevertheless, based on its "determination of subject matter jurisdiction," the court declined to enter §105(a) relief. SA.36.

In the end, the bankruptcy court refused to stay or preliminarily enjoin CAEv2 litigation against 3M despite "resounding[ly]" agreeing that such relief could help facilitate a "global settlement" of CAEv2 claims and that "the Bankruptcy Code provide[s] certain tools that Aearo and 3M will lack outside of bankruptcy." SA.36. The court certified its order for direct review by this Court under 28 U.S.C. §158(d)(2), and this Court accepted the appeal. A.431; A.441.

### E.    Subsequent Events in the CAEv2 Litigation

Following the bankruptcy court's order, CAEv2 litigation against 3M moved forward. The continued proceedings have consumed 3M's resources, increased Aearo's indemnification obligations, enhanced the likelihood of depleting Aearo's insurance, and forced Aearo and 3M (and plaintiffs) to divide their attention between two forums and two ongoing litigations over the same issues. Among other things:

- While the hearing in this case was ongoing, the MDL court issued an order enjoining 3M from "supporting … any collateral attack on [the MDL court's] orders by any other parties in any forum," including the bankruptcy court, prompting 3M to seek an emergency stay from the court and the Eleventh Circuit. A.183. The Eleventh Circuit granted the stay, and 3M recently

completed briefing on the merits. *See 3M Co. v. Valle*, No. 22-12796-A (11th Cir.).

- The MDL court ordered 3M to file answers to *all* short-form complaints in "wave" cases within fourteen days. A.438.

- Plaintiffs and 3M briefed plaintiffs' omnibus motion for summary judgment that 3M is estopped from disclaiming full and independent liability for CAEv2-related injuries. The MDL court has indicated that it will certify its decision for immediate Eleventh Circuit review. A.446.

- The MDL court scheduled the next bellwether trial to begin February 13, 2023. A.439.

- In late October, the MDL court *sua sponte* ordered a stay of all "wave" cases, but allowed individual "wave" plaintiffs to move to lift the stay. A.446. It is unclear whether the stay applies to the February bellwether trial.

- The first trial in the Minnesota litigation is scheduled to begin on January 23, 2023. A.443.

In the meantime, as of October 27, 2022, more than 9,000 *new* plaintiffs had filed CAEv2 claims against only 3M. A.444.

As the MDL court recently put it, these and other litigation proceedings have consumed "incalculable time and resources" of the parties. A.445. Even the bankruptcy court, less than a month after denying Aearo's requested relief, acknowledged the "horrible limbo" facing Aearo due to continuation of the CAEv2 litigation against 3M. A.428-29.

## SUMMARY OF ARGUMENT

Like many similarly situated parties before it, Aearo sought Chapter 11 protection to seek to efficiently and equitably resolve an unmanageable number of tort claims asserted against it—including some 290,000 claims in the largest MDL ever—through a reorganization plan that ensures compensation to claimants entitled to payment. Staying or enjoining continued prosecution of those same claims against 3M during the Chapter 11 proceedings promotes that salutary objective by preserving Aearo's estate for the benefit of those claimants—which is precisely why courts regularly stay or enjoin litigation against non-debtor parents and affiliates in mass-tort restructurings. The bankruptcy court's anomalous decision that CAEv2 litigation against 3M must nevertheless proceed is based on multiple legal errors, any one of which justifies reversal.

**I.** The bankruptcy court first erred when it failed to apply the automatic stay of 11 U.S.C. §362(a)(1) to the CAEv2 claims against 3M. Although §362(a)(1) typically applies only to claims against a debtor, numerous courts of appeals have acknowledged that §362(a)(1) can apply to claims against a non-debtor in certain circumstances. This Court is no

exception. It has recognized that §362(a)(1) can apply to a non-debtor when (1) there is such an identity between the non-debtor and the debtor that a judgment against the non-debtor would effectively be a judgment against the debtor, or (2) litigation against the non-debtor would cause the debtor irreparable harm. The bankruptcy court, however, disregarded this case law, refusing to accept that §362(a)(1) could *ever* apply to non-debtors absent "more explicit guidance from the Seventh Circuit." But this Court has already provided that guidance, which the bankruptcy court should have heeded. And even if the Court's prior discussion of §362(a)(1)'s applicability to non-debtors were insufficiently clear, this Court should clarify it and apply it here.

Doing so yields the straightforward conclusion that §362(a)(1) applies to stay the CAEv2 litigation against 3M. There is an overwhelming commonality of interests between Aearo and 3M with respect to the CAEv2 litigation. The CAEv2 claimants assert identical claims against Aearo and 3M using the same evidence, arguments, and theories; indeed, a claim against 3M turns almost entirely on Aearo's alleged acts or omissions concerning the design, testing, and manufacturing of the earplugs and their instructions for use. Continued

litigation against 3M also creates a risk of issue preclusion, claim preclusion, or evidentiary record taint against Aearo. Moreover, Aearo is obligated to indemnify 3M for any CAEv2-related losses, which is the prototypical scenario warranting application of §362(a)(1) to a non-debtor. For substantially the same reasons, continued CAEv2 litigation against 3M will irreparably harm Aearo and its ability to formulate an acceptable reorganization plan, likewise justifying a stay under §362(a)(1).

**II.**  The bankruptcy court independently erred when it failed to apply the automatic stay of §362(a)(3) to the CAEv2 claims against 3M. Section 362(a)(3) broadly prohibits any act that seeks to "obtain possession of" or "exercise control over" estate property. This Court has held that insurance policies are estate property, and therefore any action where the judgment may diminish that asset is subject to a stay under §362(a)(3). Here, Aearo and 3M share insurance policies that cover judgments, settlements, and defense costs in CAEv2 litigation. Undisputed testimony established that, if the CAEv2 litigation continues, 3M will continue to pursue coverage and payment under those

policies, thus diminishing Aearo's estate property. Consequently, §362(a)(3) applies to the CAEv2 litigation.

The bankruptcy court nonetheless held that §362(a)(3) was not triggered here because, under the Funding Agreement, 3M will fund any shortfall incurred by Aearo, including any depletions in insurance coverage. But neither the statute nor this Court's cases support the proposition that §362(a)(3) cannot apply to a conceded diminishment of estate property as long as the debtor can seek access to *another* asset to make up for that depletion. That interpretation would turn what is supposed to be an easily administrable application of the automatic stay into a cumbersome inquiry implicating other estate property, asset liquidity, and additional funding sources. The court's reasoning is especially inapposite here, given uncontroverted testimony that none of Aearo's funding sources, including 3M's funding, is riskless.

III.    Finally, the bankruptcy court erred when it failed to preliminarily enjoin the CAEv2 litigation against 3M under §105(a). Section 105(a) is a broad grant of equitable power, and bankruptcy courts regularly invoke §105(a) to enjoin litigation against non-debtors while Chapter 11 proceedings are pending, especially in the mass-tort context.

23

Section 105(a) relief is readily warranted here under the principles this Court has articulated for enjoining proceedings in other courts. First, continued CAEv2 litigation against 3M will defeat or impair the bankruptcy court's jurisdiction given the intertwined nature of CAEv2 claims against 3M and Aearo, their shared insurance policies, Aearo's indemnification obligations to 3M, the preclusion and evidentiary risk to Aearo, and the distraction that the ongoing CAEv2 litigation presents to Aearo's restructuring. Second, Aearo has shown a reasonable likelihood of a successful reorganization. And third, a preliminary injunction will not harm the public interest, but instead will promote the public interest in successful reorganizations and in prompt and equitable compensation to affected claimants.

The bankruptcy court ignored all of the foregoing and held that it lacked jurisdiction to issue §105(a) relief. But the court's analysis was flawed throughout. This Court has held that a court has "related to" bankruptcy jurisdiction if a dispute has a "potential effect" on the amount of estate property available for distribution or the allocation of property among creditors. The bankruptcy court, however, applied an outdated and concededly more constrained test requiring an "actual economic

effect" on the estate—even citing that rejected test as the reason it would not follow other decisions applying §105(a) in similar circumstances. The court's reasoning was also flawed on its own terms. The court concluded that the Funding Agreement defeats jurisdiction, but it is undisputed that Aearo must deplete its assets before receiving funding, which unquestionably affects the amount of estate property or its allocation. And as the evidence showed, 3M's payment obligations under the Funding Agreement are neither guaranteed nor free from conditions. Yet the bankruptcy court disregarded that evidence—except to acknowledge that, if it ultimately proved true, jurisdiction would be secure. That reasoning only reinforces that Aearo satisfied the "potential effect" test for jurisdiction, confirming the bankruptcy court's error and underscoring the need for reversal.

## STANDARD OF REVIEW

The Court reviews the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. *See In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015). The "scope of the automatic stay" under 11 U.S.C. §362(a) "is a question of law subject to de novo review." *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 206 (2d Cir. 2014); *see In re Grede*

*Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011). A bankruptcy court's denial of §105(a) injunctive relief is reviewed for abuse of discretion. *See In re Rimsat, Ltd.*, 212 F.3d 1039, 1049 (7th Cir. 2000). A court abuses its discretion when "it commits an error of law or makes a clearly erroneous finding of fact." *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 892 (7th Cir. 2012).

## ARGUMENT

## I. Section 362(a)(1)'s Automatic Stay Applies To The CAEv2 Litigation Against 3M.

The bankruptcy court refused to apply the automatic stay of 11 U.S.C. §362(a)(1) to the CAEv2 claims against 3M for one reason: In its view, §362(a)(1) is categorically inapplicable to claims against non-debtors. SA.20. That determination was erroneous. This Court, along with numerous other courts, has recognized that §362(a)(1) can apply to claims against non-debtors in certain circumstances. Those circumstances, moreover, are readily satisfied here, warranting application of §362(a)(1)'s stay to the CAEv2 claims against 3M.

### A. Section 362(a)(1) Can Apply to Non-Debtors in Certain Circumstances.

**1.** The Bankruptcy Code's automatic stay is "one of the fundamental protections afforded to debtors by the bankruptcy laws."

*Grede Foundries*, 651 F.3d at 790.  The stay "serves the debtor's interests by protecting the estate from dismemberment." *City of Chicago v. Fulton*, 141 S.Ct. 585, 589 (2021).  In particular, by instituting a "breathing spell" to facilitate reorganization, *Kimbrell v. Brown*, 651 F.3d 752, 755 (7th Cir. 2011), the stay "prevent[s] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts," *Grede Foundries*, 651 F.3d at 790.

Under §362(a)(1), the automatic stay applies to the "commencement or continuation" of any "action or proceeding" that is "against the debtor" or seeks "to recover a claim against the debtor."  11 U.S.C. §362(a)(1).  Typically, only the debtor itself is protected by the stay.  *See Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983).  But courts have consistently recognized that §362(a)(1) can apply to non-debtors in certain circumstances.  The first court of appeals to adopt this principle was the Fourth Circuit.  In *Robins*, the court held that §362(a)(1) can apply to a non-debtor "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Robins,* 788

27

F.2d at 999. It then offered an "illustration of such a situation": a "suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id.* To "refuse application of the statutory stay in that case," the Fourth Circuit reasoned, "would defeat the very purpose and intent of the statute." *Id.* It explained further: "[W]here … a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code." *Id.* The Fourth Circuit proceeded to bar litigation against non-debtors who "were entitled to indemnification by the debtor." *Id.* at 1007.

Citing *Robins*, the Third Circuit has likewise recognized the principle of "appl[ying] the automatic stay protection to nondebtor third parties." *McCartney v. Integra National Bank North*, 106 F.3d 506, 510 (3d Cir. 1997). And it applied §362(a)(1)'s automatic stay to litigation against a non-debtor because the debtor "would have been liable for satisfying any deficiency judgment claim asserted" against the non-debtor. *Id.* at 511. Also citing *Robins*, the Fifth Circuit has repeatedly

recognized that §362(a)(1) can be applied to claims against non-debtors if there is an "identity of interests between the debtor and nondebtor," for example, by a "formal tie or contractual indemnification." *Reliant Energy Services, Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003); *accord Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001). The Second Circuit has held that §362(a)(1) "can apply to non-debtors … when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate," including "a claim to establish an obligation of which the debtor is a guarantor" or when there is sufficient identity of interests. *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003). Other circuits have followed suit. *See, e.g.*, *Ritchie Cap. Mgmt., L.L.C. v. Jeffries*, 653 F.3d 755, 762-63 (8th Cir. 2011); *Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141-42 (10th Cir. 1994).

This Court has joined that robust body of precedent recognizing §362(a)(1)'s application to claims against non-debtors in certain circumstances. In *In re Fernstrom Storage & Van Co.*, 938 F.2d 731 (7th Cir. 1991), the Court acknowledged the "general rule that the stay does not bar actions against" non-debtor third parties. *Id.* at 736. But, citing

*Robins*, it explained that there are "two exceptions to th[is] rule" that allow applying §362(a)(1)'s stay to litigation against third parties:

> The first is applicable where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." The second operates where the pending litigation, though not brought against the debtor, would cause the debtor, the bankruptcy estate, or the reorganization plan "irreparable harm."

*Id.* Subsequently, in *Fox Valley Construction Workers Fringe Benefit Funds v. Pride of the Fox Masonry & Expert Restorations*, 140 F.3d 661 (7th Cir. 1998), the Court observed that §362(a)(1)'s automatic stay "protects only the debtor, unless the debtor and some third party have such a similarity of interests that failure to protect the third party will mean that the assets of the debtor itself will fall into jeopardy." *Id.* at 666 (citing *Robins*, 788 F.2d at 999, 1001). In turn, lower courts have stated that this Court "is among the many circuits that have recognized" §362(a)(1)'s applicability to non-debtors. *Philadelphia Indem. Ins. Co. v. Specialty Contracting, Inc.*, 2019 WL 13210052, at *1 (S.D. Ill. Mar. 27, 2019); *see also, e.g.*, *Hamilton v. Am. Corrective Counseling Services, Inc.*, 2009 WL 973447, at *2 (N.D. Ind. Apr. 8, 2009); *Lee v. RCN Corp.*, 2004 WL 2108577, at *1 (N.D. Ill. Sept. 20, 2004).

**2.** The bankruptcy court nevertheless held that §362(a)(1) cannot apply to the CAEv2 litigation against non-debtor 3M because, in its view, this Court has not "expansively discussed or formally adopted" the *Robins* rationale or "actually extended the stay to a non-debtor party under that reasoning." SA.21. That conclusion is plainly wrong in light of *Fernstrom* and *Fox Valley*, where the Court recognized that §362(a)(1) can apply to non-debtors in certain circumstances. Merely because, on the specific facts of those cases, the Court declined to apply §362(a)(1)'s stay to the particular non-debtors there does not mean that the Court did not, as a matter of law, recognize §362(a)(1)'s potential applicability to non-debtors. And to the extent the bankruptcy court believed that the Court's §362(a)(1) discussion in *Fernstrom* and *Fox Valley* was merely dictum it could disregard, that reasoning is incorrect.

Dicta consist of "peripheral" statements that are "unnecessary to the outcome of" an appeal, *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988), or "stray rumination[s] on what the law would be in a hypothetical case," *Whetsel v. Network Prop. Services, LLC*, 246 F.3d 897, 903 (7th Cir. 2001). That does not describe the Court's §362(a)(1) analysis in *Fernstrom* or *Fox Valley*. Instead, the existence of exceptions

31

to the general (but non-categorical) rule against applying §362(a)(1) to non-debtors was part and parcel of the legal rule that this Court applied in both cases. In *Fernstrom*, the Court devoted three paragraphs to addressing the appellant's argument that the automatic stay should apply to a non-debtor. The Court invoked the *Robins* framework by name, explicitly referenced "two exceptions" allowing stays of "suits against third parties," and applied that reasoning to determine that a stay was not warranted there. *Fernstrom,* 938 F.3d at 736. Likewise, in *Fox Valley*, the Court cited *Robins* specifically, set forth the "similarity of interests" rule allowing §362(a)(1)'s application to non-debtors, and concluded there was "no similarity of interests" on the facts before it because the non-debtor had "no financial or ownership relationship" with the debtors. *Fox Valley,* 140 F.3d at 666.

In both cases, the Court's finding that exceptions to the (non-categorical) general rule were not present was an integral part of its decision affirming the lower court. In both cases, moreover, the appellant's argument was "presented as an issue" and "grounded in the facts of the case," *Crawley*, 837 F.2d at 293, further distinguishing the

Court's discussion from "language in passing" that "does not establish the law of the Circuit."[4]

In short, on two separate occasions, this Court has clearly recognized that §362(a)(1) can apply to non-debtors in specified circumstances and proceeded to determine whether those circumstances were present. The bankruptcy court should have followed suit, acknowledging §362(a)(1)'s potential applicability and determining whether §362(a)(1) applies here based on the facts of this case. *See, e.g., Hart v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 360 F.3d 674, 680 (7th Cir. 2004) (requiring lower court to follow "binding precedent from its own circuit").

Even if the discussion in *Fernstrom* and *Fox Valley* were dictum, however, it is correct. Thus, to the extent there is any "lingering uncertainty," *Roadway Exp., Inc. v. U.S. Dept. of Labor*, 612 F.3d 660, 665 (7th Cir. 2010), the Court can "formalize what is evident in" *Fernstrom* and *Fox Valley* and "make clear" §362(a)(1)'s applicability to

---

[4] Indeed, this Court has recognized that even where a decision addresses "a factual scenario that was not before" the court, that does not render that analysis dicta, because a case's "holding" also includes its "rationale." *Savory v. Cannon*, 947 F.3d 409, 422 (7th Cir. 2020).

non-debtors that it has previously recognized, *Herrera v. Wyoming*, 139 S.Ct. 1686, 1697 (2019).  Categorically refusing to apply §362(a)(1) to non-debtors would not only set this Court apart from its sister circuits but also contravene the statute's language and purpose.

Section 362(a)(1) applies the automatic stay to two distinct situations: a suit "against the debtor" *or* a suit seeking "to recover a claim against the debtor."  11 U.S.C. § 362(a)(1).  That second clause "must encompass cases in which the debtor is not a defendant" because "it would otherwise be totally duplicative of the former category and pure surplusage." *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992); *see also In re Koeberer*, 632 B.R. 680, 688 n.3 (B.A.P. 9th Cir. 2021).  And where there is sufficient "identity" between a debtor and non-debtor, declining to apply the stay "would defeat the very purpose and intent of the statute," because a plaintiff litigating against the third party would be pursuing "indirectly what is expressly prohibited in the Code." *Robins*, 788 F.2d at 999.  Similarly, given Chapter 11's "goal of encouraging reorganizations," *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983), pending litigation against non-debtors that causes the debtor, estate, or potential reorganization plan "irreparable harm" is properly

34

stayed. Accordingly, even if the Court did not already recognize in *Fernstrom* and *Fox Valley* the circumstances in which §362(a)(1) is applicable to non-debtors, it can and should do so now.

## B. Under the Circumstances Here, Section 362(a)(1) Applies to the CAEv2 Litigation Against 3M.

Applying the reasoning of *Fernstrom* and *Fox Valley* (and other courts of appeals) to the undisputed facts yields a straightforward conclusion: §362(a)(1) applies to the CAEv2 litigation against 3M. The circumstances readily demonstrate that there is "such identity between" Aearo and 3M that Aearo "may be said to be the real party defendant" in the CAEv2 litigation, so that "a judgment against" 3M in that litigation "will in effect be a judgment or finding against" Aearo. *Fernstrom*, 938 F.2d at 736 (quoting *Robins*, 788 F.2d at 999).

To determine if there is a sufficient "identity of interest" between a debtor and non-debtor, courts have examined factors including (1) whether the claims against the non-debtor are inextricably intertwined with claims against the debtor; (2) whether litigation against the non-debtor risks preclusion or evidentiary concerns for the debtor; and, especially, (3) whether litigation against the non-debtor triggers the debtor's indemnification obligations. By themselves, each of these

35

considerations supports the conclusion that Aearo "may be said to be the real party defendant" in the CAEv2 litigation, thus warranting application of the automatic stay to CAEv2 claims against non-debtor 3M. Together, they compel that determination. For the same reasons, further prosecution of the CAEv2 claims against 3M will inflict irreparable harm upon Aearo, independently justifying application of §362(a)(1) under *Fernstrom*.

1. There can be no serious question that a CAEv2 suit against 3M is effectively a CAEv2 suit against Aearo, such that a judgment against 3M is invariably "a judgment or finding against" Aearo. *Fernstrom*, 938 F.2d at 736. The CAEv2 claims against 3M "involve the same products, same time periods, same alleged injuries, and same evidence as" the CAEv2 claims against Aearo. *In re LTL Mgmt.*, 638 B.R. 291, 306 (Bankr. D.N.J. 2022). It is undisputed that Aearo, not 3M, working with the U.S. military, designed the CAEv2 earplugs, tested the earplugs, manufactured the earplugs, and devised the earplugs' instructions—all actions that CAEv2 plaintiffs have alleged are faulty—not to mention sold most of the earplugs (approximately 80% of all sales). *See* A.420; A.255-56 (114:17-115:1). A claim against 3M over alleged injuries caused

by the CAEv2 earplugs turns on what Aearo did or did not do with respect to designing, testing, and manufacturing the earplugs and providing instructions for their use. Indeed, the cornerstone of the CAEv2 plaintiffs' case in every bellwether trial has been the "Flange Report," a 2000 report *by Aearo* allegedly indicating that Aearo concealed certain CAEv2 defects. *See* A.116-29 (Nos. 67-99). Thus even if CAEv2 claims were to proceed only against 3M, Aearo nevertheless "may be said to be the real party defendant" in such claims. *Fernstrom*, 938 F.2d at 736.

Confirming the point, the CAEv2 plaintiffs have never distinguished between Aearo and 3M in the hundreds of thousands of cases filed as of the petition date naming the companies as defendants. To the contrary, in every bellwether case, the plaintiffs asserted claims against both Aearo and 3M—regardless of whether the plaintiff used the CAEv2 earplug *before* Aearo was acquired by 3M, *after* Aearo was acquired by 3M, or both. *See* A.102 (No. 27). Plaintiffs have also repeatedly argued to the jury that although Aearo and 3M are different entities, "for purposes of this case, they're all one and the same." A.107 (No. 41); *see* pp.8-9, *supra*. And they have consistently asserted the same claims using the same evidence, arguments, and theories that turn on

37

Aearo's conduct, including the Flange Report. *See* A.102 (No. 27) (plaintiffs asserting in MDL that, across all initial bellwether trials, "the same 'web' of conduct—the creation of the CAEv2, its inherently unsafe nature, its manufacture, and its promotion and sale through ongoing misrepresentations and omissions … will be at issue").

In sum, to the extent CAEv2 claims proceed against just 3M, "almost all" of those claims, "if not all of them, relate to [Aearo's] operations." *LTL*, 638 B.R. at 305-06. The identity of interests between 3M and Aearo with respect to CAEv2 claims thus makes this a textbook case for applying §362(a)(1)'s automatic stay to CAEv2 claims against 3M. Where, as here, a debtor and non-debtor are "being sued on, effectively, the same products" over "the same time periods," and there is essentially no "scenario where [the non-debtor] would have liability without some action or inaction by [the debtor] also forming the basis as a cause of action," courts have not hesitated to find an "identity of interest" supporting application of §362(a)(1)'s automatic stay to the non-debtor in order to protect the debtor's interest. *Id.* at 305, 306; *see also In re Aldrich Pump LLC*, 2021 WL 3729335, at *31 (W.D.N.C. Aug. 23, 2021) (emphasizing that litigating claims against non-debtors "would

effectively liquidate claims against the Debtor"); *In re DBMP LLC*, 2021 WL 3552350, at \*27 (Bankr. W.D.N.C. Aug. 11, 2021) (same); *Walter J. Raudonis 2016 Revocable Tr. v. RealtyShares, Inc.*, 507 F.Supp.3d 378, 383 (D. Mass. 2020) (stay appropriate where "operations and alleged malfeasance of the defendants were interrelated, intertwined and intermingled"); *F.M. v. Walden*, 2013 WL 8481607, at \*5 (D.N.M. Aug. 6, 2013); *Hetherington v. Dawn's Dreams of Wellness Co., Inc.*, 2011 WL 13298567, at \*2 (M.D. Fla. Sept. 27, 2011).  The same result should follow here.

**2.**  Similarly, a sufficient identity of interest exists where litigation against the non-debtor could bind the debtor through issue preclusion (collateral estoppel) or claim preclusion (res judicata), or otherwise harm the debtor through "record taint."  *LTL*, 638 B.R. at 317.  That is so because findings or judgments in a case against a non-debtor could well have preclusive effects in cases against the debtor—or, at least, "continued litigation could create an evidentiary record that would negatively impact subsequent litigation."  *Id.*  To protect against that risk, the debtor would have to actively involve itself in, and defend against, the litigation against the non-debtor.  Because that would defeat

the "very purpose and intent of" the automatic stay, §362(a)(1) covers claims against the non-debtor in such circumstances. *Robins*, 788 F.2d at 999; *see also LTL*, 638 B.R. at 316 (applying stay where "there *exists a risk* that the doctrine of res judicata could adversely impact Debtor in future litigation"); *Aldrich Pump*, 2021 WL 3729335, at *31 (stay applies where "[t]here is even an outside risk that such litigation could bind the Debtors through res judicata and collateral estoppel"); *cf. In re W.R. Grace & Co.*, 115 F.App'x. 565, 569-70 & n.4 (3d Cir. 2004) (holding that even "unclear" possibility of collateral estoppel warranted "preventing actions from proceeding against [non-debtor] third parties").

Given the overwhelming factual and legal overlap between the CAEv2 claims against Aearo and those against 3M, there is plainly at least a risk that any adverse rulings, findings, or other decisions against 3M in the CAEv2 litigation—which, as noted, largely turns on alleged acts or omissions by Aearo—will harm Aearo. CAEv2 claimants who never litigated their claims against Aearo could seek to establish liability against Aearo simply by pointing to a prior CAEv2 judgment against 3M. At a minimum, continued litigation of CAEv2 claims against 3M would generate record taint—*i.e.*, statements, testimony, and other evidence

that could be used against Aearo, including in the Chapter 11 proceedings. Aearo itself could guard against this possibility only by remaining actively involved in the CAEv2 litigation against 3M, which would undermine the point of the automatic stay and fail to give Aearo the "breathing spell" the stay affords. *Kimbrell*, 651 F.3d at 755. Applying the automatic stay to the CAEv2 claims against 3M prevents this result and promotes the congressional intent underlying the statute.

**3.** Finally, it is well-established that there is sufficient "identity between the debtor and the third-party defendant" to warrant §362(a)(1)'s application to claims against a non-debtor when the non-debtor "is entitled to absolute indemnity by the debtor on account of any judgment that might result against [it] in the case." *Robins*, 788 F.2d at 999. Indeed, that is the very "illustration" that *Robins* and other courts of appeals have cited as obviously justifying application of the stay to claims against non-debtors. *Id.*; *see also, e.g.*, *Arnold*, 278 F.3d at 436 (stating that "contractual indemnification" creates "identity of interests" to apply §362(a)(1) to "proceedings against nonbankrupt co-defendants"); *McCartney*, 106 F.3d at 511 (affirming stay as to non-debtor where debtor "would have been liable for satisfying any deficiency judgment claim

against" non-debtor); *cf. Victor J. Salgado & Assoc. Inc. v. Cestero-Lopategui*, 34 F.4th 49, 55 (1st Cir. 2022) (noting that in municipal bankruptcies, "courts have consistently found that mandatory indemnity policies were dispositive on the automatic stay issue").

In fact, even the "mere possibility of indemnification obligations warrants extension of the automatic stay." *LTL*, 638 B.R. at 312. As the Fourth Circuit explained in a post-*Robins* decision, it had authorized a stay under §362(a) in *Robins* "because [the non-debtor] *might* seek indemnification from [debtor] for any damages it had to pay." *In re A.H. Robins Co. Inc.*, 828 F.2d 1023, 1025 (4th Cir. 1987) (emphasis added). Thus the mere existence of an indemnification duty warrants application of the automatic stay to the triggering litigation. *See, e.g., Aldrich Pump*, 2021 WL 3729335, at *31 (applying stay to non-debtors where litigation "could potentially trigger indemnification rights"); *Edwards v. McElliotts Trucking, LLC*, 2017 WL 5559921, at *3 (S.D. W. Va. Nov. 17, 2017) (stay applies where "any judgment awarded against the non-debtor defendant would have entitled it to file a claim for indemnification"); *Gulfmark Offshore, Inc. v. Bender Shipbuilding & Repair Co.*, 2009 WL 2413664, at *3 (S.D. Ala. Aug. 3, 2009) (stay applied because judgment against non-

debtors "will be, in effect, a judgment against [debtor] by operation of the relevant indemnification provisions"); *In re W.R. Grace & Co.*, 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (stay applies based on indemnification duty); *see also Trimec, Inc. v. Zale Corp.*, 150 B.R. 685, 687 (N.D. Ill. 1993) (Williams, J.) (stay "clearly" applies where the debtor "would be bound by a judgment in this case" because it "agreed to indemnify the other defendants").

Here, it is undisputed that debtor Aearo is contractually obligated to indemnify non-debtor 3M for any liabilities that 3M incurs in connection with the CAEv2 claims. As the Funding Agreement specifies in a section entitled "Indemnification":

> <u>Earplug Liabilities</u>. The Aearo Entity Earplug Defendants shall and hereby agree to jointly and severally indemnify, defend and hold harmless the Payor [3M] and each of the Payor Affiliates … from and against, and pay and reimburse Payor (or the applicable Payor Affiliate) for any Losses incurred, sustained by or imposed on Payor or any Payor Affiliate arising out of, relating in any way to or in connection with any Earplug Liabilities[.]

A.285. The Funding Agreement defines "Losses" to mean "losses, damages, penalties, fines, judgments, awards, settlements, taxes, fees, costs, and expenses, including reasonable attorneys' fees[.]" A.280. Aearo's contractual indemnity obligations are automatic and mandatory;

according to undisputed testimony by one of Aearo's independent directors, 3M insisted upon them as a condition for providing funding for Aearo's Chapter 11 cases, in order to "enhance[]" Aearo's pre-existing indemnification obligations to 3M in the LLC agreements, *see* pp.6-7, *supra*, and make "as bullet proof as possible" Aearo's obligation to indemnify 3M for any CAEv2-related losses. A.260 (225:7-23). There has never been any dispute that, if 3M incurs any "loss" related to the CAEv2 claims, Aearo must pay 3M. That indemnification obligation seals the identity of interests between Aearo and 3M with respect to CAEv2 claims and confirms that "a judgment against [3M] will in effect be a judgment against" Aearo, warranting application of §362(a)(1) to the CAEv2 litigation against 3M.

**4.** For substantially the same reasons, applying §362(a)(1) to the CAEv2 claims against 3M is justified because that litigation is irreparably harming Aearo, its estate, and its potential reorganization plan. *Fernstrom*, 938 F.2d at 736. Because further prosecution of those claims will elevate the risk of preclusion and record taint, increase Aearo's indemnification obligations, and require further draws on 3M funding that is not guaranteed or free from conditions, *see* pp.52-53, 67,

*infra*, the litigation "will impair [Aearo's] ability to formulate a plan of reorganization" and its "ability to reorganize." *Fernstrom*, 938 F.2d at 736.

## II. Section 362(a)(3)'s Automatic Stay Applies To The CAEv2 Litigation Against 3M.

The CAEv2 claims against 3M are also automatically stayed by 11 U.S.C. §362(a)(3), which enjoins "any act … to exercise control over property of the estate." Insurance policies are property of a debtor's estate, and actions that threaten such property are subject to §362(a)(3). Aearo shares coverage under insurance policies with 3M, and if the CAEv2 litigation continues, 3M will continue to pursue coverage and payment under those policies, thus diminishing Aearo's estate property and triggering the automatic stay's application to those claims. The bankruptcy court's contrary conclusion again rested on a misreading of this Court's decisions.

### A. Section 362(a)(3) Stays the CAEv2 Litigation Against 3M Because 3M Will Pursue Coverage Under Insurance Policies Shared With Aearo That are Estate Property.

The filing of a Chapter 11 petition "creates an estate" comprising "all legal or equitable interests of the debtor in property," "wherever located and by whomever held." 11 U.S.C. §541(a)(1). Section 362(a)(3)

automatically stays "any act" to "obtain possession of property of … or … from the estate" or to "exercise control over property of the estate." *Id.* §362(a)(3). Section 362(a)(3) thus "reaches farther" than §362(a)(1) by focusing on a debtor's property, whether an action is against the debtor or a third party. *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708-09 (7th Cir. 1994).

The Bankruptcy Code defines estate property "very broadly," *In re Newman*, 903 F.2d 1150, 1152 (7th Cir. 1990), "pulling virtually all the debtor's property interests into the bankruptcy estate," *In re Prince*, 85 F.3d 314, 322 (7th Cir. 1996). Under this expansive definition, insurance policies and coverage are estate property. *See In re Stinnett*, 465 F.3d 309, 312 (7th Cir. 2006) (holding that "insurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate"); *Home Ins. Co. v. Cooper & Cooper Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989) ("A policy of insurance is an asset of the estate[.]"). And because an insurance policy is "valuable property of a debtor," "[a]ny action in which the judgment may diminish this 'important asset' is unquestionably subject to a stay" under §362(a)(3). *Robins*, 788 F.2d at

1001 (quoting *In re Johns Manville Corp.*, 33 B.R. 254, 261 (Bankr. S.D.N.Y. 1983)).

The undisputed facts demonstrate that judgments in the ongoing CAEv2 litigation against 3M "may diminish"—indeed, likely will diminish—Aearo's insurance coverage, warranting a stay of those claims under §362(a)(3). As explained, Aearo and 3M are named insureds on dozens of insurance policies with combined limits of over $1 billion. Those policies extend not only to any judgments but also to any settlements, defense costs, and other expenses relating to the defense and resolution of CAEv2 litigation. 3M has provided notice of the CAEv2 claims to the insurers, no insurer is denying coverage for the CAEv2 litigation (indeed, one Aearo Legacy insurer has already tendered payment to 3M for CAEv2-related claims), and uncontroverted testimony established that 3M will continue to pursue coverage under the shared insurance policies as long as the CAEv2 claims against it continue. *See* pp.7-9 & n.3, *supra*.

The "possession or control language of Section 362(a)(3)" has "consistently been interpreted to prevent acts that diminish future recoveries from a debtor's insurance policies." *ACandS, Inc. v. Travelers*

47

*Cas. & Sur. Co.*, 435 F.3d 252, 261 (3rd Cir. 2006) (Alito, J.). Given the foregoing, permitting CAEv2 litigation to proceed against 3M would "diminish" Aearo's "future recoveries" from its insurance policies. This is not a case where a party has stipulated that "potential recovery" would "not extend beyond the proceeds of [debtor's] insurance policies." *Fernstrom*, 938 F.2d at 736 (emphasis omitted). The automatic stay of §362(a)(3) thus applies. *See, e.g.*, *LTL*, 638 B.R. at 318 (applying §362(a)(3) to "suits … against additional insureds … that will undoubtedly deplete the insurance potentially available to Debtor"); *see also In re Prudential Lines Inc.*, 928 F.2d 565, 574 (2d Cir. 1991) ("[D]espite the fact that [non-debtor's] action is not directed specifically at [debtor], it is barred by the automatic stay as an attempt to exercise control over property of the estate.").

## B. The Bankruptcy Court's Contrary Determination Is Erroneous.

The bankruptcy court accepted every step in Aearo's argument except the conclusion. The court agreed that §362(a)(3) applies "to the extent that the non-debtor third party seeks to exercise control over property of a debtor's estate." SA.23. It recognized that the insurance policies shared by 3M and Aearo "are property of [Aearo's] estate." SA.12,

24. And it noted that 3M "will seek reimbursement from the policies to the extent that" judgments are entered against it in the CAEv2 litigation. SA.24.

Despite all that, the bankruptcy court deemed the depletion of Aearo's estate property irrelevant because the "heart" of the §362(a)(3) analysis, in its view, is "whether a third party's effort has a pecuniary effect on the estate." SA.25. Because 3M's Funding Agreement is uncapped and "3M will fully fund any liability incurred by Aearo" under that agreement, the court continued, "tapping the insurance policies"— even "exhausti[ng]" them—does not "affect the amount of money Aearo can pay its creditors," and thus §362(a)(3) is not triggered. SA.25-26. In other words, the bankruptcy court reasoned, even if a claim will unquestionably deplete an estate asset, §362(a)(3) does not apply so long as the debtor can seek access to *another* estate asset to make up for that depletion.

Nothing in §362(a)(3) supports that atextual and "cramped interpretation" of the statute. *In re Caesars Ent. Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015). The statute directs that the automatic stay applies to "any act … to exercise control over property of

49

the estate." 11 U.S.C. §362(a)(3). It does not remotely suggest that if another "act" might remedy the attempted "control over property of the estate"—like seeking access to an alternative asset to mitigate the property depletion—the stay does not apply. Nor would that construction make sense, as it would turn what is supposed to be a straightforward determination of whether there is an "effort to 'exercise control over property of the estate,'" *Havlik*, 20 F.3d at 708, into a protracted examination of other estate property, asset liquidity or collectability, additional funding sources, and anything else that might bear upon whether the conceded depletion of one estate asset could be alleviated by replenishing the estate with other assets. That searching inquiry is inconsistent with the statutory text and the need for administrability and clarity in often complex and fast-moving Chapter 11 cases. Put simply, Aearo's right to insurance proceeds is an asset of its estate, and its right to funding from 3M is a *separate* asset of the estate. Depletion of the former should not be disregarded for §362(a)(3) purposes just because of the latter.

Neither of this Court's decisions invoked by the bankruptcy court (*Stinnett* and *Havlik*) supports its conclusion that §362(a)(3) does not

apply if a debtor can access other assets to remediate depletion of estate property. *Stinnett* did not even involve §362(a)(3); it addressed whether certain disability insurance payments were "property of the bankruptcy estate." 465 F.3d at 312. The Court explained that insurance proceeds are estate property when "the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim," but not if they "cannot inure to the debtor's pecuniary benefit." *Id.* at 313. The Court concluded that the disability payments were estate property because they were "made payable to the debtor," who "had the right to receive and keep the proceeds of the policy[.]" *Id. Stinnett* is thus inapposite here except to confirm that the insurance policies shared by Aearo and 3M are Aearo estate property, since the proceeds on a claim by Aearo would be "payable to" Aearo, which has "the right to receive and keep the proceeds."

*Havlik* likewise does not support the bankruptcy court. That case did not concern insurance at all; it addressed a promise made by a partnership's general partners to provide funds for a housing development. When they failed to do so, two investors sought an injunction compelling payment, and the partners caused the partnership to file for Chapter 11 and seek application of §362(a)(3)'s automatic stay.

51

20 F.3d at 706. This Court held that §362(a)(3) applied because the provision "reaches farther" than other automatic-stay provisions, it encompasses "every effort" to "exercise control over property of the estate," and the general partners' promise—comprising "[t]he right to collect from the general partners"—constituted "property of the estate." *Id.* at 708. Addressing "[o]ne last issue," the Court separately determined that the district court possessed jurisdiction because "[t]his case is all about how much money will come into the debtor's coffers." *Id.* at 709. The bankruptcy court here cited that statement, *see* SA.25, but the *Havlik* Court was addressing jurisdiction, not §362(a)(3). Indeed, the bankruptcy court especially erred by construing the *Havlik* decision, which underscored the *breadth* of §362(a)(3), as *limiting* its applicability.

Regardless, the bankruptcy court's reasoning fails on its own terms. The court's conclusion that "tapping the insurance policies" does not "affect the amount of money Aearo can pay its creditors," because Aearo can always access 3M funding to mitigate any depletion in insurance proceeds, rests on the assumption that payment from 3M is 100% certain. But while 3M is certainly a creditworthy counterparty, undisputed testimony established that 3M's ability to pay under the Funding

Agreement is not risk-free, especially given the potential magnitude of the CAEv2 litigation. Stein testified that *none* of Aearo's funding sources—cash flow, insurance policies, or 3M funding—is "riskless," so a threat to any of them could affect the aggregate amount of funding available for Aearo. A.265-66 (239:5-240:14); p.17, *supra*. And though the likelihood of 3M's inability to fund the total amount of depleted insurance proceeds may be relatively low, the pertinent point is that Aearo's estate necessarily benefits from access to the insurance proceeds, because in a world where no funding source is risk-free, two funding sources are better than one. The bankruptcy court's decision ignores this economic reality and is thus wrong even under its erroneous view of the law.

## III. The CAEv2 Litigation Against 3M Should Be Enjoined Under 11 U.S.C. §105(a).

Even if neither §362(a)(1) nor §362(a)(3) applies, the bankruptcy court erred in declining to temporarily enjoin the CAEv2 litigation against 3M under 11 U.S.C. §105(a). The circumstances here readily warrant a preliminary injunction under §105(a), and the court's threshold reason for declining relief—lack of jurisdiction—is incorrect.

**A.  Courts Regularly Grant §105(a) Relief to Enjoin Litigation Against Non-Debtors Under the Circumstances Here.**

**1.**  Section 105(a) provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).  Section 105(a) is a "broad grant of power."  *Caesars*, 808 F.3d at 1188.  It "grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties."  *Id.*; *see In re Airadigm Commc'ns., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008) (§105(a) "codifies" the "traditionally broad" understanding of bankruptcy court's "equitable powers").

Among the "extensive equitable powers" granted under §105(a) is the authority to temporarily enjoin litigation against non-debtors.  *See, e.g.*, *Robins*, 788 F.2d at 1002 ("It has been repeatedly held that 11 U.S.C. §105 … 'empowers the bankruptcy court to enjoin parties other than the bankrupt' from commencing or continuing litigation.").  Courts regularly use §105(a) to enjoin litigation against non-debtors while Chapter 11 proceedings are pending, particularly in the mass-tort context.  For example, in *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012), Pfizer and its wholly owned subsidiary, Quigley, were named in thousands of asbestos-

related suits.   Quigley filed for Chapter 11 protection, and because continued litigation against non-debtor Pfizer would deplete insurance policies shared by Quigley and Pfizer, the bankruptcy court preliminarily enjoined "'all parties ... from taking any action in any and all pending or future Asbestos Related Claims against Pfizer during the pendency of Quigley's chapter 11 case.'"  *Id.* at 48.

Similarly, in *In re W.R. Grace & Co.*, 115 F.App'x 565 (3d Cir. 2004), after the debtor filed for Chapter 11 following thousands of suits, the bankruptcy court preliminarily enjoined all asbestos-related claims against non-debtor "affiliated entities."   *Id.* at 567.   Other recent examples abound in a variety of contexts.  *See, e.g., LTL*, 638 B.R. at 322; *Aldrich Pump*, 2021 WL 3729335, at *38; *In re Purdue Pharms. L.P.*, 619 B.R. 38, 42 (S.D.N.Y. 2020); *In re Bestwall LLC*, 606 B.R. 243, 246 (W.D.N.C. 2019); *In re USA Gymnastics*, No. 18-09108, Adv. No. 19-50075 (Dkt. 71) (Bankr. S.D. Ind. Apr. 22, 2019).

**2.**   This Court has held that a bankruptcy court "'can enjoin proceedings in other courts'" under §105(a) if the debtor shows that (1) "'such proceedings would defeat or impair [the bankruptcy court's] jurisdiction over the case before it'"; (2) there is a "likelihood of success

on the merits"; and (3) the "public interest" favors a preliminary injunction." *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (quoting *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993)); *see also In re Caesars Entm't Operating Co., Inc.*, 561 B.R. 441, 450 (Bankr. N.D. Ill. 2016) (describing and applying three-part test); *accord In re Gander Partners LLC*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010).  The debtor need not demonstrate an inadequate remedy at law or irreparable harm.  *Fisher*, 155 F.3d at 882.

Under those principles, the circumstances here justify a preliminary injunction prohibiting further CAEv2 litigation against 3M. *First*, continued CAEv2 litigation against 3M will "defeat or impair" the bankruptcy court's jurisdiction over Aearo's Chapter 11 case.  *Fisher*, 155 F.3d at 882.  In assessing this factor, courts consider, *inter alia*, whether there is any factual overlap with the claims against the debtor, *see, e.g.*, *Caesars*, 808 F.3d at 1189-90; the debtor and non-debtor share insurance, *see, e.g.*, *Quigley*, 676 F.3d at 58; *Robins*, 788 F.2d at 1008; *In re IFC Credit Corp.*, 422 B.R. 659, 663-65 (Bankr. N.D. Ill. 2010); the debtor must indemnify the non-debtor, *see, e.g.*, *In re Kmart Corp.*, 285 B.R. 679, 688 (Bankr. N.D. Ill. 2002); *In re Eagle-Picher Industries, Inc.*, 963 F.2d

855, 860 (6th Cir. 1992); litigation against the non-debtor risks preclusive effects against the debtor, *see, e.g.*, *W.R. Grace*, 115 F.App'x at 568-69; or the proceedings against the non-debtor would distract from the debtor's reorganization efforts, *see, e.g.*, *Kmart*, 285 B.R. at 689.

Each of these considerations supports a preliminary injunction. As explained, the CAEv2 claims against 3M are virtually identical to the CAEv2 claims against Aearo. Aearo and 3M share insurance policies. Aearo is contractually obligated to indemnify 3M for any losses relating to the CAEv2 litigation. There is a risk to Aearo of collateral estoppel, res judicata, or evidentiary record taint from the CAEv2 claims against 3M. *See* pp.36-44, 47, *supra*. And continued proceedings against 3M distract from Aearo's restructuring proceedings. Testimony established that critical 3M legal, insurance, and accounting executives who provide services to Aearo under the SSA "would be significant[ly] distracted" from assisting with Aearo's reorganization by the CAEv2 litigation against 3M. A.199-200, 203-4, 206-7 (102:15-103:5, 103:16-23, 106:23-107:1, 109:18-110:3). And that was *before* the deluge of recent MDL activity involving All Writs Act injunctions, omnibus summary judgment motions, and over *9,000* new claims. All parties, moreover—Aearo, 3M,

and plaintiffs—have had to divide their attention between two forums and two ongoing litigations over the same issues, as well as two parallel efforts to reach negotiated resolutions to the disputes. As the MDL court acknowledged, the MDL proceedings are consuming "incalculable time and resources," and even the bankruptcy court has acknowledged the "horrible limbo" facing Aearo as the CAEv2 litigation has continued. *See* pp.18-19, *supra*.[5]

Put simply, a §105(a) preliminary injunction "is likely to enhance the prospects for a successful resolution of the disputes attending [Aearo's] bankruptcy[,]" while "its denial will … endanger the success of the bankruptcy proceedings[.]" *In re Caesars*, 808 F.3d at 1188-89; *see* SA.36 (bankruptcy court "resounding[ly]" agreeing that injunction would facilitate "global settlement"). The first factor is thus readily satisfied.

---

[5] The bankruptcy court downplayed any "distraction" to 3M personnel because there is "no evidence" they have "been unable to perform" under the SSA. SA.34-35. But the bankruptcy court asked and answered the wrong question. It is not whether 3M personnel are "unable to perform" their duties. It is whether, as testimony established, the largest MDL in history—with litigation events that are exceptional even by large-MDL standards—has distracted them from assisting with Aearo's complex Chapter 11 case, diverted Aearo's focus from its own restructuring, and divided all parties' attention across multiple litigations.

*Second*, Aearo has shown "'a likelihood of success on the merits',"
*Fisher*, 155 F.3d at 882, which in the §105(a) context means "a reasonable
likelihood of a successful reorganization," *In re Excel Innovations, Inc.*,
502 F.3d 1086, 1095 (9th Cir. 2007); *accord Purdue Pharms.*, 619 B.R. at
58. This is not a high standard. A successful reorganization is likely
unless there are clear reasons that force the conclusion that a debtor
could not reorganize. *See In re Lyondell Chem. Co.*, 402 B.R. 571, 590
(Bankr. S.D.N.Y. 2009). Debtors who face mass-tort liabilities routinely
use Chapter 11 to reorganize. *See, e.g.*, *In re Dow Corning Corp.* 86 F.3d
482, 498 (6th Cir. 1996); *Robins*, 788 F.2d at 998; *In re Mallinckrodt plc*,
639 B.R. 837, 857 (Bankr. D. Del. 2022). There is no evidence suggesting
that Aearo could not do the same here—particularly given the Funding
Agreement, which allows Aearo to fund a trust reasonably likely to be
supported by tort claimants. *See* A.198 (101:8-17) (Aearo's Chief
Restructuring Officer testifying that Aearo "has a viable path forward in
this bankruptcy"); SA.36 (bankruptcy court acknowledging that
Bankruptcy Code "provide[s] certain tools that Aearo … will lack outside
of bankruptcy"); A.261 (226:4-7) (Aearo independent director testifying

that "the funding agreement … provides a means to pursue … bankruptcy").

*Third*, a preliminary injunction will not "harm the public interest." *Fisher*, 155 F.3d at 882.  Rather, by increasing the prospects for Aearo's reorganization, temporarily enjoining the CAEv2 claims against 3M will promote the public interest "in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public." *Caesars*, 561 B.R. at 442.  A successful reorganization "particularly serves the public interest" in the mass-tort context, where it will "'resolv[e] thousands of claims in a uniform and equitable manner.'" *Bestwall*, 606 B.R. at 258 (quoting *W.R. Grace & Co.*, 386 B.R. at 36.).  That is precisely why courts have repeatedly granted §105(a) relief enjoining litigation against non-debtors under similar circumstances.

## B.    The Bankruptcy Court Erred in Concluding That It Lacked Jurisdiction to Issue §105(a) Relief.

The bankruptcy court nevertheless declined to enjoin the CAEv2 litigation against 3M based on a threshold determination:  In its view, it lacked jurisdiction to issue §105(a) relief.  That holding was plainly wrong.

**1.** A bankruptcy court "must establish that it has subject matter jurisdiction to enter" §105(a) relief. *In re W.R. Grace & Co.*, 591 F.3d 164, 170 (3rd Cir. 2009). But that is not a difficult requirement to satisfy. Federal law creates bankruptcy jurisdiction for four categories of disputes: those "under" Title 11, those "arising in" bankruptcy litigation, those "arising under" the Bankruptcy Code, and those "related to" the bankruptcy proceeding. *Bush v. United States*, 939 F.3d 839, 844 (7th Cir. 2019); *see* 28 U.S.C. §1334(a)-(b). Aearo's requested relief easily satisfies the fourth of these categories, "related to" jurisdiction.

The Supreme Court has emphasized the "breadth" of "related to" jurisdiction. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995). "Related to" jurisdiction reflects Congress' intent "'to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *Id.* at 308 (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984)); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (describing "relate to" as "broad" and "deliberately expansive" language).

In *Bush*, this Court explained how to determine "related to" jurisdiction. The Court observed that, in *Celotex*, the Supreme Court had "favorably quoted" a rule adopted by nine courts of appeals that "a matter comes within the related-to jurisdiction if it 'could conceivably have any effect on the estate being administered in bankruptcy.'" 939 F.3d at 846 (quoting *Pacor*, 743 F.2d at 994). This Court described that rule as "an *ex ante* inquiry." *Id.* The Court then noted that, in past decisions, it had adopted what *Celotex* called a "'slightly different test'" asking whether a matter "'affects the amount of property available for distribution or the allocation of property among creditors.'" *Id.* (citing *In re Xonics, Inc.*, 813 F.2d 127 (7th Cir. 1987), *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746 (7th Cir. 1989), and *In re FedPak Sys., Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996)). Those decisions, the Court explained, had not considered the "difference between demanding an actual effect at the case's end and a potential effect when the claim is filed." *Id.* The Court proceeded to "agree" with the "*ex ante* perspective" taken by its sister circuits. *Id.* Accordingly, the Court "align[ed]" itself with the "widely held" view of those other circuits recognized in *Celotex*: "related-to jurisdiction must

62

be assessed at the outset of the dispute, and it is satisfied when the resolution has a potential effect on other creditors." *Id.*

Under *Bush*, the bankruptcy court had "related to" jurisdiction to issue §105(a) relief enjoining CAEv2 claims against 3M, because, "assessed at the outset," those claims have a "potential effect" on the amount of Aearo estate property available for distribution or the allocation of Aearo property among creditors. Continued CAEv2 litigation against 3M will result in, among other things, growing indemnification obligations by Aearo and continued depletion of Aearo's insurance policies shared with 3M, both of which have a "potential effect" on the amount of Aearo's estate property, including property for distribution to creditors. Continued CAEv2 litigation will also have a "potential effect" on the allocation of property among creditors, because a CAEv2 claimant who receives a final, non-appealable judgment in the CAEv2 litigation would be entitled to that amount (either from 3M or the Aearo trust), which would almost certainly be more or less than what other CAEv2 claimants receive (from the Aearo trust).

In short, under this Court's "potential effect" standard, the bankruptcy court could exercise its "comprehensive jurisdiction" to "deal

efficiently and expeditiously with" the CAEv2 claims against 3M "connected with" Aearo's estate—specifically, by temporarily enjoining them under §105(a). *Celotex*, 514 U.S. at 308. The CAEv2 claimants agree: When the bankruptcy court asked their counsel—a former bankruptcy judge—whether it had "related to" jurisdiction, counsel twice answered, "absolutely." A.272-73 (233:14-234:2).

**2.** The bankruptcy court's contrary ruling was flawed in numerous respects. The court first failed to apply the correct legal standard for "related to" jurisdiction—*viz.*, the "potential effect" test from *Bush*. Instead, relying on the very cases that *Bush* distinguished as not considering the "difference between … an actual effect … and a potential effect"—*Xonics*, *Home Insurance*, and *FedPak*—the court stated that this Court has adopted a "more constrained approach" requiring it to "focus its analysis on the *actual* economic effect continuation of the [CAEv2 claims] will have on" Aearo's estate. SA.30, 32 (court's emphasis). The court thus examined whether the CAEv2 litigation "will affect" the Aearo estate (in a "significant" way, no less). SA.32; *see also* SA.30 (stating that "related to" jurisdiction requires "direct effect" on estate). The court concluded its decision by reiterating: "[T]he Court's focus remains on the

*actual* economic effect that a continuation of the [CAEv2 claims] would have on" Aearo's estate and creditors.  SA.35 (emphasis added).

All of that analysis flatly contradicts *Bush*, which expressly rejected an "actual effect" test in favor of the "potential effect" test adopted by nine other circuits.  *See* 939 F.3d at 846.  The bankruptcy court's cramped view of "related to" jurisdiction, which precluded it from ordering §105(a) relief, likewise conflicts with *Caesars*'s recognition that §105(a) grants "broad" and "extensive equitable powers."  808 F.3d at 1188; *see also In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1045 (7th Cir. 1993) (describing bankruptcy court's jurisdiction to issue §105(a) relief as "quite broad").  The bankruptcy court's failure to apply the correct standard for "related to" jurisdiction was not an isolated occurrence; it permeated the court's reasoning.  That fundamental error alone warrants reversal.

The bankruptcy court independently erred when it concluded that the Funding Agreement defeats "related to" jurisdiction.  In the court's view, "whatever liability the [CAEv2 claims] generate … Aearo can satisfy such liability by making a payment request" of 3M, a mechanism it deemed a "circular arrangement" that results in no "financial impact

to creditors." SA.31-32. As a threshold matter, the court failed to analyze the Funding Agreement under the proper "potential effect" test. In fact, not only did the court "focus its analysis on the *actual* economic effect"— drawn from "*Xonics* and its progeny"—but the erroneous "actual economic effect" test was the *very reason* the court declined to follow other courts that have granted identical §105(a) relief against non-debtors despite substantially similar funding arrangements. SA.32 (explaining that "actual economic effect" was "not a limiting factor" in other decisions). Put differently, the bankruptcy court effectively recognized that under the (correct) "potential effect" test, the Funding Agreement is no bar to jurisdiction.

Even on its own terms, however, the court's analysis of the Funding Agreement's impact on Aearo's estate was flawed. Under the agreement, Aearo must exhaust its own cash, insurance, and other estate assets before receiving funding from 3M; accordingly, continued claims against 3M (triggering Aearo's indemnification obligation) will drain the Aearo estate, rendering those claims "matters connected with the bankruptcy estate" over which the court has "related to" jurisdiction. *Celotex*, 514 U.S. at 308. The bankruptcy court considered the exhaustion

requirement "merely theoretical" because "3M must honor Aearo's funding request." SA.31, 33. But the diminishment of Aearo's estate *before* receiving 3M funding clearly affects the "amount of property available for distribution or the allocation of property among creditors," *Bush*, 939 F.3d at 846, triggering the court's "comprehensive" related-to jurisdiction, *Celotex*, 514 U.S. at 308.

Furthermore, as already noted, it is by no means guaranteed that Aearo will always receive 3M funding to make up for any reduction in assets. As Stein testified, none of Aearo's funding sources, including 3M's funding, is risk-free. A.265-66 (239:5-240:14). Stein explained that while 3M is "quite viable at this time," it is nevertheless "certainly susceptible to deterioration in performance, the impact of a recession or other exogenous events." A.266. Additionally, 3M is excused from complying with a funding request if Aearo breaches its own obligations under the Funding Agreement. *See* A.285, 287, 290-91. Nor is it guaranteed that Aearo will receive 3M funding for distributions to creditors under a reorganization plan; instead, the Funding Agreement requires the plan to be funded by 3M to have the support of Aearo's board of directors. A.283-85.

Despite characterizing 3M's ability to pay as "the elephant in the room," the bankruptcy court ignored all of this evidence. Yet it *conceded* that if 3M's liability for the CAEv2 litigation were sufficiently large, "continuation of the [CAEv2 litigation] as to 3M would have a significant, if not disastrous, effect on Aearo's bankruptcy, notwithstanding 3M's commitment under the Funding Agreement." SA.33.[6] That acknowledgment only underscores that 3M's payments under the Funding Agreement are not absolutely certain and that continued CAEv2 litigation against 3M could have an effect on Aearo's estate and creditors.

Even if 3M's funding were absolutely guaranteed (despite evidence to the contrary), the bankruptcy court's analysis of the Funding Agreement would still be erroneous. The Funding Agreement makes Aearo's successful reorganization much more likely precisely because its breadth increases Aearo's ability to pay its creditors. Continued litigation against 3M thus threatens Aearo's reorganization by depleting the funds Aearo can access. Such litigation would also create perverse

---

[6] Over Aearo's *Daubert* objection, the bankruptcy court had admitted the testimony of an expert for one group of claimants who stated that, in his view, 3M's liability for the CAEv2 litigation would ultimately "exceed[] 3M's cash reserves." SA.33.

incentives because solvent parents would have little reason to make assets available to debtors. "Circularity" is a false and unfairly pejorative label for an agreement that empowers Aearo to chart its own path to successful reorganization. Additionally, the bankruptcy court's view of the Funding Agreement only purports to concern the distribution of property to creditors. It does not concern the allocation of estate property among creditors, another basis on which "related to" jurisdiction rests but one the bankruptcy court did not address.

The court ended its analysis with one final error. It admitted that its conclusion that there is no "actual economic effect" on Aearo's estate would "prove improvident" if it "ultimately prove[d] accurate" that 3M's liability for CAEv2 litigation "far exceed[ed] 3M's cash reserves" and "financial wherewithal." SA.33, 35-36. It brushed aside this concern, though, because "this Court's analysis of 'related to' jurisdiction is *ex ante*," and "[f]rom the evidence currently before the Court," it could not "conclude that 3M is unable or unwilling" to pay under the Funding Agreement. SA.36 (citing *Bush*, 939 F.3d at 856 [*sic*]).

The court was correct in this particular analysis to address the evidence "currently before" it, as that responds to *Bush*'s requirement

that "related-to jurisdiction must be assessed at the outset of the dispute[.]" *Bush*, 939 F.3d at 846. But the court failed to address *Bush*'s second requirement—that "related to" jurisdiction is satisfied if, based on that evidence, there is a "potential effect" on other creditors. *Id.* Instead, the court continued to labor under the erroneous "actual economic effect" standard it employed throughout its jurisdictional analysis. *See* SA.35. In other words, in its concluding reasoning, the bankruptcy court properly applied *Bush* in terms of *when* to assess "related to" jurisdiction (at the outset), but misapplied *Bush* in terms of *how* to assess "related to" jurisdiction (based on "potential effect"). And by acknowledging the possibility that 3M "ultimately" would not pay under the Funding Agreement—as the evidence demonstrated, *see* pp.67-68 & n.6, *supra*— the court implicitly confirmed (again) that Aearo has satisfied the "potential effect" test for "related to" jurisdiction.[7]

---

[7] The bankruptcy court acknowledged this same point in a hearing less than a month later. Aearo had moved to authorize bonuses to certain salespeople, but the court modified the relief because, in its view, this is "a case where … there's a chance that all unsecured creditors may not get paid depending upon what happens." A.436 (37:1-3). That statement is inconsistent with the proposition that 3M's funding is absolutely guaranteed.

The bankruptcy court briefly "note[d]" that it would decline §105(a) relief "even if" it had jurisdiction, SA.35, but its passing language provides no alternative grounds for affirmance. The court gave no specific reasons for declining §105(a) relief except to reiterate that its "focus remains on the actual economic effect" of the CAEv2 claims—*i.e.*, the jurisdictional question. SA.35. And it expressly stated that it would "not reach" the other factors underlying §105(a) relief given its jurisdictional determination. SA.35 n.17. The court thus did not issue a merits holding—though, if it did, the "insufficient" explanation for any such conclusion would defeat "meaningful review" by this Court. *See, e.g.*, *Klein v. Perry*, 216 F.3d 571, 575 (7th Cir. 2000); *United States v. Stevens*, 997 F.3d 1307, 1311 (11th Cir. 2021). Instead, as the bankruptcy court stated in its conclusion, it denied §105(a) relief based on a "determination of subject matter jurisdiction." SA.36. Because that jurisdictional determination was flawed from start to finish, it provides no basis for denying §105(a) relief.

## CONCLUSION

The Court should reverse the bankruptcy court's order and hold that the CAEv2 litigation against 3M should be stayed or enjoined pending Aearo's Chapter 11 proceedings.

Respectfully submitted,

/s/ Paul D. Clement

GEORGE W. HICKS, JR.
AARON L. NIELSON
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

PAUL D. CLEMENT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22134
(202) 742-8900
paul.clement@clementmurphy.com

CHAD J. HUSNICK
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Counsel for Debtors-Appellants*

December 12, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME REQUIREMENT

This brief complies with the type-volume limits of Fed. R. App. P. 32, as modified by 7th Cir. Rule 32. This brief uses 14-point, Century Schoolbook font and contains 13,949 words, according to the word-processing system used to prepare it.

<u>/s/ Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Paul D. Clement
Paul D. Clement

# <u>REQUIRED SHORT APPENDIX</u>

# TABLE OF CONTENTS

**Page**

Order Denying Plaintiffs' Motion for
    Preliminary Injunction (Aug 26, 2022)
    [Bankr.Ct. Dkt.#143]........................................................ SA.1

SO ORDERED: August 26, 2022



**Jeffrey J. Graham**
**United States Bankruptcy Judge**


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AEARO TECHNOLOGIES LLC, *et al.* [1] | ) | Case No. 22-02890-JJG-11 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| 3M OCCUPATIONAL SAFETY LLC, | ) | |
|   AEARO HOLDING LLC, | ) | |
|   AEARO INTERMEDIATE LLC, | ) | |
|   AEARO LLC, and | ) | |
|   AEARO TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 22-50059 |
| | ) | |
| THOSE PARTIES LISTED ON | ) | |
|   APPENDIX A TO THE COMPLAINT and | ) | |
|   JOHN AND JANE DOES 1-1000, | ) | |
| | ) | |
| Defendants. | ) | |


**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration and (II) Granting Related Relief.*

SA.1

This matter comes before the Court on the *Motion for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay applies to Certain Action Against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction* (the "PI Motion") filed by Plaintiffs/Debtors Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (together "Aearo" or the "Aearo Plaintiffs") and Objections thereto filed by the United States Trustee (the "UST") and certain Interested Parties. Aearo filed the PI Motion to stay certain federal and stated litigation, described more fully below, involving Aearo and Aearo's parent, 3M Corporation ("3M").

The Court conducted an evidentiary hearing on Aearo's request for a preliminary injunction on August 15-17, 2022 (the "PI Hearing").[2] Having fully considered the submissions by the parties and the arguments and evidence presented to the Court at the PI Hearing, and for the reasons stated below, the Court hereby DENIES Aearo's request for a preliminary injunction and declaratory relief.

### Venue and Jurisdiction

Except as noted herein, the Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b) as well as the Standing Order of Reference by United States District Court for the Southern District of Indiana dated

---

[2] The Court conducted a hearing on Aearo's request for a temporary restraining order on July 27, 2022. At that hearing, the Court neither granted nor denied the request. Rather, the matter was resolved, at least to some extent, by a limited three-week "pause" of the subject litigation pending a hearing on Aearo's request for a preliminary injunction.

July 11, 1984.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

## Factual and Procedural Background

On July 26, 2022, Aearo Technologies LLC and six related entities[3] (together,

the "Aearo Entities" or "Aearo") filed voluntary petitions for chapter 11 relief (the

"Petition Date").  The cases are being jointly administered under Case No. 22-2890.

The Aearo Entities are operating as debtors-in-possession pursuant to §§ 1107(a)

and 1108 of the Bankruptcy Code.

### Aearo and 3M

The Aearo Entities are headquartered in, and have operated out of,

Indianapolis in one form or another for over forty years.  They are, with one

exception, limited liability companies and are each incorporated under the laws of

Delaware.  Aearo currently manufactures and sells custom noise, vibration,

thermal, and shock protection, primarily serving the aerospace, commercial vehicle,

heavy equipment, and electronics industries.  Aearo had $108 million in direct sales

in 2021.  Approximately 330 employees work directly for the Aearo Entities.

In the late 1990s Aearo designed a product called the Combat Arms earplug.

After noise reduction rating testing in 1999 and 2000, Aearo began selling Combat

Arms earplugs in 2000.  Aearo eventually designed and manufactured an earplug

sold to the United States military under the name Combat Arms Earplug Version 2

---

[3]  The related entities are:  Aearo LLC, Aearo Intermediate LLC, Aearo Holding, LLC,
Aearo Mexico Holding Corp., Cabot Safety Intermediate LLC, and 3M Occupational Safety
LLC.

(the "CAEv2") and to civilian consumers under the name Arc Plug (the CAEv2 and Arc Plug, collectively, the "CAEv2").

3M is a multinational technology and manufacturing company that develops products across a wide range of markets including pharmaceuticals, chemicals, digital imaging and sound technology, office supply and consumer goods. 3M is incorporated under the laws of Delaware and headquartered in St. Paul, Minnesota. 3M is a large, profitable company, boasting $35 billion in net sales in 2021.

3M acquired the Aearo Entities in April of 2008 through a stock purchase for approximately $1.2 billion. For the first two years following the acquisition, Aearo's business remained separate from 3M. This changed in 2010, as Aearo transferred its Head, Eye, Ear, Hearing and Face Safety business, including the CAEv2 business, to 3M (the "Upstream"). The Upstream generated a receivable on Aearo's books of approximately $965 million that remains unpaid and for which Aearo has made no demand. After the Upstream, 3M continued to manufacture, market and sell the CAEv2 until 2015.[4] Approximately 80% of all sales relating to the CAEv2 occurred prior to the Upstream. It is unclear whether 3M assumed any liabilities from Aearo relating to the Upstream or if such liabilities remained with Aearo.

Aearo became much more integrated into 3M after the Upstream, relinquishing many functions to 3M. Pursuant to a Shared Services Agreement (the "SSA"), 3M agreed to provide, among other things, legal, accounting and insurance

---

[4]  There were less than $100 in CAEv2 sales in 2016.

SA.4

services to Aearo in exchange for a fee.  3M has not charged Aearo for services

under the SSA since 2016.

In 2016, relators filed a *qui tam* action styled as *United States ex rel. Moldex-*

*Metric, Inc. v. 3M Company*, Case No. 1601533.  The action was dismissed by

stipulation in July of 2018, following execution of a settlement agreement and 3M's

payment of $9,100,000 to the United States thereunder.  Shortly thereafter,

servicemembers began to file lawsuits against 3M and/or Aearo alleging defects and

injuries related to their use of the CAEv2.

<u>The MDL</u>

On April 3, 2019, approximately 700 CAEv2 lawsuits were

consolidated into multidistrict litigation (the "MDL") before the Honorable M. Casey

Rodgers in the United States District Court for the Northern District of Florida (the

"MDL Court").  The Aearo Plaintiffs and 3M are co-defendants in the MDL and in

approximately 2000 lawsuits pending in the state courts of Minnesota (the MDL

and Minnesota actions, collectively, the "Pending Actions"). The Court notes that

most, though not all, of the claims filed in the Pending Actions assert that 3M and

Aearo are jointly and severally liable.  Some of the claims, however, have been

asserted against only 3M.

To say that the MDL is large is an understatement of epic proportions.

According to a July 15, 2022 statistical report of the United States Judicial Panel on

Multidistrict Litigation, the MDL had grown to include more than 290,000 claims,

down from a high of over 308,000 claims.  It is the largest MDL in history by an

order of magnitude and represents a staggering 30% of cases currently pending in the federal district courts.

The Pending Actions allege that the CAEv2 hearing protection devices manufactured, distributed and sold by the Aearo Entities and/or 3M were defective, resulting in hearing loss and related hearing defects. The purported design flaws at issue in the Pending Actions allegedly date to a period prior to 3M's acquisition of Aearo.

As part of the MDL process, 27 claimants were designated as "bellwethers." Of that group, eight plaintiffs' claims were dismissed prior to trial. As to the remaining plaintiffs, the parties have participated in 16 trials. Ten of the bellwether trials resulted in verdicts for 12 claimants, and the remaining six resulted in verdicts in favor of 3M and Aearo. The verdicts, each of which imposed joint and several liability against 3M and Aearo, ranged from $1.7 million to $77.5 million. Appeals are pending in five of the bellwether cases, and to date, no payment has been made to any of the plaintiffs who have obtained a verdict in their favor. Attempts to negotiate a settlement in the MDL have, to date, failed.

The MDL Court has selected several "waves" of cases, approximately 500 at a time, to engage in active discovery. Three such waves have been created to date which, after accounting for voluntary dismissals, include approximately 1,200 cases in active discovery. It is the Court's understanding that the MDL Court is poised to remand for trial some or all of those 1,200 cases to the district courts from which they originated.

As to the Pending Actions asserted in state court, the first of the bellwether trials is scheduled to begin on August 29, 2022, with four additional trial dates selected for 2023 and 2024. Thirty additional bellwether state cases are in various phases of discovery in preparation for trials scheduled within the next two years.

<u>The Funding Agreement</u>

Beginning in March 2022, 3M began exploring strategic alternatives to the MDL. Among those alternatives was a chapter 11 bankruptcy for the Aearo Entities. 3M appointed two disinterested directors to Aearo's Board of Directors: Jeffrey Stein and Roger Meltzer (the "Independent Directors"). The Independent Directors were tasked with negotiating the terms under which 3M would fund a chapter 11 bankruptcy as well as a claims trust for the CAEv2 claims and certain "respirator claims" (the "Respirator Claims") that are also the subject of litigation involving both 3M and Aearo but which are not the subject of the instant proceeding. A draft funding agreement—circulated by Kirkland & Ellis, proposed bankruptcy counsel for the Aearo Entities—became the framework for negotiations between 3M and the Independent Directors.

Stein testified that the negotiations among 3M and the Independent Directors were "vigorous." Hyperbole aside, Aearo did obtain several significant concessions from 3M. Pertinent to our discussion here, early versions of a funding agreement contained the following provisions:

- No funded trust for CAEv2 claims or Respirator Claims outside of a chapter 11 plan;

SA.7

- Aearo Entities indemnification of 3M with no funding obligation from 3M;

- Any funding requests to be conditioned on an extension of the stay of the Pending Actions to 3M;

- Each funding request required to include an officer certification, detailed narrative, documentation, and assurances regarding use;

- Inclusion of several events of default, including conversion or dismissal of the bankruptcy case as well as if the bankruptcy court declined to extend the stay or grant a restraining order in favor of 3M; and

- Termination as a remedy for an event of default.

Aearo, through the Independent Directors, pushed back on these points, as well as asking 3M to collateralize its funding commitment and maintain its credit ratings.

Negotiations continued, and 3M's initial ask on the terms highlighted above were modified as set forth below:

- 3M made a commitment of $1.24 billion, including $240 million for funding a chapter 11 case and a trust of $1 billion for CAEv2 claims and Respirator Claims, the commitment being uncapped and funded inside or outside of bankruptcy;

- Aearo would indemnify 3M but not assume liabilities, paragraph added to funding agreement where a "Permitted Funding Use" would be for 3M to pay any liability of the Aearo Entities to 3M, including indemnification obligations;

- Funding not conditioned on extension of the stay or any other requests; Aearo must only abide by a budget;

- Events of default no longer include extension of the automatic stay, conversion or dismissal; 3M does not have right to terminate agreement; and

- No financial conditions on 3M other than 3M to use commercially reasonable efforts to maintain credit rating.

These changes were presented to the Aearo Board on July 23, 2022, at which the time the Board resolved to execute the funding agreement.  The Independent Directors advised that Aearo "[s]hould not take the risk Bankruptcy Court declines to extend the automatic stay, or other bankruptcy [events of default], leaving the Aearo Entities marooned in chapter 11 proceeding without funding."

3M and the Aearo Entities executed a final funding agreement on July 25, 2022 (the "Funding Agreement"). Per the Funding Agreement's Recitals, 3M has committed to "satisfy all of the respective Aearo Entities' Liabilities specified herein on the terms set forth herein, such that each of the respective Aearo Entities will have assets with a value greater than its Liabilities and will have the financial capacity to satisfy its obligations as they become due in the ordinary course of its business . . . ."  An initial $1 billion was committed to fund a trust to compensate allowed CAEv2 claims and Respirator Claims, as well as $240 million to fund the chapter 11 cases.

In exchange for this commitment, Aearo has agreed to indemnify 3M and its non-debtor affiliates for liabilities related to the CAE2v and Respirator Claims. 3M's commitment under the Funding Agreement, both as to the chapter 11 case expenses and the trust, is on an uncapped basis.  The Funding Agreement is not a loan, as it does not impose any real repayment obligations on Aearo.

The Court needs to pause a moment and explain why it used the phrase "real repayment obligations."  Section 2(d) of the Funding Agreement States:

> No Requirement of Repayment.  For the avoidance of doubt, the Aearo Entities shall not be required to return or repay any Payment, in

whole or in part, except to the extent any Payment is used to satisfy
the Aearo Entities' obligations under Section 3.

Section 3 of the Funding Agreement contains the Aearo Entities' indemnification of
any 3M liability relating to the CAEv2 claims and the Respirator Claims. This
language initially gave the Court pause, as it seems to say there is a repayment
obligation as to the indemnity. But § 2(c) of the Funding Agreement—the section
referenced in the recap of the Funding Agreement negotiations—provides that a
Permitted Funding Use includes a request "to pay Liabilities of an Aearo Entity
owed by [3M], including any indemnification or obligation of any Aearo Entity
under Section 3."

A plain reading of the Funding Agreement is that Aearo must repay any
indemnity obligation to 3M, but may do so by asking 3M for the money to do so.
The net effect to Aearo is zero.[5] But if we assume, for the purposes of this opinion,
that the language of the Funding Agreement is ambiguous, the Court resolves that
ambiguity in favor of Aearo. Aearo's Board approved the Funding Agreement after
being told, via a Power Point slide deck presentation, of the negotiated change that
Aearo could pay any indemnity obligation to 3M by making a funding request to
3M. Aearo provided no evidence or testimony that there was a repayment
obligation under the Funding Request. Furthermore, counsel for 3M went on record
at the July 27, 2022, hearing when posed with questions about what payments
under Aearo's first day motions might create a claim by 3M against Aearo:

---

[5] One might call this circular. In fact, more than one does call it such as discussed later.

> This was something that we discussed in connection with the funding
> agreement and 3M's agreements to provide shared services during the
> cases.  3M Company will not be seeking any type of claim or any
> reimbursement from the debtors during the cases on account of any of
> the payments it makes pursuant to the funding agreement.  So that
> applies across the various relief requested in all of the first day
> motions.

Transcript of Miscellaneous Motions by Plaintiffs/Debtors, July 27, 2022 P.M.

Session, at 24, lines 6-12 (Docket No. 43).

Given the conduct and statements of Aearo and 3M before the Court and in

negotiations of the Funding Agreement, the Court finds that if there is a repayment

obligation "ado" under § 3 of the Funding Agreement, § 2(c) makes it much ado

about nothing.  We now return to the discussion of the Funding Agreement as a

whole.

The Funding Agreement is not without condition, however.  3M is obligated

to pay Aearo's Chapter 11 administrative expenses and indemnification obligations

only after Aearo has exhausted its own assets, including cash reserves and all

available insurance.[6]  Significantly, 3M's obligations under the Funding Agreement

are not conditioned on Aearo seeking or obtaining a stay of the Pending Litigation

at to 3M.

The Independent Directors reviewed 3M's finances and concluded that 3M

will be able to fund the payments provided for under the Funding Agreement.  3M's

---

[6]   The Funding Agreement provides that the Aearo Entities must exhaust all of their
assets before 3M's funding commitment is triggered.  At the PI Hearing, Aearo focused only
on its obligation to use its cash reserves and available insurance under the Funding
Agreement and did not address whether there are other assets—i.e., physical assets—that
might need to be liquidated prior to funding or whether the liquidation of such assets, if
any, would impact Aearo's estate or ability to reorganize.

SA.11

most recent SEC filings show it to be strong financially with no going concern
warnings.  Specifically, Stein testified that he was confident of 3M's financial
wherewithal and believed that the Funding Agreement provided a "clear path" to
restructuring the Aearo Entities even absent a stay of the Pending Actions.

<u>Insurance</u>

3M manages two insurance programs that might cover the CAEv2 claims:
the "3M Tower" and the "Aearo Legacy" programs.  The 3M Tower provides $1.05
billion in coverage for claims made during the applicable policy period of March 1,
2018, to March 1, 2019.  3M pays the premiums related to, and is the primary
insured under, the 3M Tower; however, Aearo is named as an additional insured
under the 3M Tower.  On June 28, 2019, 3M provided notice to its insurers of the
CAEv2 claims, and these are the only claims for which notice has been given.  The
3M Tower coverage is otherwise fully available and free of any other demands.

The Aearo Legacy provides $550 million in coverage.  The policies were paid
for by Aearo and existed prior to 3M's purchase of Aearo in 2008. The coverage
provided by the policies covers "occurrences" during the years 1997 to 2008.  Aearo
is the named insured. On June 28, 2019, 3M provided notice to the insurers in the
Aearo Legacy program of the CAEv2 claims.

The only payments made, to date, by any insurer have come from an Aearo
Legacy insurer. Liberty Mutual Insurance Company issued four checks of
$1,000,000 each to 3M and the Aearo Entities.   Liberty Mutual issued these checks
on February 17, 2002, as partial payment to 3M of a verdict issued in the MDL.  3M

has not resolved certain issues related to Liberty Mutual's coverage and, thus, has not negotiated the checks. The checks currently sit in 3M's vault.

<u>Procedural Posture</u>

On the Petition Date, Aearo filed its *Complaint for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Applies to Certain Actions against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction Motion* (the "Complaint"), along with the PI Motion, against "those Parties listed on Appendix to the Complaint," *i.e.*, the named plaintiffs in the Pending Actions, as well as any party who holds, or may seek to hold, Aearo and/or 3M liable for injury related to the CAEv2 (the "Stay Defendants").

The Complaint, coupled with the PI Motion, seek to stay the Pending Actions as to 3M and its affiliates. More specifically, Aearo insists that the automatic stay imposed by § 362(a) of the Bankruptcy Code prohibits further prosecution of the Pending Actions against not just Aearo, but also 3M. Per the PI Motion, Aearo essentially makes three arguments: (1) that the Stay Defendants have asserted claims of joint and several liability against 3M and Aearo, essentially treating them as a single entity, such that a judgment against 3M is effectively a judgment against Aearo; (2) 3M and Aearo are co-insured under shared insurance policies, the proceeds of which may be depleted if the Pending Actions are not stayed as to 3M; and (3) Aearo is obligated to indemnify 3M and its non-debtor affiliates for any losses related to the CAEv2 claims. For essentially these same reasons, Aearo

alternatively asks the Court to exercise its authority under § 105(a) of the Bankruptcy Code to enjoin the Pending Actions as to 3M.

Various of the firms who represent the Stay Defendants in the Pending Actions (collectively, the "Objecting Parties"),[7] have appeared in this proceeding—either on their own behalf or on behalf of their Stay Defendant clients. They, along with the UST, have objected to the PI Motion. While no committee of the firms or the Stay Defendants themselves has yet been formed[8] in the bankruptcy case itself (and, as such, they do not formally speak with one voice), the Objecting Parties do, as a group, oppose Aearo's requested relief. And while the Objecting Parties concede that the Court generally has the power to enjoin non-debtor parties, at least pursuant to § 105(a) of the Bankruptcy Code, they vehemently insist that the facts and equities here do not warrant such extraordinary relief.

## Discussion and Decision

At the outset of its discussion, the Court wishes to make clear what this decision is *not* about. Much has been written and said about the MDL and the MDL process as overseen by Judge Rodgers. But this Court's decision is not a referendum on the MDL or Judge Rodgers' administration thereof. This Court is neither authorized nor inclined to address or review Judge Rodgers' handling of the MDL or

---

[7]  The Objecting Parties include:  The Bailey Glasser and Pulaski Kherkher Plaintiffs; the Adkins, Wilkerson & Vaughn Plaintiffs; the Heninger Garrison Davis, LLC Plaintiffs; The Gori Law Firm, P.C. Plaintiffs; the Cory Watson, P.C. Plaintiffs; and Charles Rataj, along with the law firms of Paul, LLP, Keller Postman LLC; Aylstock, Witkin Kreis & Overholtz, PLLC; Seeger Weiss LLP; Clark, Love & Hutson, PLLC; Tracey Fox King & Walters; The Johnson Law Group; Weitz & Luxenberg, P.C.; and Quinn Emanuel, Urquart & Sullivan, LLP.

[8]  The UST's objection is largely based on the fact that no committee has yet been formed.

her rulings.  The Court is similarly not authorized or inclined to review or opine on the results of the bellwether trials or on the evidence or argument presented therein.

This is also not a debate as to the relative merits or demerits of the MDL and bankruptcy processes.  Both are merely tools, engineered by Congress, for the adjudication and resolution of claims.  Neither is perfect and each present both risk and reward for all of the various constituencies.  There has been some suggestion that the bankruptcy process is the *only* avenue by which the claimants may globally settle the Claims.  But this is not so.  Multidistrict litigation, through the bellwether process, is itself designed to "enhance and accelerate both the [litigation process itself and the global resolutions that often emerge from that process." ELDON E. FALLON ET. AL., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2337 (2008)." *See also, In re E. I. Du Pont De Nemours*, 204 F. Supp. 3d 962 (S.D. Ohio 2016) (discussion bellwether process and its value in encouraging settlement).  The fact that the bellwether trials conducted in the MDL have not yet yielded a global settlement does not mean that the MDL itself is broken.

That said, the Court also takes issue with the suggestions made by the Objecting Parties throughout this proceeding that the bankruptcy process necessarily deprives the Stay Defendants of their Constitutional right to a jury trial before an Article III judge.  Even in bankruptcy that right is preserved.  *See* 28 U.S.C. § 157(b)(5).  It is accurate to say, however, that most mass tort claims in a bankruptcy are resolved not through jury trials before a district court, but by

consensual resolution through a plan of reorganization, often through a trust mechanism akin to § 524(g) of the Bankruptcy Code. But it is also accurate to say that it is unlikely that all of the 290,000 Stay Defendants will have a jury trial in the MDL if the Pending Actions are not stayed.

Finally, the Court emphasizes that this Order is not a decision as to whether the Aearo Entities' bankruptcy petitions were filed in good faith. No party has, at least to date, moved for dismissal, and the Court expresses no opinion as to the various suggestions made by the Objecting Parties that Aearo sought bankruptcy protection for an improper purpose or with "unclean hands," as those issues are not squarely before the Court. Nor does the Court express any opinion, more generally, as to the propriety of the various devices used here and in other jurisdictions— including the much-maligned "Texas Two-Step"—by entities facing mass tort liability. Again, those issues are not squarely before the Court.

In response to charges made within the MDL that 3M is acting in bad faith in seeking a stay,[9] Judge Rodgers has indicated that she believes that Aearo is a defendant in the Pending Actions "in name only," stating that Aearo has had no meaningful role or identity in the MDL. Certainly, the Court does not question Judge Rodgers' prerogative to reach that conclusion *within the context of the MDL*. But this Court, at present, has a necessarily different vantage point. Pending before this Court are bankruptcy petitions and a related adversary proceeding filed by companies currently (and historically) operating in Indiana. The Aearo Entities

---

[9]   The Court emphasizes that 3M itself did not seek an extension of the stay and is not a party to this proceeding.

are named as defendants in most, if not nearly all, of the Pending Actions for their role in designing, manufacturing and selling the CAEv2 both prior to and after their purchase by 3M. The Stay Defendants presumably have claims against Aearo as that term is defined by § 101(5) of the Bankruptcy Code. Positions 3M and/or Aearo may have taken in the MDL do not alter this Court's view that the Aearo Entities, at least for purposes of the PI Motion, are appropriate debtors with cognizable liabilities under the Bankruptcy Code and that this Court has jurisdiction to at least consider whether an injunction of the Pending Actions as to 3M is necessary or appropriate. The positions or courses of conduct allegedly taken by any of the parties to the Pending Actions to the contrary are not relevant to this Court's inquiry here.

With that out of the way, the Court moves onto what this matter *is* about— whether the Pending Actions are, or should be stayed, as to 3M under the relevant provisions of the United States Bankruptcy Code, Title 28 of the United States Code, and controlling decisional law in light of the facts and evidence properly before the Court.

### 11 U.S.C. § 362(a)

When a bankruptcy petition is filed, the stay provisions of § 362(a) automatically take effect and pre-petition creditors are prohibited from taking certain actions to collect their debts. See 11 U.S.C. § 362; *In re Vitreous Steel Prod. Co.*, 911 F.2d 1223, 1231 (7th Cir.1990). The automatic stay is self-executing, effective upon filing of the bankruptcy petition. *In re Gruntz*, 202 F.3d 1074, 1081

(9th Cir.2000). "The automatic stay is indeed a powerful tool of the bankruptcy courts" designed to "'protect the debtor from an uncontrollable scramble for its assets in different courts. . . . '" *Fox Valley Constr. Workers Fringe Benefit Funds v. Pride of the Fox Masonry and Expert Restorations*, 140 F.3d 661, 666 (7th Cir.1998) (quoting *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 998 (4th Cir.1986)).

The purpose of the automatic stay is "'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *In re Rexene Prod. Co.,* 141 B.R. 574, 576 (Bankr. D. Del. 1992) (quoting *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3rd Cir. 1991)). The stay preserves what remains of the debtor's estate and "provide[s] a systematic equitable liquidation procedure for all creditors, secured as well as unsecured . . . thereby preventing a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 508 (7th Cir. 1982) (quoting *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y. 1981)).

Here, Aearo argues that the Pending Actions are, or should be, stayed under both §§ 362(a)(1) and (a)(3) of the Bankruptcy Code as the Pending Actions relate to 3M. Those sections provide a stay immediately upon the filing of a bankruptcy petition as to:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title;

\* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a). The Court will answer these questions in the order they were received and address first whether § 362(a)(1) has any direct applicability—at least within governing Seventh Circuit law—to non-debtors. As explained below, the Court must conclude that it does not.

### 11 U.S.C. § 362(a)(1)

Section 362(a)(1), while broad, generally protects only the debtor, not non-bankrupt co-debtors like 3M. *Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983) ("The clear language of Section 362(a)(1) thus extends the automatic stay provision only to the debtor filing bankruptcy proceedings and not to non-bankrupt co-defendants."); *Lee v. RCN Corp.*, No. 03 C 5866, 2004 WL 2108577, at *1 (N.D. Ill. Sept. 20, 2004) (§ 362 is intended to protect the assets of the debtor for the benefit of creditors and is "not designed to afford collateral benefits to non-debtor parties involved in litigation with the debtor as party defendants or as co-defendants."). This section "does not prevent actions against non-debtor obligors, debtor's sureties or guarantors. It does not protect separate legal entities, corporations, partnerships or non-debtor co-defendants in pending litigation." *In re Lengacher*, 485 B.R. 380, 383 (Bankr. N.D. Ind. 2012); *see also In re White*, 415 B.R.

696, 698 (Bankr. N.D. Ill. 2009) ("Generally, the automatic stay protects the bankruptcy debtor and does not bar suits against third parties, such as non-debtor entities, even when wholly owned by the debtor, or the debtor's insurers, guarantors, and sureties.").

Based on the foregoing authority and the plain language of the Bankruptcy Code, the Court is reluctant to conclude that § 362(a)(1), standing alone, offers sufficient statutory authority to conclude that the Pending Actions are stayed automatically as to 3M or to extend the protections of the stay to 3M.

Admittedly, there is ample case law holding otherwise. Most significantly, the Fourth Circuit, in two opinions issued in the context of the *A.H. Robins Co.* bankruptcy case, held that a bankruptcy court has multiple statutory bases for extending the stay to a non-debtor party, including directly under § 362(a)(1). *See A.H. Robins*, 788 F.2d at 1001-1003, and *A.H. Robins Co., Inc. v. Aetna (In re A.H. Robins Co., Inc.),* 828 F.2d 1023-24 (4th Cir. 1987).

In particular, the Fourth Circuit identified two exceptions to the general rule that § 362(a)(1) does not apply to non-debtor parties: (1) where there is such identity between the debtor and third-party defendant where a judgment against the third-party defendant will in effect be a judgment against the debtor, and (2) where the pending litigation, though not brought against the debtor, would cause the debtor irreparable harm. *A.H. Robins*, 788 F.2d at 999. Application of these exceptions is rare and reserved for "unusual circumstances." *Id.*

But while the Seventh Circuit, and other courts within the Circuit, have cited *A.H. Robins* and the above exceptions to § 362(a)(1)'s seemingly plain language, the Circuit has not, to date, expansively discussed or formally adopted *A.H. Robins* in this regard. *See Harley-Davidson Credit Corp. v. JHD Holdings, Inc.*, 19-cv-155jdp, 2020 WL 7078828 at *1 (W.D. Wis. Dec. 3, 2020) *and In re Caesars Entm't Operating Co.*, 540 B.R. 637, 643 n.8 (Bankr. N.D. Ill. 2015). Nor has the Circuit actually extended the stay to a non-debtor party under that reasoning. As observed recently by the district court in *Edelson, PC v. Girardi*, No. 20 C 7115, 2021 WL 3033616 (N.D. Ill. July 19, 2021):

> The Seventh Circuit has not yet had the opportunity to consider the correct process for invoking an exception to the general rule regarding the applicability of section 362(a)(1). That is because in the handful of times the Seventh Circuit has considered *A.H. Robins* or other exceptions to section 362(a)(1), it has found that the non-debtor does not qualify for the exceptions. *See Harley-Davidson Credit Corp. v. JHD Holdings Inc.*, No. 19-CV-155-JDP, 2020 WL 7078828, at *1 (W.D. Wis. Dec. 3, 2020); *Fernstrom*, 938 F.2d at 736 (deciding non-debtor did fit within *A.H. Robins'* exception; *Fox Valley*, 140 F.3d at 666 (rejecting attorney's argument that the automatic stay deprived the district court of jurisdiction to sanction him).

*Id.* at *14.

The bankruptcy court in *In re LTL Mgmt. LLC*, 638 B.R. 291, 299-301 (Bankr. N.J. 2022), recently grappled with this same issue under similar facts—having been asked to extend the stay to enjoin certain mass tort litigation as to non-debtor parties. While the *LTL* court ultimately applied *A.H. Robins*' more expansive view of a bankruptcy Court's power to "extend the stay" to non-debtor parties directly under § 362(a)(1), the court

nevertheless acknowledged that "many courts have used some iteration of the phrases "extension of the stay" and "injunctive relief" interchangeably when discussing whether to permit actions against nondebtor third parties to proceed," while other courts have cited only to § 105. *Id*. at 300. *See also*, *Girardi*, 2021 WL 3033616 at *2 ("'It should be noted that . . . extensions [of section 362(a)(1)] to non-debtors, although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action [under § 105] to protect the administration of the bankruptcy estate.'") (quoting *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993)).

Without more explicit guidance from the Seventh Circuit, the Court declines Aearo's invitation to extend § 362(a)(1) to 3M and instead frames its analysis pursuant to the Court's authority to issue injunctive relief under § 105(a) of the Bankruptcy Code.

<u>11 U.S.C. § 362(a)(3)</u>

Whereas § 362(a)(1) extends only to a debtor, § 362(a)(3) extends to property of the estate. Specifically, § 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The scope of § 363(a)(3) is, therefore, broader than just the debtor. *See Nat'l Tax Credit Partners v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994) (§ 362(a)(3) "reaches farther, encompassing every effort to 'exercise control over property of the estate.'"). Aearo argues that this broader scope includes

22

SA.22

the Pending Actions against 3M.  If that is the case, the Pending Actions were automatically stayed by § 362(a)(3) as of the Petition Date, obviating the need for an injunctive relief.  All Aearo needs is a declaration that the automatic stay applies to the Pending Actions. The Objecting Parties, not surprisingly, disagree.  So does the Court.

The Fourth Circuit's *A.H. Robins* decision again looms large in this analysis, as that court held that § 362(a)(3) is one of "four independent grounds on which it could stay the plaintiff's suit against [the nondebtor third party]." *A.H. Robins.*, 828 F.2d at 1024 (the other three being §§ 362(a)(1) and § 105(a) of the Bankruptcy Code and a court's inherent powers under 28 U.S.C. § 1334); *LTL Mgmt.* 638 B.R. at 300-01.  And the Court agrees with this conclusion to the extent that the non-debtor third party seeks to exercise control over property of a debtor's estate given the plain language of the Bankruptcy Code and the Seventh Circuit's pronouncement in *Havlik*.

Whether § 362(a)(3) stays an action is a two-step inquiry.  First, a court must determine whether property of the estate is at issue; second, a court must determine whether the action in question constitutes an action to obtain possession of, or exercise control over, the property in question.  *See, e.g., In re Klarchek*, 508 B.R. 386, 395 (Bankr. N.D. Ill. 2014); *see also In re Lee*, 524 B.R. 798 (Bankr. S.D. Ind. 2014).

Aearo asserts the property at issue here are its insurance policies, both the Aearo Legacy and the 3M Tower.  This assertion is in line with Seventh Circuit

caselaw, which has held that "[a]s a general matter, insurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate for the purposes of § 541(a) [of the Bankruptcy Code]." *In re Stinnett*, 465 F.3d 309, 312 (7ᵗʰ Cir. 2006). But that is in the general. As to the specific, the analysis hinges on whether a payment will inure to the debtor's pecuniary benefit. *Id.* at 313.[10] The Court will assume, for the purposes of this opinion, that the Aearo Legacy and 3M Tower insurance policies are property of the estate.

Having made this assumption, the Court turns to the second prong of the § 362(a)(3) analysis and whether the Pending Actions are an effort to exercise control over property of the estate. There is no evidence that the Stay Defendants are proceeding directly against the insurance policies. And 3M has taken no action against the insurance policies other than to put insurers on notice of the Pending Actions, although it apparently will seek reimbursement from the policies to the extent that judgements are entered against it and Aearo in the Pending Actions. So, there currently are no direct efforts to exercise control over property of the estate, a factor found in many of the cases staying nondebtor actions against property of the debtor pursuant to § 362(a)(3). *See Girardi*, 2021 WL 3033616 at * 16 (staying imposition of constructive trust over payments to debtor); *Klarchek*, 508 B.R. at 397 (staying dissolution of trust intended to interfere with possible claims by chapter 7 trustee) and *Lee*, 524 B.R. at 804 (staying termination of membership interests and voting rights).

---

[10] The Seventh Circuit's repeated focus on the pecuniary effect to the estate will be a recurring theme throughout this opinion.

24

But *Havlik* teaches that § 362(a)(3) encompasses "every effort to 'exercise control over property of the estate'", not just direct efforts. *Havlik*, 20 F.3d at 708. It follows, then, that indirect efforts may also fall under § 362(a)(3)'s stay. But what constitutes an indirect effort? How far can § 362(a)(3) extend? Contract rights are property of the estate[11], so can a debtor stop suits by a third party against the contractual counter-party?

Fortunately, the Court does not have to go down this parade of horribles. At the heart of the Seventh Circuit's analysis under § 362(a)(3) is whether a third party's effort has a pecuniary effect on the estate. Let us start with *Havlik*, the seminal 362(a)(3) case from the Seventh Circuit. Rather than veering off into the esoteric, the Seventh Circuit plainly states that "[t]his case is all about how much money will come into the debtor's coffers." *Id.*, 20 F.3d at 709. Other courts in the Seventh Circuit have acknowledged the same. *See Stinnett*, 465 F.3d at 313 (overriding question is whether a payment will inure to the debtor's pecuniary benefit); *Klarchek*, 508 B.R. at 397 (court looked to see if the action may have a potential adverse impact on the property of the estate); and *In re Gatke Corp.*, 117 B.R. 406, 410 (Bankr. N.D. Ind. 1989) (staying action against insurance policies where there was a threat of inequitable distribution of insurance proceeds to asbestos claimants).

Distilled to that essence, the Court finds that the Pending Actions are not stayed by § 362(a)(3) because, ultimately, 3M will fully fund any liability incurred

---

[11] *See Klarchek*, 508 B.R. at 395.

by Aearo relating to the Pending Actions pursuant to the Funding Agreement.

Granted, the Funding Agreement requires Aearo to seek recovery under the Aearo

Legacy insurance policies—and possibly the 3M Tower as well—prior to seeking

payment under the Funding Agreement.  However, there is no threat of inequitable

distribution of insurance proceeds here as the Funding Agreement operates as a

complete, uncapped backstop to the insurance policies.  So tapping the insurance

policies to cover any liability incurred in the Pending Actions does not affect the

amount of money Aearo can pay its creditors because the Funding Agreement

covers all claims arising from the Pending Actions in the absence or exhaustion of

the applicable insurance.

### 11 U.S.C. § 105(a)

That leaves Aearo's argument that the Court should enjoin the Pending

Actions pursuant to § 105(a) of the Bankruptcy Code.  Under that section,

bankruptcy courts have the express authority "to issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a); *see also, In re Caesars Entm't. Operating Co.*, 808 F.3d 1186,

1188 (7th Cir. 2015).  "Though § 105(a) does not give the bankruptcy court *carte

blanche*—the Court cannot, for example, take an action prohibited by another

provision of the Bankruptcy Code—it grants extensive equitable powers that

bankruptcy courts need in order to be able to perform their statutory duties."  *Id.*

The authority to "stay actions in other courts extends beyond claims by and against

the debtor, to include "suits to which the debtor need not be a party but which may

affect the amount of property in the bankrupt estate," *Zerand–Berna Grp., Inc.,* 23

F.3d 159, 161–62 (7th Ct. 1994), or "the allocation of property among creditors." *In re*

*Mem'l Estates, Inc.*, 950 F.2d 1364, 1368 (7th Cir.1992) (7th Cir.), *cert. denied*, 504

U.S. 986 (1992).

The burden is on the movant—here the Aearo Plaintiffs—to clearly establish

by a preponderance of the evidence the necessity for injunctive relief.  *See In re*

*Gathering Rest., Inc.*, 79 B.R. 992, 1000 (Bankr. N.D. Ind. 1986) (citations omitted).

"This will ordinarily require convincing evidence of an adverse impact on the

debtor's estate which seriously threatens the debtor's ability to formulate and carry

out a plan of reorganization." *Id.* (quoting *In re Arrow Huss, Inc.*, 51 B.R. 853, 859

(Bankr. D. Utah 1985).

"Section 105, however, is merely a vehicle to carry out the otherwise provided

powers of the bankruptcy court [and] [m]ay not be used to create new law."  *In re*

*Sybaris Clubs Inter., Inc.*, 189 B.R. 152, 155 (Bankr. N.D. Ill. 1995) *(*citing *In re*

*Lloyd*, 37 F.3d 271, 275 (7th Cir. 1994)).  To that end, then, a proper exercise of the

Court's authority to issue an injunction under § 105 first necessitates a finding by

the Court that the matter Aearo seeks to enjoin—the Pending Actions as they relate

to 3M—falls within the Court's jurisdiction.  *See Celotex Corp. v. Edwards*, 514 U.S.

300, 307 (1995).  "It is the relation of dispute to estate, and not of party to estate,

that establishes jurisdiction," *Feld v. Zale Corp. (In re Zale Corp)*, 62 F.3d 746 (5th

Cir. 1995) (citing *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics)*, 813, F.2d 127

(7th Cir. 1987)).  *See also Dore v. Assoc.'s Contracting, Inc. v. American Druggist Ins.*

*Co.,* 54 B.R. 353, 357 (Bankr. W.D. Wis. 1985) ("Two separate inquiries need to be

undertaken before the bankruptcy court may issue a preliminary injunction

pursuant to § 105(a): The first inquiry is jurisdictional and the second inquiry is the

appropriateness of the injunction . . . .").

<u>Jurisdiction</u>

The jurisdiction of the bankruptcy courts, like that of other federal courts, is

grounded in, and limited by, statute.  Section 1334(b) of Title 28 provides that "the

district courts shall have original but not exclusive jurisdiction of all civil

proceedings arising under title 11, or arising in or related to cases under title 11."

The district courts may, in turn, refer "any or all proceedings arising under title 11

or arising in or related to a case under title 11 . . . to the bankruptcy judges for the

district."  Proceedings "arising in" the Bankruptcy Code are those that concern a

matter exclusive to bankruptcy law and practice.  *Bush v. U.S.*, 939 F.3d 839, 844

(7th Cir. 2019).  Similarly, proceedings "arising under" the Bankruptcy Code are

those that present a substantive question of bankruptcy law.  *Id.*  Finally,

proceedings "related to" the Bankruptcy Code are those that have a potential effect

on other creditors.  *Id.* at 844-46.

Here, the parties agree that the Court should focus its § 105 analysis on the

Court's "related to" jurisdiction.  The Court agrees.[12]  As the court in *Zerand-Bernal*

---

[12]    The Court notes that there is at least some argument to be made that it has "arising
under" jurisdiction to issue an injunction under § 105.  *See In re Caesars Entm't Operating
Co, Inc.*, 533 B.R. 714 (Bankr. N.D. Ill. 2015) ("[A] claim to enjoin civil actions in other
courts [] is created by § 105(a) of the Code" and, thus, can be said to "arise under" the
Bankruptcy Code).  While the Seventh Circuit did not expressly reject that statement in
reversing the bankruptcy court on appeal, the Court emphasized (literally) that the

instructs, "related to" jurisdiction is "primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that § 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum." *Zerand–Bernal*, 23 F.3d at 161 (citation omitted). *See also Fisher v. Apostalou*, 155 F.3d 876, 882 (7th Cir. 1998). Taken one step further, it would seem that claims asserted against a joint-tortfeasor of the debtor are subject to this same logic.

Many courts recognize that an indirect effect upon the estate might be sufficient to confer jurisdiction under an interpretation of § 1334(b)'s "related to" jurisdiction adopted by many circuits. That sweeping standard requires only that the outcome of the proceeding "could conceivably have any effect" upon the bankruptcy estate. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984); *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991); *A.H. Robins Co.*, 788 F.2d 994, 1002 at n. 11; *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 583–84 (6th Cir. 1990); *In re Dogpatch U.S.A., Inc.*, 810 F.2d 782, 786 (8th Cir. 1987); *In re Fietz*, 852 F.2d 455, 457 (9th Cir.1988); *In re*

---

bankruptcy court's "related to" jurisdiction was the appropriate focus. *See Caesars*, 808 F.3d at 1188 (Section 1334(b) provides that "'the district courts have original but not exclusive jurisdiction of all civil matters arising under title 11, or arising in or *related to* cases under title 11.'") (quoting 38 U.S.C. § 1334(b) (emphasis added by the Seventh Circuit). Even without *Caesar's* guidance, the Court is disinclined to read "arising under" so broadly, as it would render § 105(a) far too powerful in light of the Court's otherwise limited jurisdiction.

*Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990); *In re Lemco Gypsum, Inc.*, 910 F.2d 784, 788 (11th Cir.1990).

The Seventh Circuit, however, has adopted a more constrained approach to "related to" jurisdiction and has repeatedly emphasized that the bankruptcy court should interpret its jurisdiction narrowly. *Zerand–Bernal*, 23 F.3d at 161; *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989). Under this more constrained approach, "[a] case is 'related' to a bankruptcy when the dispute 'affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors.'" *Mem'l. Estates*, 950 F.2d at 1368 (quoting *Xonics,* 813 F.2d at 131).

"[C]ommon sense cautions against an open-ended interpretation of the 'related to' statutory language 'in a universe where everything is related to everything else." *Matter of FedPak Sys., Inc.*, 80 F.3d 207, 214 (7th Cir. 1996). Thus, simply because a dispute may have some type of nexus to a bankruptcy proceeding is not enough to give the court "related to" jurisdiction over it. *Home Ins. Co.*, 889 F.2d at 749. That jurisdiction requires a direct effect upon either the assets of the estate or their distribution to creditors. "Overlap between the bankrupt's affairs and another dispute is insufficient . . . " *Home Ins. Co.*, 889 F.2d at 749.

At first blush, common sense would seem to readily support the conclusion that the Pending Actions, as they relate to 3M, fall within even the Seventh Circuit's limited view of the Court's "related to" jurisdiction. Aearo's obligation to

indemnify 3M for any liability 3M incurs by virtue of the CAEv2 claims arguably amounts to liability against Aearo. But such a conclusion ignores the economic realities of the Funding Agreement. So additional scrutiny is required.

It is true that the Aearo Entities have agreed to indemnify all liabilities related to the CAEv2 and Respirator Claims. But the Funding Agreement also provides for an *uncapped, non-recourse* commitment from 3M to fund *all* of the Aearo Entities liabilities pre- and post-petition financing, including those arising from CAEv2 claims and Respirator Claims. This includes any indemnity obligations arising from an assessment of liability against 3M relating to the Pending Actions. In support of their objections, the Objecting Parties insist that the Funding Agreement amounts to nothing more than a "circular arrangement."

To counter that charge, Aearo points to Aearo's requirement to first exhaust its own assets, namely cash and insurance coverage, before triggering 3M's funding obligation. However, the Funding Agreements makes clear that if Aearo's assets are "or are projected to be . . . insufficient to pay or satisfy the Liabilities or amounts or otherwise maintain the Minimum Balance,"[13] then 3M must honor Aearo's funding request. Moreover, while Aearo seemingly is obligated to repay any indemnity obligations to 3M, Aearo is authorized to make a funding request for such indemnification from 3M. In essence, Aearo is able to ask 3M for the funds required to pay Aearo's indemnity obligation to…3M. This does indeed seem to be a circular arrangement as the Objecting Parties argue.

---

[13] "Minimum Balance" is defined as $5 million cash on hand held, in the aggregate, by the Aearo Entities.

Significantly, 3M commitment under the Funding Agreement does not depend on the Court enjoining the Pending Actions—a commitment that Aearo expressly negotiated under the belief that it might be "marooned" in bankruptcy with no funding source if such a condition was included and if the Court denied the PI Motion.  It would seem, then, that whatever liability the Pending Actions generate—in bankruptcy, outside of bankruptcy, stay in place, or no stay—Aearo can satisfy such liability by making a payment request under the Funding Agreement.  From this, the Court is unable to discern any financial impact to creditors, let alone a significant and adverse one, from the continuation of the Pending Actions.  Stated differently, the Court cannot conclude that continuation of the Pending Actions will affect the amount of property for distribution or the allocation of property among creditors.

A number of other courts have extended the stay notwithstanding the existence of an uncapped funding agreement.  *See, e.g.*, *LTL Mgmt*, 638 B.R. at 291; *In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335 (Bankr. W.D.N.C. August 23, 2021); and *In re Bestwall LLC*, 606 B.R. 243 (Bankr. W.D.N.C. 2019).  Respectively, this Court cannot follow suit.  Given the Seventh Circuit's instruction in *Xonics* and its progeny, the Court must focus its analysis on the *actual* economic effect continuation of the Pending Actions will have on the Aearo's estate and creditors, a concern that was a not a limiting factor in the above-cited decisions.

It is true that 3M's commitment under the Funding Agreement is not without condition, but Aearo's obligation to exhaust its own assets (namely, its cash reserves

32

SA.32

and available insurance policies) do not functionally impair the Aearo Entities from operating or from offering a fully funded plan of reorganization (or a trust outside of bankruptcy, for that matter). Or, perhaps more to the point, Aearo failed to articulate what impairment, behind the merely theoretical, the conditions pose. Aearo itself must have believed that a reorganization was possible, with the financial assistance of 3M, without the promise of a stay in favor of 3M because Aearo itself negotiated for the removal of that condition from the Funding Agreement.

Of course, 3M's ability to honor its commitment under the Funding Agreement is very much the elephant in the room. To this point, Objecting Parties Keller Postman LLC and Charles Rataj (collectively, "Keller"), in support of its objection to the PI Motion,[14] presented the expert testimony of Dr. J.B. Heaton that 3M's liability for the CAEv2 claims is at least $100 billion, an amount that far exceeds 3M's cash reserves and would, according to Dr. Heaton, take 3M 17 years to repay. Based on that testimony, the Court could readily conclude that continuation of the Pending Actions as to 3M would have a significant, if not disastrous, effect on Aaero's bankruptcy, notwithstanding 3M's commitment under the Funding Agreement.

---

[14]   In its Objection, Keller asked the Court, as conditions to 3M's enjoyment of any injunction, to preclude 3M from effectuating stock dividends, stock repurchases and a planned spin-off of its health care division. Dr. Heaton's testimony was offered in at attempt not to show that an injunction under § 105(a) was appropriate but to instead suggest that 3M should be compelled to protect its viability—in order to meet its obligations under the Funding Agreement—should it enjoy an injunction of the Pending Actions.

However, Keller presented Dr. Heaton's testimony during the Objecting Parties' case[15] for the limited purpose of seeking a condition on the stay should the Court be inclined to grant the PI Motion.  Presumably fearing the Court might rely on Dr. Heaton's testimony more broadly, the other Objecting Parties did not support or adopt Dr. Heaton's testimony.  Aearo, for its part, objected to the Court hearing the testimony under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), arguing that Dr. Heaton's methodology was flawed.

While the Court overruled Aearo's objection, it is unwilling to consider Dr. Heaton's testimony for anything other than the limited purpose for which it was offered.  The evidence that Aearo—the party that bears the burden of proof under § 105(a)—presented in support of the PI Motion emphasizes that 3M is more than able to honor the Funding Agreement, even if the Pending Actions proceed. The Court accepts that evidence at face value.[16]

The Court also rejects Aearo's insistence that Court should invoke its § 105(a) powers because the Pending Actions create a significant "distraction" such that 3M will be unable to perform fully under the SSA.  The Court puts little stock on this

---

[15]  Dr. Heaton was Keller's witness; however, he did testify out of order and during Aearo's case-in-chief, as an accommodation to Dr. Heaton's availability.  But Dr. Heaton was not called as part of Aearo's case-in-chief.

[16]   In its closing argument, Aearo suggested that perhaps there was some truth in Dr. Heaton's testimony, notwithstanding Aearo's earlier objection to it.  The Court recognizes that Aearo may have tactical reason not to question 3M's ability to withstand the seemingly obvious financial peril the Pending Actions pose, but in failing to present evidence to that end (and instead providing evidence to establish that 3M has more than enough financial wherewithal to honor the Funding Agreement), the Court is compelled to conclude that continuation of the Pending Actions will not endanger or otherwise impair Aearo's reorganization.

claim.  Aearo and 3M have been embroiled in the MDL for over three years, yet the Court heard no evidence that 3M has, to date, been unable to perform under the SSA.  Undoubtedly those 3M employees tasked with providing services under the SSA are busy and likely taxed on a regular basis in the ordinary course of 3M's business.  But the Court has otherwise heard no evidence to conclude that Aearo's operations or its administration of these bankruptcy cases will be impacted in the manner that Aearo argues.

Based on the foregoing, the Court declines Aearo's request to enjoin the Pending Actions as to 3M pursuant § 105(a).  The Court notes that even if it were to find that it has subject matter jurisdiction over the Pending Actions, the Court would reach the same conclusion.  An injunction under § 105(a) should issue only[17] in extraordinary circumstances where it is "necessary or appropriate" to carry out the provisions of the Code.  In the end, the Court's focus remains on the actual economic effect that a continuation of the Pending Actions would have on Aearo's bankruptcy estate and, ultimately, its distribution to creditors.  Having found no such effect in light of the Funding Agreement, the Court finds no basis upon which to invoke its § 105(a) powers.

---

[17]  In *Fisher*, the Seventh Circuit held that to obtain the benefit of a § 105(a) injunction, a debtor need only show that (1) that there is a likelihood of success on the merits; and (2) that the injunction serves the public interest."  *Fisher*, 155 F.3d at 882.  The Court finds no need to discuss these requirements here, as *Fisher* makes clear that a court does not reach those issues unless it first concludes that the third-party litigation would "defeat or impair" the Court's jurisdiction. *Id.* The Court can make no such conclusion for the reasons already stated.

Of course, the Court recognizes that this conclusion may ultimately prove improvident if Dr. Heaton's estimation of 3M's liability and financial wherewithal ultimately proves accurate. But as the Seventh Circuit's decision in *Bush* instructs, this Court's analysis of "related to" jurisdiction is *ex ante*. *Bush*, 939 F.3d at 856. From the evidence currently before the Court, the Court is unable to conclude that 3M is unable or unwilling to honor its commitment under the Funding Agreement and, as such, an injunction of the Pending Actions is neither necessary nor appropriate.

## Conclusion

Admittedly, it is tempting to be swayed by the sheer size of the MDL at issue in this case, but that alone provides insufficient reason for the Court to conclude that an injunction is necessary for Aearo's reorganization or that creditors will be negatively impacted in the absence of an injunction. Might a stay influence these proceedings or, more to the point, provide Aearo and/or 3M with additional leverage to negotiate a global settlement? And might the Bankruptcy Code provide certain tools that Aearo and 3M will lack outside of bankruptcy? The Court believes the answer to both these questions is a resounding yes. Alas, those questions are not things to be considered when reviewing the language of §§ 362(a)(1) and (a)(3), or in a determination of subject matter jurisdiction for purposes of § 105(a).

For the reasons stated above, the Court hereby SUSTAINS the objections of the Objecting Parties—other than those relating to unclean hands—and DENIES

the PI Motion.  Because of the denial of the PI Motion, the Court OVERRULES as moot the Keller Objection to the extent it sought conditions on an injunction.

###

## CIRCUIT RULE 30(d) STATEMENT

I certify that all materials required by Circuit Rule 30(a)-(b) are included in the Appendix.

*/s/ Paul D. Clement*

Paul D. Clement