No. 22-2606

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

IN RE: AEARO TECHNOLOGIES, LLC, et al.,

_____

AEARO TECHNOLOGIES, LLC, et al.,

*Debtors-Appellants*,

v.

THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT AND
JOHN & JANE DOES, 1-1000,

*Appellees*.

---

On Direct Appeal from the United States Bankruptcy Court
for the Southern District of Indiana, Indianapolis Division
No. 22-2890, Adv. No. 22-50059

---

## BRIEF FOR NATIONAL ASSOCIATION OF MANUFACTURERS AND PRODUCT LIABILITY ADVISORY COUNCIL, INC. AS *AMICI CURIAE* IN SUPPORT OF DEBTORS-APPELLANTS

---

Erica Klenicki
Michael A. Tilghman II
NAM LEGAL CENTER
733 10th Street, N.W., Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for National Association of Manufacturers*

Jaime A. Santos
Jesse Lempel
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2606

Short Caption: Aearo Technologies LLC, et al v. Those Parties Listed on Appendix A to the Complaint, et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Association of Manufacturers and Product Liability Advisory Council, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Goodwin Procter LLP and NAM Legal Center

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jaime A. Santos    Date: 12/20/2022

Attorney's Printed Name:  Jaime A. Santos

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address:  Goodwin Procter LLP

1900 N Street, N.W. Washington, DC 20036

Phone Number: 202-346-4000    Fax Number:  202-346-4444

E-Mail Address: jsantos@goodwinlaw.com

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2606

Short Caption: Aearo Technologies LLC, et al v. Those Parties Listed on Appendix A to the Complaint, et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
         National Association of Manufacturers and Product Liability Advisory Council, Inc.

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
         Goodwin Procter LLP and NAM Legal Center

(3)      If the party, amicus or intervenor is a corporation:

         i)       Identify all its parent corporations, if any; and

                  N/A

         ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                  N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

         N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

         N/A

Attorney's Signature: /s/ Jesse Lempel                    Date: 12/20/2022

Attorney's Printed Name: Jesse Lempel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [ ]     No [✓]

Address: Goodwin Procter LLP

         100 Northern Avenue, Boston, MA 02210

Phone Number: 617-570-1000                    Fax Number: 617-523-1231

E-Mail Address: jlempel@goodwinlaw.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2606

Short Caption: Aearo Technologies LLC, et al v. Those Parties Listed on Appendix A to the Complaint, et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    National Association of Manufacturers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    NAM Legal Center and Goodwin Procter LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
    The Debtors are wholly-owned subsidiaries of non-Debtor 3M Company

Attorney's Signature: /s/ Erica Klenicki          Date: 12/20/2022

Attorney's Printed Name: Erica Klenicki

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: NAM Legal Center

733 10th Street, N.W., Suite 700 Washington, DC 20001

Phone Number: 202-637-3000          Fax Number: 202-637-3182

E-Mail Address: eklenicki@nam.org

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2606

Short Caption: Aearo Technologies LLC, et al v. Those Parties Listed on Appendix A to the Complaint, et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Association of Manufacturers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

NAM Legal Center and Goodwin Procter LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Michael A. Tilghman II    Date: 12/20/2022

Attorney's Printed Name: Michael A. Tilghman II

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: NAM Legal Center

733 10th Street, N.W., Suite 700 Washington, DC 20001

Phone Number: 202-637-3000    Fax Number: 202-637-3182

E-Mail Address: mtilghman@nam.org

rev. 12/19 AK

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ......................................................................................................5

I.  Bankruptcy provides an important and legitimate mechanism for a financially distressed manufacturer or other business to efficiently resolve its liabilities and obtain a fresh start. ...................................................5

II.  Multi-district litigation cannot reliably and efficiently achieve widespread resolution of mega mass-tort litigation. .....................................11

    A.  Multi-district litigation is ill equipped to reliably achieve global resolution in mega mass-tort litigation..................................................11

    B.  "Bellwether" trials are not likely to advance mega mass-tort cases toward resolution, as this case illustrates...................................18

    C.  Multi-district litigation is often inefficient and unfair to financially struggling companies in mega mass-tort cases. ...............20

III.  A bankruptcy proceeding cannot achieve its purpose or properly function without staying or enjoining pending MDL claims. ......................26

CONCLUSION .................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ............................................................................10

*In re Aearo Techs. LLC*,
642 B.R. 891 (Bankr. S.D. Ind. 2022) ..........................................3, 11, 15, 19, 28

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
771 F. Supp. 415 (J.P.M.L. 1991) ....................................................................17

*In re Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.*,
223 F. Supp. 3d 1355 (J.P.M.L. 2016) ..............................................................21

*In re Caesars Entm't Operating Co.*,
808 F.3d 1186 (7th Cir. 2015) ..........................................................................27

*Cent. Va. Cmty. Coll. v. Katz*,
546 U.S. 356 (2006) ..........................................................................................6

*In re Chambers*,
348 F.3d 650 (7th Cir. 2003) ..............................................................................6

*In re Chevron U.S.A., Inc.*,
109 F.3d 1016 (5th Cir. 1997) ..........................................................................18

*In re Condustrial, Inc.*,
No. 09-04425, 2011 WL 3290389 (Bankr. D.S.C. Aug. 1, 2011)......................13

*Covey v. Com. Nat'l Bank of Peoria*,
960 F.2d 657 (7th Cir. 1992) ..............................................................................7

*In re Deer Park, Inc.*,
10 F.3d 1478 (9th Cir. 1993) ............................................................................10

*DeLaventura v. Columbia Acorn Tr.*,
417 F. Supp. 2d 147 (D. Mass. 2006)..........................................................20, 24

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prods. Liab. Litig.*,
787 F. Supp. 2d 1358 (J.P.M.L. 2011) ..............................................................21

iii

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)*
  *Prods. Liab. Litig.*,
  990 F. Supp. 834 (J.P.M.L. 1998) ....................................................25

*In re Dow Corning Corp.*,
  187 B.R. 919 (E.D. Mich. 1995), *supplemented* (Sept. 14, 1995),
  *rev'd*, 103 F.3d 129 (6th Cir. 1996) ................................................16

*In re Dow Corning Corp.*,
  211 B.R. 545 (Bankr. E.D. Mich. 1997) ..........................................10

*In re Fed.-Mogul Glob. Inc.*,
  684 F.3d 355 (3d Cir. 2012) ...............................................................9

*In re Gonic Realty Tr.*,
  909 F.2d 624 (1st Cir. 1990) .............................................................10

*In re Grossman's Inc.*,
  607 F.3d 114 (3d Cir. 2010) ...............................................................9

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs.*
  *& Prods. Liab. Litig.*,
  220 F. Supp. 3d 1356 (J.P.M.L. 2016) .............................................21

*In re LTL Mgmt., LLC*,
  637 B.R. 396 (Bankr. D.N.J. 2022) ...........................7, 8, 9, 11, 14, 21

*In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*,
  No. 4:08-MD-2004, 2016 WL 4705807 (M.D. Ga. Sept. 7, 2016)...................23

*In re Nat'l Prescription Opiate Litig.*,
  290 F. Supp. 3d 1375 (J.P.M.L. 2017) .............................................18

*Nat'l Tax Credit Partners, L.P. v. Havlik*,
  20 F.3d 705 (7th Cir. 1994) .................................................................6

*Pettibone Corp. v. Easley*,
  935 F.2d 120 (7th Cir. 1991) .............................................................26

*Pippen v. NBCUniversal Media, LLC*,
  734 F.3d 610 (7th Cir. 2013) ...............................................................5

*Schwab v. Reilly*,
560 U.S. 770 (2010) ..................................................................................4, 6

*In re Silica Prods. Liab. Litig.*,
398 F. Supp. 2d 563 (S.D. Tex. 2005) ...............................................25

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
793 F. Supp. 1098 (J.P.M.L. 1992) ...................................................16

*In re Stryker Rejuvenate, ABG II Hip Implant Prods. Liab. Litig.*,
949 F. Supp. 2d 1378 (J.P.M.L. 2013) ...............................................21

*Zerand–Bernal Grp., Inc. v. Cox*,
23 F.3d 159 (7th Cir. 1994) ................................................................27

## Statutes

11 U.S.C. § 101(5) ..............................................................................................9

11 U.S.C. § 105(a) ............................................................................................27

11 U.S.C. § 362(a)(1) .......................................................................................27

11 U.S.C. § 362(a)(3) .......................................................................................27

11 U.S.C. § 362(d)(2) .........................................................................................7

11 U.S.C. § 1141(a) ..........................................................................................14

28 U.S.C. § 157(b) ............................................................................................14

28 U.S.C. § 1334(b) ..........................................................................................27

28 U.S.C. § 1407(a) .....................................................................................13, 22

## Other Authorities

S. Todd Brown, *Plaintiff Control and Domination in Multidistrict
Mass Torts*, 61 Clev. St. L. Rev. 391 (2013) ....................................12, 13, 14, 29

S. Todd Brown, *Specious Claims and Global Settlements*, 42 U. Mem.
L. Rev. 559 (2012) ............................................................................25

Elizabeth Chamblee Burch & Margaret S. Williams, *Perceptions of Justice in Multidistrict Litigation: Voices from the Crowd*, __ Cornell L. Rev. __ (forthcoming 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3900527 ..................20, 21

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343 (1995) ............................................................16

Jaime Dodge, *Facilitative Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 Emory L.J. 329 (2014)..............................................23

Natalie R. Earles, *The Great Escape: Exploring Chapter 11's Allure to Mass Tort Defendants*, 82 La. L. Rev. 519 (2022)........................................12

Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) ..........................................................................18

S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases* (Fed. Judicial Ctr. 2005), https://www.uscourts.gov/sites/default/files/gibsjudi_1.pdf ..............................3

Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. Rev. 1 (2021) .......................................................................17

Jan Hoffman & Mary Williams Walsh, *Purdue Pharma, Maker of OxyContin, Files for Bankruptcy*, N.Y. Times (Sept. 15, 2019, updated Nov. 24, 2020), https://www.nytimes.com/2019/09/15/health/purdue-pharma-bankruptcy-opioids-settlement.html ..................................................................18

Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. Rev. 960 (2012) ......................6, 7, 8, 12, 14

Roger Michalski, *MDL Immunity: Lessons from the National Prescription Opiate Litigation*, 69 Am. U. L. Rev. 175 (2019) ........................19

Samir D. Parikh, *The New Mass Torts Bargain*, 91 Fordham L. Rev. 447 (2022).......................................................... 12, 13, 15, 17, 24, 25

D. Theodore Rave & Francis E. McGovern, *A Hub-and-Spoke Model of Multidistrict Litigation*, 84 Law & Contemp. Probs. 21 (2021)....................17

Christopher J. Roche, *A Litigation Association Model to Aggregate Mass Tort Claims for Adjudication*, 91 Va. L. Rev. 1463 (2005)......................20

Amy L. Saack, *Global Settlements in Non-Class MDL Mass Torts*, 21 Lewis & Clark L. Rev. 847 (2017)....................................................15

Edward F. Sherman, *When Remand Is Appropriate in Multidistrict Litigation*, 75 La. L. Rev. 455 (2014)................................................14

Michael R. Sisak, *Purdue Pharma to stay in business as bankruptcy unfolds*, AP News (Sept. 17, 2019), https://apnews.com/article/white-plains-wv-state-wire-us-news-opioids-health-8bf66a5868b5460a84104b9f5ea801d0 ......................................18

David A. Skeel, Jr., *When Should Bankruptcy Be an Option (for People, Places, or Things)?*, 55 Wm. & Mary L. Rev. 2217 (2014) ...........26, 27

Douglas G. Smith, *The Myth of Settlement in MDL Proceedings*, 107 Ky. L.J. 467 (2018-2019)...............................................................23, 24

Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613 (2008)..................................7, 8, 10, 17, 26

U.S. J.P.M.L., *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending* (Nov. 15, 2022), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-November-15-2022.pdf .........................8, 18, 21, 22

U.S. J.P.M.L., *MDL Statistics Report – Docket Summary Listing* (Nov. 15, 2022), https://www.jpml.uscourts.gov/sites/jpml/files/Recently_Terminated_MDLs-January%201-November-15-2022.pdf ...............................................22

## INTEREST OF *AMICI CURIAE*[1]

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs over 12.9 million men and women, contributes $2.77 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly two-thirds of all private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The Product Liability Advisory Council, Inc. ("PLAC") is a non-profit professional association of corporate members representing a broad cross-section of American and international product manufacturers.[2] These companies seek to contribute to the improvement and reform of law in the United States and elsewhere, with emphasis on the law governing the liability of manufacturers of products and those in the supply chain. PLAC's perspective derives from the experiences of a

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or person or entity other than *amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

[2] *See* https://plac.com/PLAC/PLAC/Amicus.aspx.

corporate membership that spans a diverse group of industries in various facets of the manufacturing sector. In addition, several hundred of the leading product litigation defense attorneys are sustaining (non-voting) members of PLAC. Since 1983, PLAC has filed more than 1,200 briefs as amicus in both state and federal courts, including this court, on behalf of its members, while presenting the broad perspective of product manufacturers seeking fairness and balance in the application and development of the law affecting product risk management.

The NAM and PLAC are interested in this case because their membership includes companies that may find themselves as defendants in mass-tort suits. Members of the NAM and PLAC believe that bankruptcy is an important tool for manufacturers in financial distress, including those that face mass-tort liability, to resolve their liabilities in an efficient manner that is both fair to their creditors and claimants, and also affords the businesses an opportunity to reemerge as productive market participants.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Appellants (collectively, "Aearo") and their parent company, 3M Corporation ("3M"), are embroiled in "the largest [multi-district litigation] in history by an order of magnitude," which has had over 300,000 claims and "represents a staggering 30% of cases currently pending in the federal district courts." *In re Aearo Techs. LLC*, 642 B.R. 891, 897 (Bankr. S.D. Ind. 2022). The lawsuits allege that design flaws in earplugs made, distributed, and sold by Aearo or 3M caused hearing-related injuries, and most of the claims "assert that 3M and Aearo are jointly and severally liable." *Id.* Faced with this cascade of lawsuits and potential liability, Aearo has sought to resolve these claims through bankruptcy—just as numerous manufacturers and other businesses have done for decades. *See* S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases*, at 1 (Fed. Judicial Ctr. 2005) (noting that dozens of corporations have resolved mass tort liability through bankruptcy since 1982).[3] Bankruptcy is both "a viable alternative for companies hoping to put their mass tort liability behind them" and "acceptable to tort claimants as a means of resolving their claim." *Id.*

Bankruptcy is well equipped to resolve mass-tort lawsuits, even a behemoth like this one, in an efficient manner so that financially distressed businesses can

---

[3] https://www.uscourts.gov/sites/default/files/gibsjudi_1.pdf.

3

obtain the "fresh start" that lies at the core of bankruptcy law. *Schwab v. Reilly*, 560 U.S. 770, 791 (2010). Bankruptcy enables a debtor's liabilities to be resolved in an efficient manner by staying all efforts—in either federal or state court—to collect against the debtor outside the bankruptcy forum, thereby channeling claimants into a single forum so that the company's liabilities can be addressed in a coordinated manner. This channeling function also preserves the financially distressed company's value against a rush-to-the-courthouse frenzy of creditors that could deplete the company's remaining assets to the detriment of its employees, shareholders, and other creditors. At the same time, bankruptcy promotes global resolution of a company's liabilities by sweeping in even future claims. All of this is crucial for businesses facing mega mass-tort liability, given the sheer number of claims scattered across dozens of jurisdictions and the accompanying risk that the company's resources could be quickly depleted by tens (or hundreds) of thousands of separate lawsuits. In the end, bankruptcy not only benefits the financially distressed company, but also its employees, shareholders, and other stakeholders who are invested in its continued existence—including creditors, for whom bankruptcy offers equitable distribution and efficient recovery.

While multi-district litigation ("MDL") has been successful in resolving some mass-tort cases, it is not a panacea. First, MDL cannot reliably achieve widespread resolution of mass-tort litigation: it cannot stay efforts in state court to collect from

the debtor; it cannot bind *present* claimants without their consent; and it cannot reliably address *future* claimants. It is thus unsurprising that numerous entities that started out in MDL ultimately went into bankruptcy.

Second, MDL historically has struggled to resolve mass-tort litigation efficiently. The MDL in this case, for example, has been active for over three and a half years. Yet fewer than twenty cases have actually been tried and they have produced inconsistent verdicts. At the same time, MDL is notorious for attracting—indeed, incentivizing—meritless claims, which only causes additional delays and unfairly prejudices defendants who have to weed them out. The risk of meritless claims is only exacerbated in mega mass-tort cases. In short, MDL is not a one-size-fits-all model meant to displace other options—such as bankruptcy—that are capable of bringing efficient and widespread resolution to an ever-growing mountain of lawsuits.

## ARGUMENT

### I.    Bankruptcy provides an important and legitimate mechanism for a financially distressed manufacturer or other business to efficiently resolve its liabilities and obtain a fresh start.

A manufacturer, like any business or person, may find itself in "financial distress" for any number of reasons. *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013). When that happens, bankruptcy offers an important mechanism for the troubled company to resolve its liabilities while ensuring an "equitable distribution" to creditors and giving the debtor a "fresh start"—a chance to reorder

its affairs and return as a productive market participant. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 364 (2006). This "fresh start" is one of bankruptcy's "fundamental" objectives. *Schwab*, 560 U.S. at 791 (citation omitted). Indeed, that is bankruptcy's "primary purpose." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003).

The bankruptcy code contains a number of important features that enable financially distressed businesses to obtain this "fresh start." These features are particularly salient for businesses facing mega mass-tort lawsuits, which can entail a seemingly infinite number of present and future claims that could impose enterprise-ending liability. But bankruptcy is valuable not only for the struggling manufacturer; its benefits inure to the manufacturer's stakeholders, too—employees, shareholders, and business partners—who are invested in its continued viability. Likewise, bankruptcy benefits the universe of creditors (including MDL claimants) by mandating equitable distribution and facilitating efficient recovery.

A.     Bankruptcy benefits manufacturers and other businesses by providing an efficient mechanism for channeling "all claims against [the company] in a single forum for collective resolution." Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. Rev. 960, 999 (2012). "Aggregation prevents efforts by creditors to pick off or affect the disposition of assets in ways that may be privately beneficial but collectively harmful." *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994). This is accomplished, in large

6

measure, through the "automatic stay" that is triggered by the filing of a bankruptcy petition, which enjoins all ongoing or future efforts by creditors to collect against the debtor, including efforts to collect in state court.  *See* 11 U.S.C. § 362(d)(2); Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613, 1639 (2008).  Thus, "bankruptcy courts offer a unique opportunity to compel the participation of all parties in interest … in a single forum." *In re LTL Mgmt., LLC*, 637 B.R. 396, 414 (Bankr. D.N.J. 2022).  This centralization of claims benefits the bankrupt entity, claimants, and the judicial system—protecting the debtor from having to litigate claims across the country while promoting the efficient and fair resolution of a debtor's liabilities.  *See* McKenzie, *Toward A Bankruptcy Model*, *supra*, at 1004-05 ("the judicial system and society benefit from unified proceedings in a single forum in which all interested parties in the debtor's fate are represented"); *Covey v. Com. Nat'l Bank of Peoria*, 960 F.2d 657, 662 (7th Cir. 1992) ("Competition among creditors to dismember the debtor may reduce the aggregate value of the assets, to the detriment of all" in "a rush to separate assets from an ailing debtor").

B.    Bankruptcy is especially important for businesses, including manufacturers, that are threatened with mass-tort liability.  Mass-tort litigation poses numerous problems for the efficient resolution of liability due to the sheer number of claims that can be filed over long time periods.  In this MDL, for instance, as of

November 15, 2022, there were an astonishing 260,966 actions pending.  S*ee* U.S.

J.P.M.L., *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions*

*Pending*, at 1 (Nov. 15, 2022)[4] (*"MDL Statistics Report - Distribution"*).  And three

and a half years into the MDL, new plaintiffs continue to emerge by the thousands—

with at least 9,290 *new* claims filed in just the past few months.  *See In re: 3M Com-*

*bat Arms Earplug Prods. Liab. Litig.*, No. 19-md-02885, Dkt. No. 3568 (N.D. Fla.

Oct. 17, 2022).  Bankruptcy's ability to centralize claims in a single forum makes it

"uniquely equipped to efficiently address the large numbers of claims that are char-

acteristic of mass tort litigation."  Smith, *Resolution of Mass Tort Claims*, *supra*, at

1649; *accord* McKenzie, *Toward A Bankruptcy Model*, *supra*, at 1004 (bankruptcy

"greatly aids the coordination of aggregate litigation").  By concentrating litigation

in one place, bankruptcy protects the debtor from being forced to litigate a torrent of

claims across numerous federal and state forums while protecting its assets from

being depleted through thousands of individual lawsuits.  *See* pp. 6-7, *supra*.

Bankruptcy's capacity to achieve global resolution of claims is particularly

beneficial in mass-tort litigation, where in many cases large numbers of claimants'

injuries will not manifest for years—even decades.  McKenzie, *Toward A Bank-*

*ruptcy Model*, *supra*, at 1001-02; *see, e.g.*, *LTL Mgmt., LLC*, 637 B.R. at 413-14

---

[4] https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Ac-tions_Pending-November-15-2022.pdf.

(recognizing bankruptcy's benefits in light of the "acknowledged latency period for" certain injuries).  The bankruptcy code defines "claim[s]" subject to a bankruptcy court's jurisdiction expansively to include "unmatured," "contingent," and "unliquidated" obligations, 11 U.S.C. § 101(5)—terms which encompass future claims that arise from an injury, such as "exposure to a product," that "occur[s] pre-petition, even though the injury manifest[s]" after the bankruptcy has concluded.  *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010).  The bankruptcy court's jurisdiction thus sweeps broadly to include "future" claims, thereby enabling the court to effectuate "a global resolution and discharge of current and future liability."  *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012).

C.      Bankruptcy thus provides an important mechanism for manufacturers and other businesses to obtain efficient and widespread resolution of liabilities, particularly those arising from mass-tort litigation where the company faces tens of thousands of high-dollar claims in the present, and the prospect of thousands more accruing in the future.  In one MDL that recently transitioned into a bankruptcy proceeding, for the past two years the corporation had "been served on average with one or more ovarian cancer complaint every hour of every day, every single day of the week."  *LTL Mgmt., LLC*, 637 B.R. at 401.  In another case, a corporation facing mass tort liability arising from its breast implant device resorted to bankruptcy when the MDL process and a negotiated global settlement lay "in shambles" and "the

possibility of defending itself on so many fronts simultaneously was financially and logistically impossible." *In re Dow Corning Corp.*, 211 B.R. 545, 553 (Bankr. E.D. Mich. 1997); *see also A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 996 (4th Cir. 1986) (corporation filed for bankruptcy when facing "an avalanche of actions filed in various state and federal courts"). Several of these mass tort bankruptcies are widely thought to be success stories by any measure. *See* Smith, *Resolution of Mass Tort Claims*, *supra*, at 1636-38 (discussing successes of A.H. Robins and Dow Corning bankruptcies).

Bankruptcy's benefits also inure to the distressed business's stakeholders, including its employees and shareholders. By preserving the company's value against a rush-to-the-courthouse frenzy of creditor claims, *see* pp. 6-7, *supra*, bankruptcy maximizes the potential that the company will reemerge as a productive market participant, continue to employ workers, and preserve value for its shareholders. These protections for employees, shareholders, and other stakeholders are not peripheral; they are central to bankruptcy's goal: the "purpose of a business reorganization is to 'restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.'" *In re Deer Park, Inc.*, 10 F.3d 1478, 1485 (9th Cir. 1993) (quoting H.R. Rep. No. 595, 95th Cong., 2nd Sess. 220, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6179); *see In re Gonic Realty Tr.*, 909 F.2d 624, 627 (1st Cir. 1990) (a "purpose of the

Bankruptcy Code is … to … preserv[e] jobs and shareholder interests").

In short, bankruptcy offers an important tool for manufacturers and other businesses in financial hardship to "produce comprehensive, equitable, and timely" resolution of their liabilities for the benefit of the company and its stakeholders, *LTL Mgmt., LLC*, 637 B.R. at 414—benefits that are all the more relevant in the context of mass-tort litigation.

## II. Multi-district litigation cannot reliably and efficiently achieve widespread resolution of mega mass-tort litigation.

MDL can be a useful tool in resolving some mass tort cases, particularly where dispositive issues may be decided in pre-trial motions and the circumstances are conducive to a fair, negotiated settlement. But it is not a one-size-fits-all mechanism. And it can be especially poorly suited for mass-tort cases that reach this "staggering" magnitude. *Aearo Techs. LLC*, 642 B.R. at 897. MDL lacks key features of bankruptcy that tend to reliably achieve a fair and widespread resolution of mega mass-tort litigation. That is why it is "folly" to contend "that the tort system offers the only fair and just pathway of redress and that other alternatives"—like bankruptcy— "should simply fall by the wayside." *LTL Mgmt., LLC*, 637 B.R. at 414 (emphasis omitted).

### A. Multi-district litigation is ill equipped to reliably achieve global resolution in mega mass-tort litigation.

MDL is ill equipped to provide global resolution in mega mass-tort

controversies, thus prolonging litigation for defendants and claimants alike while delaying recovery and depleting the debtor's resources. Unlike bankruptcy, therefore, MDL cannot reliably produce widespread resolution of a debtor's liabilities.

MDL's shortcomings are particularly acute with respect to future mass-tort claimants. Mega mass-tort suits can often involve claimants with latent injuries that may not manifest for years, possibly decades. *See* Samir D. Parikh, *The New Mass Torts Bargain*, 91 Fordham L. Rev. 447, 451 & n.25 (2022); McKenzie, *Toward A Bankruptcy Model*, *supra*, at 1001. The "sheer volume of claims" stretching so far out over time "means that there is no natural termination to the litigation." Natalie R. Earles, *The Great Escape: Exploring Chapter 11's Allure to Mass Tort Defendants*, 82 La. L. Rev. 519, 533 (2022). Unlike bankruptcy, however, MDL lacks a reliable mechanism for resolving the claims of unknown future parties whose injuries may not manifest until years later. *Cf.* pp. 8-9, *supra*. In these types of cases, even if MDL were to produce settlement of present claims, it could not resolve the potentially hundreds of thousands of future claims that may be asserted in years to come. *See* pp. 7-8, *supra*. This presents "an obvious problem" for global resolution: defendants will be less likely to "enter into a global settlement if they cannot be reasonably certain that it will bring peace." S. Todd Brown, *Plaintiff Control and Domination in Multidistrict Mass Torts*, 61 Clev. St. L. Rev. 391, 403 (2013).

MDL's inability to obtain global resolution of mega mass-tort claims extends

to present claims as well.  To start, MDL judges are authorized to conduct only "*pre-trial* proceedings" and must "remand[]" each case "to the district from which it was transferred" after pretrial proceedings have concluded.  28 U.S.C. § 1407(a) (emphasis added).  But MDL's restriction to pretrial proceedings means that post-remand cases risk "break[ing] down into … thousands of individual actions … that may involve additional discovery, repetitive litigation concerning similar issues across forums, and inconsistent rulings concerning these issues."  Brown, *Plaintiff Control and Domination in Multidistrict Mass Torts*, *supra*, at 402.

That is especially true in mega mass-tort litigation, like this one, given the significant issues that cannot be resolved in the MDL proceedings.  For example, causation is a necessary element of each plaintiff's claim, but it is also "extremely difficult to establish for mass tort victims," particularly where the "individual suffers an injury that is fairly common in the general population" and "[l]ong latency periods allow for other variables" unique to the individual claimant "to intervene in the causal chain."  Parikh, *The New Mass Torts Bargain*, *supra*, at 458.  These hurdles are immense in this case, which concerns hundreds of thousands of allegations of various stages of hearing loss or other hearing-related problems.  Similarly, the amount of each claimant's damages (if any) will depend on highly individualized factors that will almost certainly require further discovery after remand.  *See, e.g.*, *In re Condustrial, Inc.*, No. 09-04425, 2011 WL 3290389, at *6 (Bankr. D.S.C. Aug.

1, 2011) (recognizing that mass torts "typically" involve claimants with "individualized claims for damages … based on separate and distinct factual circumstances particular to each claimant"); *see also* Edward F. Sherman, *When Remand Is Appropriate in Multidistrict Litigation*, 75 La. L. Rev. 455, 464 (2014) (noting that mass-tort cases "may require additional individualized plaintiff discovery … [on] remand, particularly on such issues as specific causation and damages").  Compelling the parties to proceed through MDL will "force[]" them to "relitigate causation, and damages, and apportion liability among defendants in every case," ultimately burden[ing] the tort system with unnecessarily drawn-out litigation." *LTL Mgmt., LLC*, 637 B.R. at 412.  In contrast, consolidated bankruptcy actions can result in *complete* adjudication of claims, including trial before a federal bankruptcy judge.  28 U.S.C. § 157(b).

Even if MDL were to result in settlement, rather than adjudication through trial or dispositive motion, it has further limitations that make it an unsatisfying solution in mega mass-tort cases.  To begin with, MDL cannot "bind[] non-consenting plaintiffs" to a proposed settlement.  Brown, *Plaintiff Control*, *supra*, at 401.  Bankruptcy judges, in contrast, are empowered to ensure that global resolution is truly global.  *See* 11 U.S.C. § 1141(a) (providing that Chapter 11 confirmation plan "bind[s] … any creditor … whether or not such creditor … has accepted the plan"); *see also* McKenzie, *Toward A Bankruptcy Model*, *supra*, at 1006 (noting that a

14

bankruptcy "discharge is binding even against a claimant who did not submit a proof of claim … or who submitted a proof of claim and objected to the [reorganization] plan"); *see also* pp. 5-11, *supra*.

State lawsuits also pose a problem for global resolution, as "[s]tate claims are not subject to the jurisdiction of the transferee court in a federal MDL." Amy L. Saack, *Global Settlements in Non-Class MDL Mass Torts*, 21 Lewis & Clark L. Rev. 847, 855 (2017); *see* Parikh, *The New Mass Torts Bargain*, *supra*, at 477 (noting that "state law claims … cannot be aggregated" in MDL). These shortcomings are evident in this case where "approximately 2000 lawsuits [are] pending in the state courts of Minnesota." *Aearo Techs. LLC*, 642 B.R. at 897. MDL simply cannot reliably achieve widespread resolution of these claims. And the inability of MDL to resolve state claims in particular also means it cannot prevent a debtor's assets from being rapidly depleted through uncoordinated litigation in state court as MDL progresses—all to the detriment of other claimants and those invested in the company's continued survival.

For these reasons, MDLs frequently fail to actually resolve mega mass-tort litigation and often result in collapsed settlements and eventual bankruptcy—often after resources have been depleted. For example, in the 1990s Dow Corning Corp. was subject to an increasing number of product injury lawsuits arising from its silicone gel breast implants—with 3,000 suits filed in 1992, 8,000 in 1993, and over

7,000 in 1994. *In re Dow Corning Corp.*, 187 B.R. 919, 922 (E.D. Mich. 1995), *supplemented* (Sept. 14, 1995), *rev'd*, 103 F.3d 129 (6th Cir. 1996). By early 1995, Dow Corning "was a Defendant in 45 putative class action lawsuits … and over 19,000 individual lawsuits." *Id.* These cases were transferred to MDL in 1992, *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098, 1099 (J.P.M.L. 1992), but efforts to obtain a global settlement ultimately failed. The parties initially agreed to settlement terms, but more than 400,000 claims were filed— an amount that "clearly exceeded defendants' expectations" and required a significant reduction in the benefits that would be paid to plaintiffs. John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1408 (1995); *see Dow Corning Corp.*, 187 B.R. at 922 (noting that the settlement was "oversubscribed" because "claims … exceed[ed] the Defendants' funding commitments"). This, in turn, led a substantial number of plaintiffs to opt out of the settlement, putting Dow Corning in the position of "both fund[ing] the settlement and continu[ing] to incur substantial litigation costs in connection with the opt-out claimants." *Dow Corning Corp.*, 187 B.R. at 922. The settlement "had clearly failed to achieve a global peace," and Dow Corning sought bankruptcy reorganization in May 1995. Coffee, *Class Wars*, *supra*, at 1408-09.

Numerous asbestos manufacturers took the same route. By 1991, the volume of asbestos litigation in federal courts had overwhelmed the federal docket, with

"nearly two new asbestos actions … being filed for every action terminated," a pace that would result in "more than 48,000 actions pending in the federal courts at the end of three years." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 419 (J.P.M.L. 1991).  In July 1991, some 26,639 actions (pending in 87 districts) were transferred to the Eastern District of Pennsylvania.  *Id*. at 416.  By 2002, "730,000 individuals had filed asbestos claims."  Smith, *Resolution of Mass Tort Claims*, *supra*, at 1618.  Years passed as the court sought to "orchestrate a global settlement."  *See* D. Theodore Rave & Francis E. McGovern, *A Hub-and-Spoke Model of Multidistrict Litigation*, 84 Law & Contemp. Probs. 21, 27 (2021).  Meanwhile, the "federal cases in the MDL largely remained at a standstill," while state court litigation proceeded, resulting in "thousands of claims [being] resolved through piecemeal" litigation and settlements.  *Id*. at 28.  Unable to reach global finality, "most of the major asbestos manufacturers sought protection in bankruptcy."  *Id*.; *see* Parikh, *The New Mass Torts Bargain*, *supra*, at 464 ("[B]y 2007, 'nearly all of the major [asbestos] manufacturers ha[d] declared bankruptcy.'" (alterations in original) (citation omitted)).

The opioid MDL presents a more recent example.  That litigation "dates back to the early 2000s, shortly after Purdue Pharma began marketing OxyContin in 1996."  Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. Rev. 1, 21 (2021).  The MDL panel transferred 64 separate actions pending in

nine districts to the Northern District of Ohio, *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1377 (J.P.M.L. 2017), but only two years later Purdue filed for bankruptcy with some 2,600 separate lawsuits pending against it.[5]  Today, the MDL continues with other defendants, but no global resolution has been reached. *See MDL Statistics Report - Distribution*, *supra*, at 1.

### B. "Bellwether" trials are not likely to advance mega mass-tort cases toward resolution, as this case illustrates.

So-called "bellwether" trials do not overcome MDL's deficiencies in the mega mass-tort context—and they may aggravate them, as this case demonstrates. It is true that, in some scenarios, "[i]f a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997); Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2338 (2008) ("[B]ellwether trials can precipitate and inform settlement negotiations by indicating future trends, that is, by providing guidance on how similar claims may fare before subsequent juries.").  But bellwether trials may not

---

[5] Jan Hoffman & Mary Williams Walsh, *Purdue Pharma, Maker of OxyContin, Files for Bankruptcy*, N.Y. Times (Sept. 15, 2019, updated Nov. 24, 2020), https://www.nytimes.com/2019/09/15/health/purdue-pharma-bankruptcy-opioids-settlement.html; Michael R. Sisak, *Purdue Pharma to stay in business as bankruptcy unfolds*, AP News (Sept. 17, 2019), https://apnews.com/article/white-plains-wv-state-wire-us-news-opioids-health-8bf66a5868b5460a84104b9f5ea801d0.

meaningfully advance resolution of mega mass-tort litigation like the lawsuits facing Aearo here, where there are thousands of "[d]iverse plaintiffs with individualized discovery needs" who are "unlikely to benefit" from trials of plaintiffs "that are differently situated and few in number." *See* Roger Michalski, *MDL Immunity: Lessons from the National Prescription Opiate Litigation*, 69 Am. U. L. Rev. 175, 221 (2019).

The bellwether trials in this case gave rise to none of the benefits that bellwether cases are touted for—if anything, they illustrate the pitfalls of relying on MDL procedures to resolve a mega mass-tort case on this scale. Of twenty-seven bellwether claimants, nineteen went to trial (in sixteen separate trials). *Aearo Techs. LLC*, 642 B.R. at 897. Aearo and 3M won six verdicts, whereas the other ten trials produced verdicts in favor of the plaintiffs ranging from $1.7 million to $77.5 million. *Id.* These inconsistent verdicts hardly indicate a trend; if anything, the wide variation of the verdicts have obscured matters—a dynamic that typically renders the prospect of a "global" settlement even more remote. What's more, the MDL court's procedural and substantive rulings during the bellwether trials have generated a host of subsidiary disputes to be litigated in post-trial motions and appeals to the Eleventh Circuit. Given the contested trial decisions made by the MDL court— as well as the inconsistent verdicts and the basic fact that the bulk of plaintiffs are not likely to be similarly situated to the bellwether plaintiffs—it is anyone's guess

19

how the thousands of trials will turn out on remand to the district courts across the nation.

**C.     Multi-district litigation is often inefficient and unfair to financially struggling companies in mega mass-tort cases.**

MDL is also not well equipped to resolve mega mass-tort litigation like this one in an efficient and fair manner, particularly when an enormous number of claims have been filed or are expected to be filed for the foreseeable future.  Although resolving tens (or hundreds) of thousands of claims will necessarily take time—in bankruptcy or elsewhere—MDL proceedings are notorious for inefficiency and attracting meritless claims.

**1.**     "[A]s compared to the processing time of an average case, MDL practice is slow, very slow." *DeLaventura v. Columbia Acorn Tr.*, 417 F. Supp. 2d 147, 150 (D. Mass. 2006).  This delay is "a common feature of mass tort litigation" in particular, resulting in years of litigation that can "effectively preclud[e] plaintiffs from any meaningful recovery."  Christopher J. Roche, *A Litigation Association Model to Aggregate Mass Tort Claims for Adjudication*, 91 Va. L. Rev. 1463, 1469 (2005).

This reputation is well-earned:  MDL lasts almost four times as long as the average civil case, with products-liability MDLs on the whole lasting an average of 4.7 years.  *See* Elizabeth Chamblee Burch & Margaret S. Williams, *Perceptions of Justice in Multidistrict Litigation: Voices from the Crowd*, __ Cornell L. Rev. __

(forthcoming) (manuscript at 35).[6]  For example, the Johnson & Johnson MDL has been ongoing for six years—since October 4, 2016.  *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 220 F. Supp. 3d 1356 (J.P.M.L. 2016).  Even so, more than 37,000 cases remain pending as of November 15, 2022, *MDL Statistics Report – Distribution*, *supra*, at 1, with a "projected *10,000 new cases* to be filed *each year* going forward," *LTL Mgmt., LLC*, 637 B.R. at 410 (emphasis added); *id*. at 408 (noting that "in the first nine months of 2021, more than 12,300 new lawsuits were filed").  And "in nearly six years, there has been no progress toward a global resolution."  *Id*. at 412.  Similarly, lawsuits related to C-Qur mesh products were transferred to MDL on December 8, 2016, *In re Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.*, 223 F. Supp. 3d 1355 (J.P.M.L. 2016), which still continues—six years later—having resolved fewer than 100 of the more than 3,400 total claims, *MDL Statistics Report – Distribution*, *supra*, at 1.

Some have gone on even longer.  The lawsuits related to the Stryker modular-neck hip implant products were transferred to MDL in mid-2013, *In re Stryker Rejuvenate, ABG II Hip Implant Prods. Liab. Litig.*, 949 F. Supp. 2d 1378 (J.P.M.L. 2013), but the MDL remains unresolved over nine years later, *MDL Statistics Report – Distribution*, *supra*, at 1.  And suits regarding DePuy Orthopedics' hip implants were transferred to MDL on May 23, 2011, *In re DePuy Orthopaedics, Inc.,*

---

[6] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3900527.

*Pinnacle Hip Implant Prods. Liab. Litig.*, 787 F. Supp. 2d 1358 (J.P.M.L. 2011), but 230 cases still remain after more than a decade, *MDL Statistics Report – Distribution*, *supra*, at 1. The asbestos MDL, which commenced in 1991, was finally resolved only a few weeks ago—over thirty (30!) years later. U.S. J.P.M.L., *MDL Statistics Report – Docket Summary Listing* (Nov. 15, 2022).[7]

This case is a prime example of MDL's inability to efficiently resolve mega mass-tort litigation. Three and a half years into the MDL, this litigation, which is unprecedented in its scope, remains in its infancy. Few trials have been held, and the ones that have occurred have produced inconsistent verdicts. Well over 200,000 cases have not come anywhere near the trial stage, and a breathtaking number of individual cases will have to be "remanded" "to the district from which [they were] transferred," 28 U.S.C. § 1407(a), in preparation for trials (and appeals) that will keep the shadow of liability hanging over defendants and will delay any recovery for the MDL claimants for many years. Indeed, multiple appeals of significant issues are already pending and poised to affect any number of cases. All the while, cases continue to be filed by the thousands. *See* pp. 11-19, *supra*. In short, this case is a textbook example of the inherent limitations of MDL in resolving mega mass-tort cases.

---

[7] https://www.jpml.uscourts.gov/sites/jpml/files/Recently_Terminated_MDLs-January%201-November-15-2022.pdf.

**2.**     At the same time, MDL produces significant unfairness to defendants by subjecting them to a flood of non-meritorious claims.  It is no secret that the aggregation of an enormous number of claims under one judicial roof necessarily results in the filing of meritless claims or claims that would never have been brought otherwise.  *See* Douglas G. Smith, *The Myth of Settlement in MDL Proceedings*, 107 Ky. L.J. 467, 471 (2018-2019) ("[A]ggregation tends to incentivize the filing of claims of dubious merit").  Indeed, MDL is "notorious[]" for attracting meritless claims, but "the structure of the modern MDL does not provide as strong a check upon these claims as exists in single-plaintiff litigation."  Jaime Dodge, *Facilitative Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 Emory L.J. 329, 350 (2014).  As one judge observed based on "fifteen years on the federal bench and a front row seat as an MDL transferee judge on two separate occasions," "MDL consolidation for products liability actions" results in "producing more new case filings of marginal merit in federal court, many of which would not have been filed otherwise."  *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004, 2016 WL 4705807, at *2 (M.D. Ga. Sept. 7, 2016).

The MDL structure features no check on baseless claims.  In fact, MDL's incentive structure *encourages* them.  The "most obvious cause" is "the financial incentive plaintiff lawyers have to maximize their returns[:]  [t]he more claims that are filed, the greater the potential recovery."  Smith, *The Myth of Settlement*, *supra*,

at 471.  The problem is compounded by the fact that "a firm's inventory of claims is often a key determinant" of whether the firm will be selected by the presiding judge to serve on the "plaintiff steering committee" that will control the litigation.  *Id*. Thus, plaintiffs' attorneys have an incentive to rack up as many cases as possible; indeed, MDL often involves "mass-advertising campaigns" that "encourage members of the public to file claims if they believe they have been injured."  *Id*. at 472. But this causes a problem:  "the larger the volume of claims, the more difficult it becomes for the lawyers to adequately screen the claims before filing them," all of which strains the lawyer's resources and inhibits effective screening mechanisms. *Id*.

The overwhelming tendency of MDL to eventually settle—after years or even decades and the expenditure of an extraordinary amount of resources—creates an additional magnet for meritless claims.  "[T]he 'settlement culture' for which the federal courts are so frequently criticized is nowhere more prevalent than in MDL practice."  *DeLaventura*, 417 F. Supp. 2d at 150; *see also* Parikh, *The New Mass Torts Bargain*, *supra*, at 477 ("the supermajority of mass tort litigation is resolved through contractual settlements").  But this settlement culture can have a "profoundly negative effect—incentivizing counsel to file meritless claims at the expense of both defendants and those plaintiffs whose claims have merit."  Smith, *The Myth of Settlement*, *supra*, at 473.  Thus, "[r]esources that could go to actual victims are

fragmented by fraudulent claims."  Parikh, *The New Mass Torts Bargain*, *supra*, at 478.

The risk of meritless claims is not theoretical.  For example, the Silica MDL consisted of more than 10,000 separate claims.  *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 573 (S.D. Tex. 2005).[8]  Through the use of "increasingly aggressive" discovery, defendants uncovered "numerous flaws" in the plaintiffs' attorneys' screening of cases, leading to a "rate of positive diagnosis [that] was shockingly high," S. Todd Brown, *Specious Claims and Global Settlements*, 42 U. Mem. L. Rev. 559, 580, 582 (2012), prompting the district court to conclude that "they were manufactured for money," *Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 635.  High numbers of meritless claims were also uncovered in the Fen-Phen MDL, which involved claims that an anti-obesity treatment caused valvular heart disease and pulmonary hypertension.  Brown, *Specious Claims*, *supra*, at 583, 586; *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 990 F. Supp. 834, 835 (J.P.M.L. 1998).  Even though the settlement was "carefully structured to screen out weak claims," many made it through; a post-settlement audit of the claim pool "revealed that roughly 12.5% of the claims submitted were legitimate."  Brown, *Specious Claims*, *supra*, at 584, 586.  Considering that the combat earplug MDL here is

---

[8] Silica is a common mineral that can cause respiratory swelling and scarring when inhaled.  *Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 569.

by far the largest MDL in history, it is highly likely that there are an *enormous* number of meritless, or even fraudulent, claims lurking alongside the genuine ones.

### III.   A bankruptcy proceeding cannot achieve its purpose or properly function without staying or enjoining pending MDL claims.

In failing to stay the MDL claims against 3M, the bankruptcy court undercut the key strategy of the bankruptcy proceeding and severely threatened its useful functioning.  "Bankruptcy palliates creditors' problem of collective action, forcing disputes into a single forum and preventing the dismemberment of a firm that still may be more valuable alive than dead."  *Pettibone Corp. v. Easley*, 935 F.2d 120, 123 (7th Cir. 1991).  Chiefly through the automatic stay, bankruptcy closes the door to all other avenues of recovery against the debtor and brings all creditors into one "centralized" location to "resolve competing economic interests in an orderly and effective way."  Smith, *Resolution of Mass Tort Claims*, *supra*, at 1639-40 (citation omitted).

This channeling mechanism is vitally important for preserving the troubled company's value against a cascade of creditors seeking to collect before the company's assets run dry.  Upon learning a business is in financial trouble, creditors often "rush to get paid before the money runs out."  David A. Skeel, Jr., *When Should Bankruptcy Be an Option (for People, Places, or Things)?*, 55 Wm. & Mary L. Rev. 2217, 2227 (2014).  But this rush to the courthouse can be enormously harmful as it rapidly depletes the company's remaining assets, leaving its employees with little

hope the company will recover and depriving many creditors (including plaintiffs, present and future) who miss the rush of any chance at even partial recovery. If the MDL process plays out here, for instance, some plaintiffs—perhaps those in the designated first few "waves" currently queued up in discovery—may get a slice of the pie. But well over *200,000 others* are at the back of the line, and there is no guarantee that assets will remain for them. To address this dilemma, bankruptcy "imposes a cease fire": "[b]y halting creditors' individual efforts to collect … and providing a collective proceeding for resolving the debtor's financial distress," bankruptcy preserves the business's value against a "disorderly liquidation." *Id.* at 2227, 2235.

In addition to the automatic stay provisions, *see* 11 U.S.C. § 362(a)(1), (3), bankruptcy courts are empowered "to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title," *id.* § 105(a). The bankruptcy code thus "grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *In re Caesars Entm't Operating Co.*, 808 F.3d 1186, 1188 (7th Cir. 2015). When another suit is "related" to a bankruptcy proceeding, 28 U.S.C. § 1334(b), that suit can "be stayed by authority of section 105." *Zerand–Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 161-62 (7th Cir. 1994).

The Aearo bankruptcy simply cannot function in its intended manner, benefitting debtors and creditors alike, while the specter of colossal liability in the MDL

litigation looms. Whether under the automatic stay provisions or through equitable injunctive relief, the MDL must be paused while Aearo and the host of parties work to resolve the mass-tort liability in the bankruptcy court. Puzzlingly, the bankruptcy court here held that it did not even have *jurisdiction* to consider whether to stay the MDL claims against 3M. *Aearo Techs. LLC*, 642 B.R. at 911. This, despite the court's recognition that a stay would "influence" the bankruptcy proceedings, including by providing "Aearo and/or 3M with additional leverage to negotiate a global settlement," and that "the Bankruptcy Code provide[s] certain tools that Aearo and 3M will lack outside of bankruptcy." *Id.* at 912. The bankruptcy court even acknowledged that it had evidence before it from which it "could readily conclude that continuation of the [MDL] as to 3M would have a significant, if not disastrous, effect on Aaero's bankruptcy." *Id.* at 911. Nonetheless, the court held that it had no power at all to stay the MDL.

The court's conclusion is doctrinally wrong under the plain language of the statute—and the practical effect of this ruling would be to block manufacturers and other businesses from resolving their mass-tort liability through bankruptcy, even though bankruptcy is often the far more efficient and equitable mechanism for doing so. The bankruptcy court itself has since recognized that, because of the ongoing MDL litigation, the Aearo bankruptcy descended into "a horrible limbo." App. 428. This Court should clarify that bankruptcy is a legitimate and efficient procedure for

resolving a corporation's mass-tort liability and that a bankruptcy court can and should do what that is necessary and appropriate to enable the proceeding's success—including staying parallel mass-tort litigation against a related entity whose liabilities redound to the debtor. Without a stay in these types of cases, a debtor's estate is likely to be devoured by the MDL claims and the payoff of bankruptcy will be lost.

* * * * *

MDL is no panacea for mega mass-tort lawsuits, particularly those of this magnitude. MDL "lacks any direct structural framework" capable of ensuring that a case "can be resolved once and for all through litigation or global settlement in the transferee court," Brown, *Plaintiff Control*, *supra*, at 401, much less in an efficient and fair manner to defendants. By contrast, bankruptcy is an important mechanism for manufacturers and other business defendants to achieve widespread resolution of mass-tort liability in a single forum, preserving the debtor's assets so that creditors (both past and future) may receive equitable recovery and the business debtor may have a hope of achieving the "fresh start" that bankruptcy promises—for its benefit and that of its employees and shareholders. But the benefits of a bankruptcy are illusory if mega mass-tort litigation that involves common facts and overlapping claims against a related entity whom the debtor is bound to indemnify can continue during the reorganization. This Court should make clear that a bankruptcy court can

and should stay pending mega mass-tort litigation while the bankruptcy proceeding

progresses toward an ultimate resolution.

## CONCLUSION

This Court should vacate the judgment of the bankruptcy court.


Dated:  December 19, 2022                    Respectfully submitted,

                                             *s/ Jaime A. Santos*
Erica Klenicki                               Jaime A. Santos
Michael A. Tilghman II                       Jesse Lempel
NAM LEGAL CENTER                             GOODWIN PROCTER LLP
733 10th Street, N.W., Suite 700             1900 N Street, N.W.
Washington, DC 20001                         Washington, DC 20036
(202) 637-3000                               (202) 346-4000
                                             *jsantos@goodwinlaw.com*

                                             *Counsel for Amici Curiae*

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), and Cir. R. 29 because it contains 6,950 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  December 19, 2022

*s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
*jsantos@goodwinlaw.com*

*Counsel for Amici Curiae*
