No. 22-2606

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

IN RE: AEARO TECHNOLOGIES, LLC, ET AL.

AEARO TECHNOLOGIES, LLC, ET AL.,
*Debtors-Appellants,*

v.

THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT
AND JOHN & JANE DOES, 1-1000,
*Appellees.*

On Direct Appeal from the United States Bankruptcy Court
for the Southern District of Indiana, Indianapolis Division
No. 22-2890, Adv. No. 22-50059

## BRIEF FOR APPELLEE OFFICIAL COMMITTEE OF
## UNSECURED CREDITORS FOR TORT CLAIMANTS –
## RELATED TO USE OF COMBAT ARMS VERSION 2 EARPLUGS

David C. Frederick
Joshua D. Branson
Derek C. Reinbold
Eden M. Bernstein
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com

*Counsel for Appellee Official Committee of
Unsecured Creditors for Tort Claimants –
Related to Use of Combat Arms Version 2 Earplugs*

January 25, 2023

*(Additional Counsel Listed On Signature Page)*

# DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

undersigned counsel provides the following information:

1.     The full name of every party that the attorney represents in the
case:

Official Committee of Unsecured Creditors for Tort Claimants – Related

to Use of Combat Arms Version 2 Earplugs.

2.     The names of all law firms whose partners or associates
have appeared for the party in the case (including proceedings in the
bankruptcy court, in the district court, or before an administrative agency) or
are expected to appear for the party in this Court:

KTBS Law LLP; Otterbourg, P.C.; Brown Rudnick LLP; Caplin

& Drysdale; Rubin Levin, P.C.; and Kellogg, Hansen, Todd, Figel &

Frederick, P.L.L.C.

3.     Identify all parent corporations, if any, of the party, and any
publicly held company that owns 10% or more of the party's stock:

The party has no parent corporation, and it has issued no stock.

4.     Debtor information required by Federal Rule of Appellate
Procedure 26.1(c)(1) and (2):

Debtors are wholly owned subsidiaries of nondebtor 3M Company.

January 25, 2023

_____
    */s/ David C. Frederick*
    David C. Frederick

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT ABOUT ORAL ARGUMENT ...................................... xi

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 4

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE ............................................................. 5

    A.    3M And Aearo ............................................................... 5

    B.    The Earplug Litigation ................................................ 6

        1.    Background ........................................................ 6

        2.    Multidistrict Litigation.................................... 7

    C.    3M's Liability Management Strategy And Aearo's Bankruptcy................................................................... 9

        1.    Project Crane.................................................... 9

        2.    The Funding Agreement................................... 10

        3.    Shared Insurance Policies ............................... 12

    D.    The Bankruptcy Proceedings ..................................... 13

    E.    Post-Bankruptcy Events In The Earplug Litigation ................... 17

SUMMARY OF ARGUMENT ........................................................... 18

STANDARD OF REVIEW ................................................................ 21

ARGUMENT ................................................................................... 22

I.    Section 362(a)(1) Does Not Stay The Earplug Litigation Against 3M ............................................................... 22

A.   Section 362(a)(1) Stays Actions And Claims Against Aearo, Not 3M ................................................................ 23

B.   This Case Presents No "Unusual Circumstances" Supporting A Stay ................................................................ 24

1.   Courts find "unusual circumstances" when nondebtor litigation would create an immediate adverse economic effect on the estate ................................ 25

2.   The bankruptcy court's factual findings confirm that the earplug litigation against 3M will have no economic effect on Aearo's estate ................................ 28

3.   Aearo's arguments for "unusual circumstances" lack merit ................................................................ 29

C.   Section 362(a)(1) Contains No Exception For "Unusual Circumstances" ................................................................ 36

II.   The Bankruptcy Court Held Correctly That § 362(a)(3) Does Not Stay The Earplug Litigation Against 3M ........................ 40

A.   Lawsuits Against 3M Are Not Acts To "Obtain" Or "Control" Insurance Coverage ........................................ 40

B.   Hypothetical Proceeds Under The Aearo Legacy And 3M Tower Insurance Policies Are Not Estate Property ............... 50

III.   The Bankruptcy Court Properly Declined To Enjoin Earplug Claims Against 3M Under § 105(a) ........................ 53

A.   The Bankruptcy Court Did Not Abuse Its Discretion In Determining That It Was Not "Necessary" Or "Appropriate" To Enjoin Earplug Claims Against 3M ............... 53

B.   The Bankruptcy Court Lacked Jurisdiction To Enjoin The Earplug Claims Against 3M ................................ 58

CONCLUSION ................................................................ 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.H. Robins Co. v. Piccinin*,
 788 F.2d 994 (4th Cir. 1986) .......................................... 25, 26, 27, 28, 29,
 31, 32, 35, 39, 40, 48

*ACandS, Inc. v. Travelers Cas. & Sur. Co.*,
 435 F.3d 252 (3d Cir. 2006) .................................................... 43

*Aldrich Pump LLC, In re*,
 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) ............................ 32

*Allied Digit. Techs. Corp., In re*,
 306 B.R. 505 (Bankr. D. Del. 2004) ........................................... 53

*Anderson v. U.S.F. Logistics (IMC), Inc.*,
 274 F.3d 470 (7th Cir. 2001) .............................................. 50, 56

*Austin v. Unarco Indus., Inc.*,
 705 F.2d 1 (1st Cir. 1983) ..................................................... 33

*Bigelow v. Old Dominion Copper Mining & Smelting Co.*,
 225 U.S. 111 (1912) ........................................................... 34

*Bradt v. Woodlawn Auto Workers, F.C.U.*,
 757 F.2d 512 (2d Cir. 1985) ................................................... 46

*Brown v. J.I. Case Co.*,
 813 F.2d 848 (7th Cir. 1987) .................................................. 34

*Bush v. United States*,
 939 F.3d 839 (7th Cir. 2019) ......................................... 16, 58, 59

*Caesars Ent. Operating Co., In re*,
 808 F.3d 1186 (7th Cir. 2015) ................................................. 54

*Canter, In re*,
 299 F.3d 1150 (9th Cir. 2002) ................................................. 38

*Celotex Corp. v. Edwards*,
 514 U.S. 300 (1995) ....................................................... 58, 59

*Central States, Se. & Sw. Areas Pension Fund v. Slotky*,
    956 F.2d 1369 (7th Cir. 1992) .................................................................. 38

*Chugach Forest Prods., Inc., In re*,
    23 F.3d 241 (9th Cir. 1984) ............................................................. 39, 44

*City of Chicago v. Fulton*,
    141 S. Ct. 585 (2021) ............................................ 37, 38, 41, 43, 45, 48

*Colonial Realty Co., In re*,
    980 F.2d 125 (2d Cir. 1992) ......................................................... 23, 24

*Combustion Eng'g, Inc., In re*,
    391 F.3d 190 (3d Cir. 2004) .................................................................. 58

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) .............................................................................. 37

*Diocese of Rochester, In re*,
    2022 WL 1638966 (Bankr. W.D.N.Y. May 23, 2022) ...................... 46, 47

*Disch v. Rasmussen*,
    417 F.3d 769 (7th Cir. 2005) ................................................................ 54

*DM Trans, LLC v. Scott*,
    38 F.4th 608 (7th Cir. 2022) ................................................................ 55

*DMBP LLC, In re*,
    2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ............................ 32

*Downey Fin. Corp., In re*,
    428 B.R. 595 (Bankr. D. Del. 2010) ...................................................... 46

*Eagle-Picher Indus., Inc., In re*,
    963 F.2d 855 (6th Cir. 1992) ................................................................ 27

*Edgeworth, In re*,
    993 F.2d 51 (5th Cir. 1993) .................................................................. 51

*Excel Innovations, Inc., In re*,
    502 F.3d 1086 (9th Cir. 2007) .................................................... 21, 39, 56

*F.M. v. Walden*,
    2013 WL 8481607 (D.N.M. Aug. 6, 2013) ....................................... 32, 33

*Fernstrom Storage & Van Co., In re,*
    938 F.2d 731 (7th Cir. 1991)......................................... 22, 27, 28, 29, 30, 39

*Fisher v. Apostolou,*
    155 F.3d 876 (7th Cir. 1998).................................................... 54, 56, 57, 58

*Fox Valley Constr. Workers Fringe Benefit Funds v. Pride of the Fox*
    *Masonry & Expert Restorations,*
    140 F.3d 661 (7th Cir. 1998)......................................................... 27, 29, 39

*Furry v. United States,*
    712 F.3d 988 (7th Cir. 2013)..................................................................... 29

*Hetherington v. Dawn's Dreams of Wellness Co.,*
    2011 WL 13298567 (M.D. Fla. Sept. 27, 2011)....................................... 33

*Holtkamp, In re,*
    669 F.2d 505 (7th Cir. 1982)..................................................................... 28

*Just Brakes Corp. Sys., In re,*
    108 F.3d 881 (8th Cir. 1997)..................................................................... 24

*Klein v. Perry,*
    216 F.3d 571 (7th Cir. 2000)..................................................................... 55

*Kmart Corp., In re,*
    359 F.3d 866 (7th Cir. 2004)..................................................................... 53

*L & S Indus., Inc., In re,*
    989 F.2d 929 (7th Cir. 1993)............................................................... 54, 57

*Levitz Furniture Inc., In re,*
    267 B.R. 516 (Bankr. D. Del. 2000)......................................................... 44

*LTL Mgmt., LLC, In re*:

    637 B.R. 396 (Bankr. D.N.J. 2022) ......................................................... 36

    638 B.R. 291 (Bankr. D.N.J. 2022) ......................................................... 32

*Ludlow Hosp. Soc'y, Inc., In re,*
    124 F.3d 22 (1st Cir. 1997) ...................................................................... 54

*Lynch v. Johns-Manville Sales Corp.,*
    710 F.2d 1194 (6th Cir. 1983)................................................................. 31

*marchFIRST, Inc.*, *In re*,
　　288 B.R. 526 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Megliola*
　　*v. Maxwell*, 293 B.R. 443 (N.D. Ill. 2003) .................................. 51, 52, 53

*Marcus-Rehtmeyer, In re,*
　　784 F.3d 430 (7th Cir. 2015)................................................... 21

*Maritime Elec. Co. v. United Jersey Bank,*
　　959 F.2d 1194 (3d Cir. 1991) .................................................. 31

*Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n,*
　　892 F.2d 575 (7th Cir. 1989)................................................... 42

*Marvel Ent. Grp., Inc., In re,*
　　209 B.R. 832 (D. Del. 1997) ................................................... 44

*Mazurek v. Armstrong,*
　　520 U.S. 968 (1997)............................................................. 54

*Mazzolin v. Lehman Bros. Real Est. Fund III, L.P.,*
　　2012 WL 245192 (N.D. Ill. Jan. 25, 2012) ............................... 53

*McCartney v. Integra Nat'l Bank N.,*
　　106 F.3d 506 (3d Cir. 1997) .................................... 26, 27, 35

*Metal Ctr., Inc., In re,*
　　31 B.R. 458 (Bankr. D. Conn. 1983)................................. 32, 34

*Minoco Grp. of Cos., In re,*
　　799 F.2d 517 (9th Cir. 1986).................................................. 51

*National Tax Credit Partners, L.P. v. Havlik,*
　　20 F.3d 705 (7th Cir. 1994).............................................. 43, 48

*NC12, Inc., In re,*
　　478 B.R. 820 (Bankr. S.D. Tex. 2012) .................................... 53

*Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett,*
　　24 F.3d 136 (10th Cir. 1994).................................................. 25

*Otoe Cnty. Nat'l Bank v. W & P Trucking, Inc.,*
　　754 F.2d 881 (10th Cir. 1985)................................................ 39

*Pacor, Inc. v. Higgins,*
　　743 F.2d 984 (3d Cir. 1984) .................................................. 34

*Panther Mountain Land Dev., LLC, In re,*
    686 F.3d 916 (8th Cir. 2012)....................................................... 38, 39, 45

*Patton v. Bearden,*
    8 F.3d 343 (6th Cir. 1993)........................................................... 39

*Picard v. Fairfield Greenwich Ltd.,*
    762 F.3d 199 (2d Cir. 2014) ........................................................ 42, 43

*Pitts v. Unarco Indus., Inc.,*
    698 F.2d 313 (7th Cir. 1983)................................................. 15, 22, 23, 37

*Price v. Rochford,*
    947 F.2d 829 (7th Cir. 1991)........................................................ 38

*Prudential Lines Inc., In re,*
    928 F.2d 565 (2d Cir. 1991) ........................................................ 42, 43

*Queenie, Ltd. v. Nygard Int'l,*
    321 F.3d 282 (2d Cir. 2003) ......................................... 22, 25, 26, 33, 35

*Ransom v. FIA Card Servs., N.A.,*
    562 U.S. 61 (2011)..................................................................... 37, 41

*Raudonis as Tr. for Walter J. Raudonis 2016 Revocable Tr. v.
    RealtyShares, Inc.,*
    507 F. Supp. 3d 378 (D. Mass. 2020) ............................................. 32, 33

*Reliant Energy Servs., Inc. v. Enron Canada Corp.,*
    349 F.3d 816 (5th Cir. 2003)........................................................ 25

*Ritchie Cap. Mgmt., L.L.C. v. Jeffries,*
    653 F.3d 755 (8th Cir. 2011)........................................................ 27

*Smith v. Capital One Bank (USA), N.A.,*
    845 F.3d 256 (7th Cir. 2016)........................................................ 38

*Stinnett, In re,*
    465 F.3d 309 (7th Cir. 2006)........................................................ 51

*Thorpe Insulation Co., In re,*
    671 F.3d 1011 (9th Cir. 2012)...................................................... 56-57

*U.S. Underwriters Ins. Co. v. Kum Gang Inc.,*
    443 F. Supp. 2d 348 (E.D.N.Y. 2006) ............................................ 52

*UAL Corp., In re,*
    412 F.3d 775 (7th Cir. 2005)....................................... 42, 45, 46

*United States v. Crawley,*
    837 F.2d 291 (7th Cir. 1988)............................................ 39

*United States v. Frederick,*
    182 F.3d 496 (7th Cir. 1999)............................................ 21

*Village of Rosemont v. Jaffe,*
    482 F.3d 926 (7th Cir. 2007).......................................... 53-54

*Wilder Corp. of Delaware v. Thompson Drainage & Levee Dist.,*
    658 F.3d 802 (7th Cir. 2011)......................................... 50-51

*Yellow Cab Coop. Ass'n, In re,*
    132 F.3d 591 (10th Cir. 1997)........................................... 48

*Yonikus, In re,*
    996 F.2d 866 (7th Cir. 1993)............................................ 53

*Youngstown Osteopathic Hosp. Ass'n, In re,*
    271 B.R. 544 (Bankr. N.D. Ohio 2002) ................................ 46

## STATUTES AND RULES

Bankruptcy Code (11 U.S.C.):

    Ch. 1:

        11 U.S.C. § 101(13)..................................................... 23

        11 U.S.C. § 105 .................................................... 2, 19, 39

        11 U.S.C. § 105(a)................................... 4, 15, 16, 20, 21,
                                          40, 53, 54, 55, 58

    Ch. 3:

        11 U.S.C. § 362(a)..................................................... 38

        11 U.S.C. § 362(a)(1) ............................................. *passim*

        11 U.S.C. § 362(a)(2)-(5)............................................... 38

11 U.S.C. § 362(a)(3) ................................................................*passim*

11 U.S.C. § 362(h) (1988) ...................................................... 38

Ch. 9 .............................................................................................. 37

11 U.S.C. § 922(a) .................................................................. 37

Ch. 11 ............................................................................................ 13

Ch. 12 ............................................................................................ 37

11 U.S.C. § 1201(a) ................................................................ 37

Ch. 13 ............................................................................................ 37

11 U.S.C. § 1301(a) ................................................................ 38

28 U.S.C. § 158(d)(2) .................................................................... 17

28 U.S.C. § 1407 ............................................................................ 57

7th Cir. R. 28(b) .............................................................................. 4

## OTHER MATERIALS

*Black's Law Dictionary* (5th ed. 1979) .................................... 41

*Collier on Bankruptcy* (16th ed. 2022):

Vol. 3 ...................................................................................... 38

Vol. 5 ...................................................................................... 24

*Webster's Third New International Dictionary* (1976) ...................... 41

*Webster's Third New International Dictionary* (1986) ...................... 41

## STATEMENT ABOUT ORAL ARGUMENT

Appellee Official Committee of Unsecured Creditors for Tort Claimants – Related to Use of Combat Arms Version 2 Earplugs agrees that oral argument will aid the Court in resolving this appeal.

**INTRODUCTION**

This bankruptcy arose at the behest of debtor Aearo's nonbankrupt parent, the international conglomerate 3M.  3M faces thousands of lawsuits for selling defective earplugs that harmed U.S. military veterans who served in Afghanistan, Iraq, and elsewhere.  3M dislikes the way those lawsuits are progressing, and it has excoriated the court overseeing them as "out-of-control" and "broken."  So it sought to engineer a change of forum by placing its subsidiary Aearo into bankruptcy and having Aearo (represented by 3M's litigation counsel) ask the bankruptcy court to enjoin those lawsuits.  The lawsuits Aearo seeks to enjoin are against *nondebtor* 3M.  The question on appeal is whether Aearo can use the Bankruptcy Code's stay provisions to halt earplug litigation against its wealthy, nonbankrupt parent.  The answer, as the bankruptcy court correctly adjudged after a three-day trial, is no.

The first two Code provisions at issue stay actions or claims "against the debtor" (11 U.S.C. § 362(a)(1)) and acts "to obtain possession of . . . or to exercise control over property of the [debtor's] estate" (*id.* § 362(a)(3)).  The first, by its plain terms, does not reach nondebtors like 3M.  Although some courts have (incorrectly) extended § 362(a)(1) to nondebtors in "unusual circumstances," no such circumstances exist here.  That is because, as the bankruptcy court determined, the circular funding agreement that 3M executed on the eve of Aearo's bankruptcy is too clever by half.  It purports to make Aearo indemnify

3M for earplug liability, but it also provides an unlimited (yes, unlimited) funding stream from 3M to cover *all* of Aearo's liabilities – including the very indemnity liability the agreement nominally creates. In the bankruptcy court's considered judgment, 3M's uncapped funding commitment ensured that continued earplug litigation against 3M would have no "financial impact to [Aearo's] creditors, let alone a significant and adverse one." SA.32.

That finding, which Aearo does not seriously contest on appeal, defeats every argument Aearo musters in support of a stay. Indeed, Aearo cannot cite any case enjoining litigation against a nondebtor despite a factual finding that such litigation will affect neither the debtor nor its creditors. Without such an effect, there can be no "unusual circumstances" that warrant extending § 362(a)(1) beyond its text. Nor can the litigation diminish any "property of the estate" under § 362(a)(3). And the same reasoning amply justifies the bankruptcy court's discretionary decision to deny a stay under 11 U.S.C. § 105, which the court found would not aid Aearo's reorganization.

As for § 362(a)(3), the court also held correctly that litigation against 3M seeks neither to "obtain" nor "control" any estate property. Aearo proffers its hypothetical future insurance proceeds as estate property and predicts that continued litigation will induce 3M to take for itself the money due to Aearo under those policies. This theory does not show that any *earplug lawsuit* against 3M seeks to "obtain" or "control" insurance proceeds. Rather, it shows

2

at most that those lawsuits might *induce 3M* to seize Aearo's insurance money to pay for the judgments against it. 3M has not yet done so, and § 362(a)(3) may well bar 3M from ever doing so. But the statute does not bar plaintiffs from recovering damages from 3M, which is all their lawsuits seek to do.

This whole scheme is a contrivance by clever lawyers to channel thousands of cases out of the civil litigation system, where they belong, and into a bankruptcy system that 3M believes will afford it greater leverage. The bankruptcy court, which carefully considered the evidence, understood the infirmities of extending Aearo's litigation stay to 3M. And the MDL court, which faithfully has stewarded the litigation against 3M for years, properly perceived Aearo's gambit (really, 3M's) as "old-fashioned litigation forum shopping," designed "to evade dissatisfactory legal rulings and verdicts in the MDL." CA.559.

The Bankruptcy Code does not support that gambit. Awarding a stay to nondebtor 3M is unfaithful to the Code's text, its purpose, this Court's precedents, and cases from other Circuits. Simply put, the Code is designed to foster successful reorganizations, not to provide wealthy tortfeasors with litigation leverage. 3M's unhappiness with the civil litigation against it does not justify contorting the Code to halt that litigation in its tracks.

## JURISDICTIONAL STATEMENT

Aearo's jurisdictional statement is complete and correct, 7th Cir. R. 28(b), except that the bankruptcy court lacked jurisdiction to issue the injunction Aearo seeks, *infra* Part III.B.

## STATEMENT OF THE ISSUES

1.     Whether litigation against 3M, the nonbankrupt parent of debtor Aearo, is litigation "against the debtor" or "to recover a claim against the debtor."  11 U.S.C. § 362(a)(1).

2.     Whether litigation to recover damages from nondebtor 3M is an "act to obtain possession of" or to "exercise control over" Aearo's property.  11 U.S.C. § 362(a)(3).

3.     Whether the bankruptcy court abused its discretion in finding it neither "necessary" nor "appropriate" to stay litigation against 3M under 11 U.S.C. § 105(a), and whether the court had jurisdiction to issue such a stay.

## STATEMENT OF THE CASE

### A.     3M And Aearo

3M is one of the largest, most profitable companies in the world.  SA.4.[1]
It sells diverse goods, from ubiquitous household products like Scotch® tape
and Post-it® notes to pharmaceuticals and chemicals.  *Id.*; CA.538.  It had $35
billion in net sales in 2021.  SA.4.

Aearo is a wholly owned 3M subsidiary that sells products to protect
against noise, heat, and shock.  SA.3.  An Aearo officer described the company
as a "$100 million . . . business sitting inside of a $35 billion conglomerate."
CA.199 (58:13-14).  One of the company's past products was the Combat Arms
Earplug Version 2, which Aearo sold to the U.S. military.  SA.3.

3M bought Aearo in April 2008 for $1.2 billion.  SA.4.  When 3M acquired
Aearo, it executed a "Support Services Agreement" under which 3M took over
nearly all of Aearo's operations.  CA.332-53.  Under that agreement, still
operative today, 3M performs Aearo's "selling, marketing, general and
administrative" tasks, plus "back-office" functions such as insurance,
accounting, and legal.  CA.204-06, CA.208 (67:21-69:1, 71:2-10); CA.347-51.
The agreement nominally requires Aearo to "pay" 3M for these services, but
Aearo "would never send" payments; the debits and credits were only ever

---

[1] "SA" is Aearo's Short Appendix; "A" is Aearo's Appendix; "CA" is the
Committee's Supplemental Appendix.

accounting entries. CA.216 (158:9-25). Since 2016, Aearo has not "paid" anything, even on paper. SA.4-5.

Aearo's earplug business remained technically separate from 3M until 2010, when it was "upstreamed" to 3M. SA.4. Through the upstream, Aearo transferred its head, eye, ear, hearing, and face-safety "assets and liabilities" to 3M. CA.221 (208:11-18). 3M owes Aearo $965 million from the upstream. SA.4. That receivable remains uncollected on Aearo's books. *Id.*

## B.    The Earplug Litigation

### 1.    Background

Aearo began selling earplugs to the military in 2000. SA.3. After the 2010 upstream, 3M took over the earplugs' manufacture and sale. CA.417, CA.420-21 (136:4-7, 139:20-140:5, 140:14-17); CA.493-98. 3M itself then sold the earplugs from 2010 until 2015. SA.4. The earplugs were standard military issue from at least 2003 to 2015, and (at least) hundreds of thousands of soldiers wore them in training, patrol, and combat. *E.g.*, CA.465, CA.474-75 (¶¶ 1, 70-72).

Both 3M and Aearo knowingly concealed serious defects in the earplugs. A.122 (¶ 82). A July 2000 internal Aearo report, known as the Flange Report, first documented those flaws. A.116 (¶ 67). The report revealed that, when service members used the earplugs according to standard fitting instructions, they would loosen imperceptibly, providing little to no hearing protection.

6

A.116-29 (¶¶ 67-99).   That flaw caused hundreds of thousands of service members to suffer hearing loss and tinnitus.  A.152 (¶ 141).  3M and Aearo knew about this flaw but concealed it to enable continued sales.  A.116-29 (¶¶ 67-99).  The Flange Report remained secret until 2015, when it emerged in discovery in an unrelated patent case.  A.122 (¶ 82).  3M stopped selling the earplugs the next day, without informing the military of the flaw.  CA.18.

Soon after, the 3M competitor that had discovered the Flange Report filed a qui tam action against 3M, alleging that 3M defrauded the military by knowingly concealing defects in the earplugs it sold.  *See United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, No. 3:16-cv-1533 (D.S.C.).  3M settled with the United States for millions of dollars.  SA.5.

### 2.    Multidistrict Litigation

Private personal-injury litigation followed.  In the first suit, filed in December 2018, Robin Kennedy alleged that 3M's defective earplugs caused his hearing loss and tinnitus.  CA.475 (¶¶ 72-73).  Kennedy, a 20-year Marine Corps veteran, wore the earplugs on convoys and patrols.  CA.474 (¶ 71).  He named 3M and "Doe" defendants, not Aearo.  CA.464.  Hundreds of veterans with similar injuries sued soon after.  Facing suits nationwide, 3M "support[ed]

centralization" through the MDL process.  CA.1.  In April 2019, the cases were consolidated in the Northern District of Florida before Judge Rodgers.  CA.2.[2]

3M[3] used the MDL's centralized process to its advantage.  It forced claimants to provide common discovery, litigated common defenses, and sought to exclude expert testimony.  It also obtained dismissal of thousands of plaintiffs' claims after they failed to produce necessary information, like military service records.  A.148-49 (¶ 131); CA.61-62.

The MDL court also adopted a bellwether process for adjudicating the claims.  The court first created a representative pool of potential bellwether plaintiffs.  A.103-04 (¶ 29).  From that pool, the court (randomly), 3M, and plaintiffs each selected 9 plaintiffs for trial.  A.104 (¶ 30).  Eight of those cases were dismissed; the rest resulted in 16 trials encompassing 19 plaintiffs before 9 different trial judges.  A.105-06 (¶¶ 33, 36-37).  3M won 6 trials, 5 of which involved plaintiffs that it had selected.  *Id.*  Plaintiffs won the remaining 13 trials, including all of the court's random picks.  *Id.*  In each case 3M lost, the jury found it jointly and severally liable with Aearo.  *Id.*

---

[2] Similar litigation brought by consumers and government contractors proceeded in Minnesota state court.  A.149 (¶ 134).

[3] "3M" in this section means the MDL defendants:  3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC, and Aearo, LLC.  Throughout the MDL, 3M Company represented that it alone was responsible for earplug-related liabilities.  CA.565; *infra* pp. 17-18.

Although Aearo remained a nominal defendant in those cases, 3M held itself out as the one that mattered.  As the MDL court observed, "over the years of intensive discovery, motions practice, and bellwether trials," "3M Company comported itself as the sole entity" in the litigation.  CA.401.  It paid all defense costs.  CA.441-42 (186:23-187:4).  Aearo paid nothing to litigate the cases, and 3M took no steps to recover any defense costs from Aearo.  CA.213 (155:13-20); CA.442 (187:5-22).  3M's conduct throughout was, according to the MDL court, "premised on two truths – that 3M Company is directly and independently responsible for the [earplug] liability in this litigation and that its subsidiaries [we]re parties in name only."  CA.406-07.  Indeed, "all 16 bellwether trials went forward with no suggestion from 3M that it had anything but exclusive liability for the alleged [earplug]-related injuries."  CA.565.

## C.     3M's Liability Management Strategy And Aearo's Bankruptcy

### 1.     Project Crane

By March 2022, the MDL court began preparing waves of 500 cases for remand to transferor courts.  A.149 (¶¶ 135-136).  Faced with those impending remands, 3M's General Counsel assembled a team of 3M executives to work on a project, codenamed "Project Crane," to explore "strategic alternative[s] to managing 3M's litigation."  CA.434-36, CA.440 (179:15-181:17, 185:4-11); CA.505.  Nobody from Aearo was involved.  CA.435 (180:12-14).

Project Crane soon identified bankruptcy as the best tool to manage 3M's litigation exposure. At a May 2022 board meeting, 3M discussed Project Crane as "Litigation Risk Management," referring to the earplug claims. CA.504-05. By July 2022, 3M determined that the MDL had "not provided a pathway" for resolving the earplug claims to 3M's satisfaction, so "[3M] should instead seek to resolve the alleged claims [including those against 3M] through a chapter 11 process of the Aearo Entities." CA.526-27.

### 2.    The Funding Agreement

For an Aearo bankruptcy to give 3M the litigation advantage it sought, 3M had to create an unorthodox contractual relationship with Aearo. 3M contrived to do so through a "Funding Agreement" with Aearo the day before Aearo declared bankruptcy. SA.9; A.276. Kirkland & Ellis, 3M's litigation counsel in the MDL, drafted the first version of that agreement, which served as a framework for later versions. CA.370-98.

Under the final funding agreement, 3M agreed to fund all of Aearo's costs and liabilities. A.280-81, A.283-84. 3M made an initial funding "commitment" of $1.24 billion. A.278. That initial amount "d[id] not serve as a cap on [3M's] funding obligations," *id.*, as both 3M's and Aearo's signatories confirmed, CA.426 (171:5-19) (Michael Dai, for 3M); CA.452-53 (270:13-271:4) (Jeffrey Stein, for Aearo). Rather, 3M agreed to cover Aearo's liabilities no matter how large they grew. A.280-81, A.283-84. Nor were 3M's payments loans; Aearo

10

did not have to pay them back.  CA.429, CA.447 (174:5-9, 226:4-11).  So long as Aearo submitted "a Funding Request," in any amount, 3M "agree[d] . . . to make a Payment" to satisfy the request.  A.284.

In exchange for 3M's uncapped, no-questions-asked funding commitment, Aearo nominally promised to indemnify 3M for its earplug liabilities.  A.285.  But that promise had no effect on Aearo.  A "Permitted Funding Use" – which triggered 3M's duty to pay Aearo on request – includes "any indemnification or other obligations of any Aearo Entity."  A.282.  If 3M asked Aearo to honor its indemnity obligations, Aearo thus could ask 3M for the money to do so.  SA.10-11.

The final agreement did not require Aearo to exhaust its own assets before seeking funding.  An earlier draft agreement had said Aearo could ask 3M to pay for "indemnification" "solely to the extent [Aearo's] then available cash on hand is insufficient to pay such amounts in full."  CA.375-76.  But the final version was different, requiring 3M to honor Aearo's funding request whenever Aearo's assets are, "or are projected to be," "insufficient to pay or satisfy" its liabilities.  A.282.  That arrangement permits Aearo itself to "make a determination" whether 3M's funding is needed.  CA.459 (277:3-9); SA.31.[4]

_____

[4] Aearo asserts (at 12) that the funding agreement requires Aearo to "exhaust[] . . . its own cash" before 3M will tender payment.  But when asked whether Aearo itself "could make a determination . . . that they have . . . insufficient assets to pay all [the earplug] liabilities that they have and ask 3M

### 3.    Shared Insurance Policies

3M also has two insurance programs that Aearo says are relevant here. The first, the 3M Tower Program, is 3M's general products-liability insurance. It requires 3M to pay the first $25 million in settlements or judgments per "occurrence."  CA.226 (224:15-17); CA.248.  After 3M pays that initial amount, it can access $1.05 billion in insurance for March 1, 2018 to March 1, 2019. SA.12; CA.367-69; CA.231-32 (255:24-256:1).  3M alone pays the premiums for, and is the primary insured under, the 3M Tower.  SA.12.  Aearo is listed as an additional insured.  *Id.*  Aearo presented no evidence that it ever submitted a claim or otherwise sought money under the 3M Tower.  When Aearo filed for bankruptcy, neither it nor 3M had received any money under that policy.  *Id.*

The second, the Aearo Legacy Program, is a bundle of insurance policies Aearo bought before 3M acquired it.  *Id.*  The program provides $550 million in coverage and covers "occurrences" from 1997 to 2008.  *Id.*  3M is the only party that has ever received payment under these policies.

In February 2019, 3M (not Aearo) first notified the 3M Tower insurers of the earplug claims.  CA.354-55.  3M has not paid the $25 million retention, CA.238 (262:12-22), and 3M's Vice President of Insurance testified that no such payment is imminent, CA.239-40 (263:22-264:2).

---

for funding," the Aearo director who signed the agreement testified that "the plain language" of the agreement would permit it.  CA.459 (277:3-9).

A few months later, 3M (and Aearo) also notified the Aearo Legacy Program insurers of the earplug claims. SA.12. Under one Aearo Legacy policy, and in partial payment of one MDL bellwether verdict, an insurer issued four checks of $1 million each, payable to 3M alone. *Id.*; CA.361-63; CA.243-44 (267:19-268:2). 3M apparently disputes those amounts and holds the checks in its vault. SA.12-13.

## D.    The Bankruptcy Proceedings

Aearo filed for Chapter 11 bankruptcy on July 26, 2022, the day after it executed the funding agreement. SA.3. Aearo's bankruptcy counsel – Kirkland & Ellis – was the same as 3M's litigation counsel in the MDL.

In its first-day filings and argument in the bankruptcy court, Aearo admitted it had entered bankruptcy to allow 3M to escape the MDL. At the hearing, a Kirkland & Ellis lawyer said, "I don't think that there's a single MDL in history that is as broken as this one is." CA.182 (38:23-24). Counsel continued: "I am blaming the district judge," elaborating that "the heart of our problem comes out of her court." CA.183, CA.186-87 (39:20-23, 42:20-43:2). Counsel then explained the timing of the bankruptcy filing: "Judge Rodgers . . . is about to remand thousands of cases back . . . . So the out-of-control docket now becomes an out-of-control remand docket." CA.187 (43:3-9). Aearo's informational brief echoed a similar theme, lambasting the MDL court's alleged "frenetic bellwether cadence," "gutted defenses," and "tainted . . .

13

trials." CA.110.  After stating its criticisms of the MDL court, Aearo asked the bankruptcy court to "resolve the claims" against 3M and Aearo "on a scientific basis based on a fair and complete evidentiary record."  CA.124.

Once Aearo petitioned for bankruptcy, the Code automatically stayed all litigation against Aearo itself.  *See* 11 U.S.C. § 362(a)(1).  Aearo, again represented by 3M's litigation counsel, also moved the bankruptcy court to stay all MDL proceedings against 3M.  SA.2.  After three days of evidence and argument, the bankruptcy court denied the motion.  *Id.*

The court first found that 3M had orchestrated Aearo's bankruptcy as a "strategic alternative[] to the MDL."  SA.7.  The court then concluded that it was neither factually necessary nor legally appropriate to enjoin the earplug litigation against 3M.  Based on evidence Aearo itself presented, the court held "that continuation of the [earplug claims against 3M] will not endanger or otherwise impair Aearo's reorganization."  SA.34 n.16.

At bottom, the court found that 3M had made an uncapped, non-recourse commitment to fund all of Aearo's costs and liabilities, which meant that continued litigation against 3M could neither disrupt "Aearo's reorganization" nor "negatively impact[]" Aearo's creditors.  SA.36.  It also found that 3M would be "more than able to honor the Funding Agreement, even if the [earplug claims against 3M] proceed."  SA.34.  As for Aearo's nominal obligations to indemnify 3M, the court found them illusory.  To satisfy those obligations,

"Aearo is able to ask 3M for the funds required to pay Aearo's indemnity obligation to...3M." SA.31 (ellipsis in original). Under this "circular arrangement," *id.*, the "net effect to Aearo is zero," SA.10.

The court rejected Aearo's arguments for a stay. *First*, it concluded that 11 U.S.C. § 362(a)(1), which stays actions or claims "against the debtor," did not cover earplug litigation against nondebtor 3M. SA.19-22. The court noted this Court's statement that § 362(a)(1)'s "'clear language . . . extends the automatic stay provision only to the debtor filing bankruptcy proceedings and not to non-bankrupt co-defendants.'" SA.19 (quoting *Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983) (per curiam)). The court acknowledged out-of-circuit cases extending the stay to nondebtors in "unusual circumstances." SA.20. But this Court "has not, to date, expansively discussed or formally adopted" that atextual expansion of § 362(a)(1). SA.21. The court therefore declined Aearo's request to extend § 362(a)(1) beyond its text, instead analyzing the request as one for "injunctive relief under § 105(a) of the Bankruptcy Code." SA.22.

*Second*, the court concluded that 11 U.S.C. § 362(a)(3), which stays acts to "obtain possession of" or "exercise control over" estate property, did not apply to earplug litigation against 3M. SA.22-26. Aearo asserted it had property interests in the 3M Tower and Aearo Legacy insurance programs. The court "assume[d]" that assertion was correct, but held "there currently are

15

no direct efforts to exercise control over property of the estate." SA.24. The court found the earplug plaintiffs were not "proceeding directly against the insurance policies" and that 3M "ha[d] taken no action against the insurance policies other than to put the insurers on notice." *Id.* And because the funding agreement operated as "a complete, uncapped backstop to the insurance policies," any draw on those policies would "not affect the amount of money Aearo can pay its creditors." SA.26.

*Third*, the court denied an injunction under 11 U.S.C. § 105(a), both for lack of jurisdiction and on the merits. The court noted that, under this Court's precedents, a bankruptcy court has jurisdiction to enjoin related proceedings "that have a potential effect on other creditors." SA.28 (citing *Bush v. United States*, 939 F.3d 839, 844-46 (7th Cir. 2019)). But given "the economic realities of the Funding Agreement" – especially its "circular arrangement" – the court concluded that earplug litigation against 3M would have no potential effect on Aearo's creditors. SA.31.

On the merits, the court explained that an injunction "should issue only in extraordinary circumstances where it is 'necessary or appropriate.'" SA.35 (footnote omitted). No such extraordinary circumstances existed because litigation against 3M would have no "actual economic effect" on "Aearo's bankruptcy estate and, ultimately, its distribution to creditors." *Id.* The court therefore exercised its discretion to deny an injunction. *Id.*

16

The bankruptcy court certified its order for direct review by this Court under 28 U.S.C. § 158(d)(2), which this Court accepted.  A.431-32, A.441-42.

**E.    Post-Bankruptcy Events In The Earplug Litigation**

A few weeks after losing its preliminary-injunction motion, Aearo successfully moved the bankruptcy court to lift the automatic stay to allow appeals and post-trial briefing to proceed as to all the bellwether verdicts in the MDL.  CA.548-52.  In those ongoing appeals, 3M and Aearo are challenging the MDL court's evidentiary rulings, plus its denial of certain dispositive defenses that 3M and Aearo have asserted.  A.105-06 (¶¶ 33, 38-39).

Meanwhile, in the MDL, 3M sought for the first time to shift responsibility for the earplug lawsuits to Aearo, asserting that 3M itself had "neither independent nor successor liability for any alleged [earplug]-related injuries."  CA.561 & n.11.  The MDL court sanctioned 3M for that late-breaking argument.  CA.565-68.  Before its bankruptcy maneuver, "not one" of 3M's summary-judgment motions had suggested that Aearo was responsible for the earplug plaintiffs' injuries.  CA.564-65.  3M likewise had more than 500 hours of trial time, but spent "not one moment" denying its own responsibility for earplug-related liabilities.  CA.565.  And in damages briefing, 3M had "rejected as 'illusory' any 'suggestion'" that any other party besides 3M was involved.  CA.566.  That last position saved 3M millions of dollars because state law capped noneconomic damages per defendant.  CA.566-67.

The MDL court found that 3M's eleventh-hour attempt to reverse its position and pin responsibility on Aearo constituted "a brazen abuse of the litigation process," CA.561-62, and reflected "a flagrant contempt for [the MDL] Court," CA.567. 3M's bankruptcy stratagem was, for the MDL court, "good old-fashioned litigation forum shopping, solely – and admittedly – designed to evade dissatisfactory legal rulings and verdicts." CA.559.

The court used its inherent authority to sanction 3M by precluding it "from attempting to avoid any portion of its alleged liability for the [earplug] claims in [the MDL] by shifting blame to the Aearo defendants." CA.573. The court stayed the order pending appeal. CA.574.

## SUMMARY OF ARGUMENT

A bankruptcy stay protects the debtor's estate from being picked apart outside of bankruptcy. It also protects creditors as a whole by preventing one from seizing assets before others get their chance. The stay therefore preserves the value of the debtor's estate and ensures an equitable distribution to creditors. Here, staying the earplug litigation against nondebtor 3M will provide none of those benefits. As the bankruptcy court found, 3M, not Aearo, ultimately will bear all the costs of that litigation. That central point undermines Aearo's arguments on appeal, which also fail for other reasons.

I.    Section 362(a)(1) does not stay earplug litigation against 3M. That provision stays only "action[s] or proceeding[s]" either "against the debtor" or

18

"to recover a claim against the debtor."  The debtor is Aearo, not 3M.  And earplug litigation against 3M is neither "against" Aearo nor "to recover a claim against" Aearo.  Aearo does not argue that the first clause applies.  As for the second, courts apply it to nondebtor lawsuits – if at all – only when they involve fraudulent-conveyance actions seeking to "recover a claim" against the debtor by seeking the return of property the debtor unlawfully transferred.  The earplug cases do not fit that description.

The earplug litigation also presents no "unusual circumstances" that warrant broadening § 362(a)(1) beyond its text.  Unlike every case in which courts have found "unusual circumstances," the litigation here will affect neither Aearo nor its creditors.  That was the bankruptcy court's key finding, which Aearo barely contests.  With no effect on Aearo's reorganization, none of Aearo's arguments for "unusual circumstances" supports a stay.

Because this case presents no "unusual circumstances," the Court need not decide whether such circumstances might ever justify broadening § 362(a)(1) beyond its text.  But if the Court were to reach that question, it should answer it in the negative.  The "unusual circumstances" principle is a poor fit for § 362(a)(1)'s automatic-stay regime.  If such circumstances ever warrant a stay of nondebtor litigation, they do so only under § 105, as multiple Circuits have found.  The Court should interpret § 362(a)(1) as Congress enacted it, not modify it to achieve 3M's policy aims.

19

**II.**     Section 362(a)(3) likewise does not stay earplug litigation against 3M.  That provision stays acts to "obtain possession" of or "exercise control" over estate property.  Here, Aearo asserts the "property" at issue comprises insurance proceeds from the Aearo Legacy and 3M Tower policies.  The bankruptcy court correctly found that earplug lawsuits against 3M seek neither to possess nor to control those proceeds.  Rather, they seek damages from 3M, which 3M can satisfy by drawing on non-insurance assets.

In any event, the proceeds are not estate property because insurance payments for the earplug litigation are payable only to 3M, which has no duty to pass them to Aearo.  Aearo's asserted right to those proceeds is also too speculative – no insurer has agreed or been ordered to make any payments.

**III.**     The bankruptcy court did not abuse its discretion by finding it neither "necessary" nor "appropriate" to enjoin the earplug claims against 3M under § 105(a).  Aearo bore the burden to show that continued earplug litigation against 3M would impede Aearo's reorganization.  It came nowhere near carrying that burden.  The court correctly concluded that the earplug litigation would not affect Aearo's estate or its creditors.  Rather than fight this conclusion head on, Aearo bypasses it, claiming first that the court offered insufficient reasoning and second that it mixed up merits and jurisdiction.  But the court's many factual findings provided ample support for its discretionary

determination not to issue an injunction. And the court made a point to separate its merits and jurisdictional analyses.

In any event, the bankruptcy court was also correct on jurisdiction. As relevant here, the court had jurisdiction only over acts "related to" the bankruptcy, meaning acts that would potentially affect the estate. Because the earplug litigation would have no such effect, the court lacked jurisdiction to enjoin it. The court did what this Court's precedents require: it looked forward, considered the possible effects 3M's litigation could have on Aearo, and found none.

## STANDARD OF REVIEW

This Court reviews the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *See In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015). The bankruptcy court's discretionary denial of § 105(a) relief "will be reversed only if the bankruptcy court abused its discretion by basing its decision on an incorrect legal standard or on clearly erroneous findings of fact." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1093 (9th Cir. 2007). Clear-error review "is deferential" – "a light appellate touch is best." *United States v. Frederick*, 182 F.3d 496, 499 (7th Cir. 1999).

21

## ARGUMENT

### I.    Section 362(a)(1) Does Not Stay The Earplug Litigation Against 3M

A bankruptcy petition automatically stays litigation against "the debtor." 11 U.S.C. § 362(a)(1). Consistent with the statute's text, this Court's general rule is that § 362(a)(1) reaches only litigation or claims against the debtor itself – here, Aearo – not litigation against nondebtors like 3M. *See Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983) (per curiam).

Some courts outside this Circuit have read an "unusual circumstances exception" into the principle that § 362(a)(1) stays only actions or claims against the debtor. *See, e.g., Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). This Court never has decided whether § 362(a)(1) contains such an exception. Instead, each time the Court has confronted the issue, it has found no "unusual circumstances," making it unnecessary to decide whether the statute impliedly extends beyond its text. *E.g., In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 736 (7th Cir. 1991).

This case too presents no "unusual circumstances" supporting a stay of litigation against 3M. The bankruptcy court's judgment was therefore correct under any reading of the statute, and the Court can affirm without deciding whether § 362(a)(1) might in another case stay nondebtor litigation. But if the

Court does reach the question, it should hold that § 362(a)(1) stays only litigation and claims against the debtor itself.

## A.  Section 362(a)(1) Stays Actions And Claims Against Aearo, Not 3M

Section 362(a)(1) stays actions (1) "against the debtor" or (2) "to recover a claim against the debtor."  11 U.S.C. § 362(a)(1).  Aearo, not 3M, is the "debtor."  *See id.* § 101(13) (defining "debtor").  Aearo does not argue that lawsuits against nondebtor 3M are "actions . . . against the debtor" under the first prong.  Nor could it.  That prong's "clear language" "extends the automatic stay provision only to the debtor filing bankruptcy proceedings and not to non-bankrupt co-defendants."  *Pitts*, 698 F.2d at 314.

Section 362(a)(1)'s second prong – which stays "actions . . . to recover a claim against the debtor" – reaches only inches further.  Appellate courts have identified only one set of cases the second prong covers that the first does not: fraudulent-transfer actions.  *See In re Colonial Realty Co.*, 980 F.2d 125, 131-32 (2d Cir. 1992) (holding § 362(a)(1)'s second prong reaches "a third-party action to recover fraudulently transferred property").  Though the transferee is the named defendant – meaning the action is not "against" the debtor – "there is no independent basis for the action against the transferee" without "a *claim* against the debtor."  *Id.* at 132 (emphasis added).  Indeed, the sole available remedy is to recover the "property or value thereof received from the

debtor." *Id.* Such relief, premised on *the debtor's* fraud and claiming property *the debtor* unlawfully transferred, is against the nondebtor in name only. Because it really "seeks satisfaction of a claim against the debtor," it falls within § 362(a)(1). 5 *Collier on Bankruptcy* ¶ 548.01[2][b][i] (16th ed. 2022). A stay in those circumstances furthers the Code's purpose by protecting the trustee's ability "to litigate a competing avoidance claim on behalf of all creditors." *In re Just Brakes Corp. Sys.*, 108 F.3d 881, 884 (8th Cir. 1997).

Here, no plaintiff has asserted a fraudulent-conveyance claim or sought to recover property that Aearo transferred. Rather, the litigation seeks damages from 3M, based on 3M's independent liability for plaintiffs' injuries. CA.553-74. Because obtaining tort damages from 3M does not "recover a claim" against Aearo, the nondebtor earplug litigation falls outside § 362(a)(1).

## B. This Case Presents No "Unusual Circumstances" Supporting A Stay

Outside this Circuit, some courts have recognized an "unusual circumstances" exception to the rule that § 362(a)(1) reaches only debtors. Though the statute contains no such exception, *infra* Part I.C, Aearo cannot show "unusual circumstances" here.

24

### 1. Courts find "unusual circumstances" when nondebtor litigation would create an immediate adverse economic effect on the estate

Other courts have extended § 362(a)(1) to nondebtors only in "unusual circumstances." In the first case to adopt this extension of § 362(a)(1), the Fourth Circuit described an "unusual situation" as one in which "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986). Appellate courts after *Robins* have cautioned that this exception is "narrow," *Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141 (10th Cir. 1994), and that "unusual circumstances" are "rare[]," *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003). They exist only "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie*, 321 F.3d at 287.

*Robins* exemplifies the type of immediate economic harm necessary for its test to apply. The debtor there, A.H. Robins Co., sold an intrauterine device that severely injured many women. 788 F.2d at 996. A "mounting tide" of litigation forced Robins into bankruptcy. *Id.* Once in bankruptcy, the automatic stay halted the suits against Robins, but plaintiffs sought to press forward against its co-defendants, including some Robins directors and

25

employees. *Id.* Robins had to indemnify those individuals, with whom it also shared insurance. *Id.* at 1007. Unlike here, there was no funding agreement covering the debtor's costs and liabilities. Continued litigation against the debtor's co-defendants therefore threatened to "diminish the insurance fund . . . and thereby affect the property of the debtor to the detriment of the debtor's creditors as a whole." *Id.* at 1008.

Those economic consequences led the district court in *Robins* to stay the litigation against the nondebtor defendants. *Id.* The Fourth Circuit affirmed, finding no "abuse of discretion." *Id.* Because "the limited fund available under [the debtor's] insurance policy [wa]s recognized," and the debtor's indemnity obligations were "undisputed," the Fourth Circuit affirmed that "any effort at reorganization of the debtor will be frustrated, if not permanently thwarted," if the nondebtor litigation continued. *Id.*

Every appellate decision finding "unusual circumstances" has fit this mold. The Second Circuit extended a § 362(a)(1) stay because the debtor wholly owned the nondebtor co-defendant, so that any judgment against the nondebtor subsidiary would drain the parent debtor's assets. *See Queenie*, 321 F.3d at 288. The Third Circuit extended the stay because the debtor, "as guarantor, was secondarily liable for any deficiency entered against" the nondebtor, which "had no assets." *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997). There, too, "any deficiency judgment recovery

26

from [the nondebtor] would have necessarily impacted upon [the] estate." *Id.* And the Sixth Circuit ruled similarly based on a finding that the debtor would have to pay the nondebtors' defense costs. *See In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860 (6th Cir. 1992). The key, in each case, was that "the debtor's estate will be unnecessarily diminished [without] an injunction." *Id.*

By contrast, this Court and others have found no unusual circumstances absent harm to the debtor's estate. That was true in *Fernstrom*, which involved litigation by IBM's insurers against a debtor's insurers. The insurer-versus-insurer litigation posed no economic threat to the debtor's estate because IBM was the only creditor with a claim to the insurance, and IBM agreed not to go beyond policy limits. 938 F.2d at 736. Those facts distinguished the case from *Robins*, which was "animated by the fear" that nondebtor litigation would "harm" the debtor by draining its assets. *Id.* (citing *Robins*, 788 F.2d at 1008); *see Fox Valley Constr. Workers Fringe Benefit Funds v. Pride of the Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998) (unusual circumstances exist only when "the assets of the debtor itself will fall into jeopardy"); *Ritchie Cap. Mgmt., L.L.C. v. Jeffries*, 653 F.3d 755, 763 (8th Cir. 2011) ("The unusual-circumstance exception is not implicated where, as here, the new litigation has no potential impact on the bankrupt entity."). Because the nondebtor litigation in *Fernstrom* would not deplete any money available

27

to other creditors, this Court was "not faced with the 'unusual situation' present in *Robins*." *Fernstrom*, 938 F.2d at 736 (citation omitted).

That limitation is vital to the rationale underlying the "unusual circumstances" principle. The automatic stay "protect[s] the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation." *Robins*, 788 F.2d at 998 (citing *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982)). *Robins* thought that, in rare situations, staying litigation against nondebtors serves those purposes. *Id*. But as this Court recognized in *Holtkamp*, the case *Robins* cited, a stay of outside litigation "in no way fosters Code policy" when, as here, someone other than the debtor has "assumed full financial responsibility for defending that litigation." *Holtkamp*, 669 F.2d at 508-09.

> **2.    The bankruptcy court's factual findings confirm that the earplug litigation against 3M will have no economic effect on Aearo's estate**

The Court should not extend § 362(a)(1) to earplug litigation against 3M, because the litigation will not affect Aearo's estate. That was the bankruptcy court's core finding: it was "unable to discern any financial impact to creditors, let alone a significant and adverse one, from the continuation of" earplug litigation against 3M. SA.32. Indeed, the funding agreement negates any such

28

impact by providing "a complete, uncapped backstop" to any loss of estate assets. SA.26. Whatever effect nondebtor litigation might otherwise have had on the estate, 3M has contracted it away.

The bankruptcy court correctly rejected 3M's attempt to use the funding agreement's indemnity clause to conjure an effect on the estate. As the court found, that clause is "circular": although it makes Aearo theoretically liable to 3M, "Aearo can satisfy such liability by making a payment request" to 3M. SA.31-32. In other words, Aearo may fund its indemnity obligations "by asking 3M for the money." SA.10. The "net effect to Aearo is zero." *Id.*

Those findings, which the court made after a three-day trial, merit deference. *See Furry v. United States*, 712 F.3d 988, 993 (7th Cir. 2013). And those findings provide a straightforward path to affirmance. Unlike in *Robins* and every other appellate case extending § 362(a)(1) to nondebtors, the funding agreement establishes that nondebtor litigation here cannot "affect the property of the debtor to the detriment of the debtor's creditors as a whole." 788 F.2d at 1008. That is reason enough to deny a stay. *See Fox Valley*, 140 F.3d at 666 (no unusual circumstances when litigation would not cause debtor's assets to "fall into jeopardy"); *Fernstrom*, 938 F.2d at 736 (similar).

### 3.   Aearo's arguments for "unusual circumstances" lack merit

Aearo cannot credibly contest the bankruptcy court's finding that the earplug litigation will neither affect its estate nor harm any creditor. So

instead it tries to draw "unusual circumstances" from other, irrelevant considerations: its status as 3M's co-defendant in the MDL; speculation about preclusion or record taint; and its circular indemnity agreement. But those considerations matter only when coupled with economic harm to the estate. Without such harm, none of Aearo's arguments supports a stay.

a. ***Factual overlap.*** Aearo first asserts that unusual circumstances exist because "a judgment against 3M is invariably 'a judgment or finding against' Aearo." Br. 36 (quoting *Fernstrom*, 938 F.2d at 736). That assertion is incorrect and would fail to justify a stay even if it were true. From the start, 3M has been independently liable for the earplug claims, no matter Aearo's role. The qui tam suit that sparked the earplug litigation was brought against only 3M and settled by only 3M. SA.5. One of the first earplug lawsuits against 3M did not even name Aearo as a defendant. CA.464, CA.468 (¶ 21). Starting in 2010, moreover, 3M alone manufactured and sold the earplug – making 3M independently liable for the resulting injuries. CA.417, CA.420-21 (136:4-7, 139:20-140:5, 140:14-17). Given those facts, a judgment against 3M is simply a judgment against 3M. It is not "invariably" a judgment against Aearo.

Although Aearo remains 3M's co-defendant in the MDL, it is one "in name only." CA.401. 3M – the real defendant – waged a years-long "battle" against "every theory of liability," yet made "nary a whisper that Aearo, and not 3M, was . . . a target at all." CA.558. Throughout, 3M "established itself

as *the defendant* with exclusive responsibility for, and control over, alleged [earplug] liability." CA.564. To suggest now that a judgment against 3M is really a judgment against Aearo is the same "duplicitous" gimmick the MDL court rejected as "beyond the pale of acceptable litigation conduct." CA.567.

Aearo relatedly argues (at 36-38) that Aearo's conduct is factually relevant to the suits against 3M. But mere overlapping conduct does not warrant a stay. The Sixth Circuit put it plainly: "It is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities . . . with a similar legal or factual nexus to the . . . debtor." *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir. 1983); *see Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1991) (collecting cases). Allowing nondebtor litigation to continue despite factual overlap with other claims that are stayed is merely an accepted "byproduct of bankruptcy law." *Lynch*, 710 F.2d at 1199.

Awarding a stay whenever the nondebtor's tortious conduct overlaps with the debtor's would not advance the purposes of the *Robins* exception. Litigants who support claims against 3M with evidence about Aearo, like the Flange Report, neither subject Aearo to a "scramble for its assets" nor "disadvantage [any] creditors." *Robins*, 788 F.2d at 998. In fact, they do not affect Aearo's estate at all. No creditor's position changes when a plaintiff merely introduces an Aearo document in litigation against someone else.

31

Equating evidentiary overlap with "unusual circumstances" would stretch the exception past its breaking point. Evidence and claims overlap in virtually every case involving joint tortfeasors. If such overlap were enough, stays of nondebtor litigation would become routine whenever joint tortfeasors were involved, defying *Robins*'s instruction that they remain "unusual." *Robins* itself therefore clarifies that its expansion of § 362(a)(1) "'clearly'" does not apply when "'the debtor and another are joint tort feasors or where the nondebtor's liability rests upon his own breach of duty.'" *Id.* at 999 (quoting *In re Metal Ctr., Inc.*, 31 B.R. 458, 462 (Bankr. D. Conn. 1983)). 3M's own breach of duty is clear here, as the MDL court has confirmed. CA.553-74.

The cases Aearo cites (at 38-39) do not support its position. In each, there was obvious economic harm to the estate, whether because of indemnification agreements,[5] the debtor's assigned liability,[6] or both.[7] In three, the claims were ones "the Debtor [wa]s exclusively responsible for" because it had been assigned all liability. *DMBP*, 2021 WL 3552350, at *27; *Aldrich Pump*, 2021 WL 3729335, at *30; *see LTL*, 638 B.R. at 306

---

[5] *See F.M. v. Walden*, 2013 WL 8481607, at *5 (D.N.M. Aug. 6, 2013); *Raudonis as Tr. for Walter J. Raudonis 2016 Revocable Tr. v. RealtyShares, Inc.*, 507 F. Supp. 3d 378, 383 (D. Mass. 2020).

[6] *See In re DMBP LLC*, 2021 WL 3552350, at *27 (Bankr. W.D.N.C. Aug. 11, 2021); *In re Aldrich Pump LLC*, 2021 WL 3729335, at *30 (Bankr. W.D.N.C. Aug. 23, 2021).

[7] *See In re LTL Mgmt., LLC*, 638 B.R. 291, 297 (Bankr. D.N.J. 2022).

("[C]orporate transactions and indemnity agreements ... left Debtor ultimately responsible for talc-related liabilities."). And the rest involved only derivative liability of nondebtors who had not, through their litigation or other conduct, assumed independent liability for the misconduct. *See F.M.*, 2013 WL 8481607, at *5 ("[T]he only way the non-debtor Defendants could possibly be liable [wa]s if [the debtor] [wa]s first found liable."); *Raudonis*, 507 F. Supp. 3d at 383 (similar); *see also Hetherington v. Dawn's Dreams of Wellness Co.*, 2011 WL 13298567, at *2 (M.D. Fla. Sept. 27, 2011).

  **b.**   ***Preclusion and record taint.***   Aearo also argues (at 39-41) that litigation against 3M will risk issue preclusion or record taint. But those concerns alone cannot support a stay. On preclusion, the Second Circuit could not "locate[] any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel." *Queenie*, 321 F.3d at 288. "If such apprehension could support application of the stay, there would be vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants." *Id.*

  Similarly, record-taint worries cannot alone justify a stay. "Whatever prejudice results" from letting the earplug lawsuits proceed against less-than-all of the defendants "is simply that inherent in the principle of joint and several liability." *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (affirming decision to not lift automatic stay). The rule for 100 years has been

that joint tortfeasors have no cause to complain when suits go forward without them, even though such suits involve all the record-taint risks about which Aearo speculates here. *See Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111, 132 (1912). The Court should not reverse that principle just because 3M's joint tortfeasor has petitioned for bankruptcy.

Besides, Aearo's concerns are overblown. Future litigation against 3M cannot preclude Aearo because Aearo has no opportunity to participate. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984) ("Since Manville is not a party to the Higgins-Pacor action, it could not be bound by res judicata or collateral estoppel."). Before preclusion applies, "the Due Process Clause require[s] that [the court] decide whether [the party] was given a full and fair opportunity to litigate [its] claim." *Brown v. J.I. Case Co.*, 813 F.2d 848, 854 (7th Cir. 1987). Aearo's pending bankruptcy bars it from participating in the ongoing litigation, defeating issue preclusion. *See Metal Ctr.*, 31 B.R. at 463.

Aearo's feigned concern (at 40-41) about "record taint" is even less credible. 3M has for years litigated by "establish[ing] itself as *the defendant* with exclusive responsibility for, and control over, alleged [earplug claims] liability." CA.564. And the MDL court precluded 3M from changing course and blaming Aearo now. *Id.* Allowing litigation against 3M to continue will not taint the evidence against Aearo any more than the 16 trials already have.

Aearo's own conduct also refutes its professed need for a stay.  Indeed, Aearo recently obtained stay relief to allow the bellwether cases to proceed through the appellate process to finality.  CA.548-52.  Those cases theoretically raise all the concerns Aearo cites here:  they risk yielding judgments against Aearo; they threaten issue preclusion; and they will further cement the evidentiary record about Aearo's conduct.  Yet Aearo actively is pushing those cases forward so that 3M can obtain final, preclusive judgments adjudicating all its principal defenses.  Once the final judgments issue, any marginal risks to Aearo posed by additional litigation against 3M become nonexistent.

**c.   *Indemnification obligations.*** Aearo finally argues (at 41-44) that "the mere existence of an indemnification duty" satisfies the *Robins* exception.  But no case Aearo cites goes that far.  Each appellate case involved an indemnification duty that, if exercised, would have "an immediate adverse economic consequence for the debtor's estate." *Queenie*, 321 F.3d at 287.  In *Robins*, for example, the indemnified nondebtors made no agreement to fund the debtor.  With no funding backstop, the nondebtors' indemnity rights threatened to drain "the property of the debtor to the detriment of the debtor's creditors as a whole." *Robins*, 788 F.2d at 1008; *see McCartney*, 106 F.3d at 508 (judgment "would have necessarily impacted upon [the debtor's] estate").

But here, as the bankruptcy court found, Aearo's indemnity obligation is illusory. SA.11. Aearo cites no case applying § 362(a)(1) to comparable facts.[8]

Recognizing the problem created by the funding agreement's "circular" construction, SA.31, Aearo tries to rewrite it on appeal. Aearo asserts (at 66) that it must exhaust its assets, and therefore "drain" its estate, before receiving funding. But Aearo need deplete nothing, as the bankruptcy court found. SA.31. Under the agreement, Aearo can call funding if it merely "project[s]" its assets will be insufficient. *Id.* That crucial "projected to be" language was added during drafting revisions and was key to the bankruptcy court's circularity finding. *Id.* Yet Aearo ignores it on appeal, instead portraying the agreement in line with an earlier, never-executed draft. *Supra* p. 11 & n.4. The bankruptcy court correctly rejected that framing in finding that the final indemnity clause, as executed, was "much ado about nothing." SA.11. Aearo comes nowhere near showing clear error in that determination.

## C.    Section 362(a)(1) Contains No Exception For "Unusual Circumstances"

The Court need not decide whether § 362(a)(1) applies to nondebtors in "unusual circumstances" because those circumstances are absent here. But if

---

[8] Aearo cites the funding agreement in *LTL*, but that agreement was capped, so any judgments above the cap would drain the estate. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 404 (Bankr. D.N.J. 2022).

the Court does reach the question, it should reject the "unusual circumstances" principle as inconsistent with § 362(a)(1)'s text.

Interpreting the Code "starts where all such inquiries must begin: with the language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quotations omitted). And § 362(a)(1)'s language forecloses any "unusual circumstances" exception. The text covers only two situations: "action[s] or proceeding[s] against the debtor," and "claim[s] against the debtor." 11 U.S.C. § 362(a)(1). That "language unambiguously states that the stay operates only as 'against the debtor.'" *Pitts*, 698 F.2d at 314. The Court should not extend the statute beyond its textual limits. *See City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021) (rejecting attempt to "engraft[]"exception onto automatic-stay provision without a "textual basis"); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) (rejecting "'rare case' exception" to Code's priority rules and stressing that courts "cannot alter the balance struck by the [Code], not even in 'rare cases'") (quotations and citation omitted).

Statutory structure confirms the point. As *Pitts* observed, *see* 698 F.2d at 314, Congress knows how to draft stay language that extends to nondebtors: it did just that in Chapters 9, 12, and 13. *Compare* 11 U.S.C. § 922(a) (staying actions "against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor," "in addition to [actions stayed by] section 362"), *id.* § 1201(a) (staying actions against "any individual that is liable on [a] debt with

the debtor"), *and id*. § 1301(a) (same) *with id*. § 362(a)(1).   Other § 362(a)

subsections likewise are not confined to the "debtor."   *E.g.*, *id*. § 362(a)(2)-(5).

The Court should presume that § 362(a)(1)'s comparatively restrictive wording

was "intentional[]."  *Smith v. Capital One Bank (USA), N.A.*, 845 F.3d 256, 260

(7th Cir. 2016).  Had Congress meant to extend § 362(a)(1) to nondebtors in

"unusual circumstances," it would have said so.

Sound policy reasons support Congress's decision not to do so.  One is

that § 362(a)(1) is inflexible – it grants "no authority" to bankruptcy judges to

refuse a stay.  *In re Canter*, 299 F.3d 1150, 1155 n.1 (9th Cir. 2002).  Instead,

the stay is an "automatic consequence of the filing of a bankruptcy petition."

*Fulton*, 141 S. Ct. at 589.  Engrafting an amorphous, fact-sensitive expansion

onto that nondiscretionary regime creates "problematic notice issues."  *In re

Panther Mountain Land Dev., LLC*, 686 F.3d 916, 926-27 (8th Cir. 2012).

Indeed, litigants unaware of "unusual circumstances" may violate the stay by

litigating against a nondebtor, "expos[ing] the violator to contempt

proceedings."  *Central States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d

1369, 1376 (7th Cir. 1992).  They could face "actual damages, including costs

and attorney's fees, and . . . punitive damages."  *Price v. Rochford*, 947 F.2d

829, 831 (7th Cir. 1991) (quoting 11 U.S.C. § 362(h) (1988)).  These draconian

remedies, available without "[f]ormal service" or "particular notice," 3 *Collier

on Bankruptcy* ¶ 362.02, counsel against extending § 362(a)(1) beyond its text.

38

Given that concern, the Eighth Circuit has called § 105 "the more appropriate source of authority" to stay nondebtor litigation. *Panther Mountain*, 686 F.3d at 926-27. Locating stay authority under § 105 not only avoids "a tortured expansion" of the text, but also lets bankruptcy courts lend their judgment to whether a circumstance warrants a stay's harsh medicine. *Id.* at 927. The Sixth, Ninth, and Tenth Circuits also follow this approach.[9]

No precedent constrains this Court from following that persuasive authority. The bankruptcy court was correct that this Court never has "formally adopted" the *Robins* principle. SA.21. The two cases discussing it – *Fernstrom* and *Fox Valley* – did not hold that "unusual circumstances" justify staying nondebtor litigation; any such suggestion was dicta because both cases found unusual circumstances absent on the facts. *See United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (dicta are statements that are "unnecessary to the outcome"). Moreover, neither case opined on the statutory basis for staying nondebtor litigation. That is significant because *Robins* itself pointed to § 105 as a potential source of authority for the "unusual

---

[9] *See Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *Otoe Cnty. Nat'l Bank v. W & P Trucking, Inc.*, 754 F.2d 881, 883 (10th Cir. 1985) (similar); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1096 (9th Cir. 2007) ("stays under the [*Robins*] doctrine, 'although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court'") (quoting *In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 247 n.6 (9th Cir. 1984)).

circumstances" principle it invented.  *See* 788 F.2d at 1002-03.  The bankruptcy court thus correctly "frame[d] its analysis . . . under § 105(a)," rather than § 362(a)(1).  SA.22.  Whatever relevance Aearo's arguments may have under § 105(a), they do not support extending § 362(a)(1) beyond its text.

## II.  The Bankruptcy Court Held Correctly That § 362(a)(3) Does Not Stay The Earplug Litigation Against 3M

Earplug litigation against 3M also falls outside § 362(a)(3), which stays "any act to obtain possession of . . . or exercise control over property of the estate."  Aearo asserts (at 22-23) that earplug litigation triggers § 362(a)(3) because 3M will "pursue coverage and payment" under insurance policies it shares with Aearo, which will in turn reduce Aearo's ability to secure future insurance proceeds.  The bankruptcy court "assume[d]" without deciding that the shared insurance policies are estate property but held that earplug plaintiffs are not acting to "obtain" or "control" that property.  SA.24-26.  That holding was correct, and this Court should affirm it.  Alternatively, the Court can affirm because the future insurance proceeds are not estate property.

### A.  Lawsuits Against 3M Are Not Acts To "Obtain" Or "Control" Insurance Coverage

**1.**  A lawsuit to recover damages from 3M is not an "act to obtain possession of" or "exercise control over" Aearo's insurance coverage.  11 U.S.C. § 362(a)(3).  Section 362(a)(3) bars only claims that seek directly to obtain

insurance coverage belonging to the estate.  Because the earplug lawsuits do not seek any insurance coverage belonging to Aearo, § 362(a)(3) does not apply.

When the Bankruptcy Code "does not define" a term, courts "look to the ordinary meaning." *Ransom*, 562 U.S. at 69.  In ordinary parlance, § 362(a)(3)'s verbs demand a direct interface between the enjoined claim and the estate property.  Plaintiffs *obtain possession* of property only when they "take hold" of the property such that it becomes subject to their control.[10]  Similarly, plaintiffs *exercise control* over property only when they assert the power to direct or manage the property.[11]  In both instances, the focus is on a plaintiff's own "affirmative acts." *Fulton*, 141 S. Ct. at 590 (construing § 362(a)(3)).  For insurance, therefore, § 362(a)(3) applies only when a lawsuit itself seeks to seize or control an insured's coverage.  When the only connection is one of induced effect – that is, when the lawsuit merely risks spurring *someone else* to claim the debtor's insurance – § 362(a)(3) is inapplicable.

---

[10] *See Webster's Third New International Dictionary* 1559, 1770 (1976) (defining "obtain" as "to take hold of," and "possession" as "the act or condition of having in or taking into one's control"); *Black's Law Dictionary* 972, 1047 (5th ed. 1979) (similar).

[11] *See Webster's Third New International Dictionary* 496, 795 (1986) (defining "control" as the "power or authority to guide or manage" and "exercise" as "to bring into play" or "make effective in action"); *Black's Law Dictionary* 298, 513 (defining "control" as "[t]o exercise restraining or directing influence over" and "exercise" as "[t]o make use of").

Precedent supports that distinction.  This Court has distinguished acts that themselves "possess[]" or "control[]" estate property from acts that merely "affect [the debtor's] interest in" such property.  *In re UAL Corp.*, 412 F.3d 775, 778-79 (7th Cir. 2005).  *UAL* addressed whether § 362(a)(3) stayed a third party's sale of the debtor's stock that could "jeopardize [the debtor's] ability" to claim "tax deductions in future years."  *Id.* at 777.  Although the "sale of stock could affect [the debtor's] interest" in the deductions, the Court held, the "sale of stock does not 'obtain *possession* . . . or exercise *control*'" over those deductions.  *Id.* at 778 (court's emphases and ellipsis).  Because any effect on estate property "would not occur because of anything the [seller] possessed or controlled," it did not trigger a stay.  *Id.*; *see Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989) (suit by debtor "[wa]s an asset of the estate," but § 362(a)(3) did not bar motion to dismiss because "opposing that suit [was not] seeking to take possession of it"); *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014) (§ 362(a)(3) does not bar "actions taken against third parties that are only factually likely, as opposed to legally certain, to impact estate property").[12]

---

[12] *UAL* refused to extend *In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991), which Aearo cites (at 48).  *UAL*, 412 F.3d at 778-79.  In *Prudential Lines*, a parent company was enjoined from claiming a stock deduction that would have blocked the debtor from claiming the same deduction – thereby "effectively eliminat[ing]" the estate asset.  928 F.2d at 574.  The case had something not present in *UAL* or here: an act that "exercised control" of estate property without intermediate action.  *UAL*, 412 F.3d at 779; *see Picard*, 762

That interpretation promotes the Code's purpose. Section 362(a)(3) bars "efforts to collect prepetition debts outside the bankruptcy forum," which "protect[s] the estate from dismemberment" and "prevent[s] individual creditors from pursuing their own interests to the detriment of the others." *Fulton*, 141 S. Ct. at 589. Nondebtor litigation that does not claim a right to the debtor's insurance coverage implicates neither concern. Such litigation does not demand any insurance money. Nor does it demand control of the debtor's insurance policy. Indeed, it does not ask for any estate asset to change hands at all. The litigation here merely asks 3M to pay damages to 3M's victims. A nondebtor's payment of damages does not violate § 362(a)(3) because it is not an "effort to 'exercise control over property of the estate.'" *National Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994).

The broader rule Aearo urges lacks any limiting principle. Under Aearo's logic (at 46-48), § 362(a)(3) bars any lawsuit that, although not itself seeking to obtain or control estate property, could nonetheless affect that property indirectly. But in a globally interconnected economy, the acts that might indirectly touch Aearo's property are nearly infinite. As the bankruptcy

---

F.3d at 208 (similarly distinguishing *Prudential Lines*). Aearo's other appellate case, *ACandS, Inc. v. Travelers Casualty & Surety Co.*, 435 F.3d 252 (3d Cir. 2006) (Alito, J.), is also inapposite. That case stayed an arbitration proceeding between the debtor and its insurer, in which the parties directly litigated the amount of coverage available to the debtor. *Id.* at 259-60.

court noted (SA.25), those indirect acts could include all manner of lawsuits against any of Aearo's myriad contract counterparties.[13] Or they could include unrelated actions against one of Aearo's distributors, if the effect on the distributor risked in turn disrupting Aearo's supply chain.[14] They could even include corporate-governance acts to elect new board members to one of Aearo's creditors, if the new members might be more likely to vote for action adverse to Aearo's property.[15] Congress did not intend § 362(a)(3) to be so boundless.

An indirect-effect test also creates notice problems. Under the statute as written, applying § 362(a)(3) is straightforward: potential violators need only ask whether their own acts seek to take or restrain a debtor's property. Under Aearo's theory, by contrast, potential violators must guess the second- or third-order consequences of their acts and refrain from any that might induce someone else to take estate property. Misjudging those consequences would risk contempt and other harsh remedies. *Supra* Part I.C. Subjecting litigants to such remedies whenever they fail to anticipate some attenuated

---

[13] *See*, *e.g.*, *In re Levitz Furniture Inc.*, 267 B.R. 516, 521 (Bankr. D. Del. 2000) (rejecting stay of fiduciary-duty suit against debtor's contract counterparty because it did not "exercise direct control" over property).

[14] *See*, *e.g.*, *Chugach Forest Prods.*, 23 F.3d at 244-45 (rejecting stay of seizure of vessel carrying debtor's property and holding "the statute does not apply to such an indirect exercise of control").

[15] *See*, *e.g.*, *In re Marvel Ent. Grp., Inc.*, 209 B.R. 832, 839-40 (D. Del. 1997) (rejecting stay based on "speculation that a new board elected by the bondholders might take some action that would violate the automatic stay").

link to estate property would create the sort of "problematic notice issues" courts strive to avoid. *Panther Mountain*, 686 F.3d at 927.

**2.**     The bankruptcy court held correctly that earplug lawsuits against 3M are not "proceeding directly against the insurance policies." SA.24. No plaintiff has named any insurer as a co-defendant, asserted a right to any insurance proceeds, or sought to enforce a judgment against any insurance policy. Because there are "no direct efforts to exercise control over property of the estate," *id.*, the earplug lawsuits fall beyond § 362(a)(3).[16]

Aearo does not dispute that finding. Rather, it asserts (at 47) that the earplug lawsuits will induce 3M "to pursue coverage under the shared insurance policies" and that 3M's future coverage claims "will diminish . . . Aearo's insurance coverage." In that circuitous causal chain, *3M's own claims* against the insurers – not the earplug lawsuits – are what seek to "obtain possession" of estate property. 11 U.S.C. § 362(a)(3). But 3M cannot manufacture a stay for itself by creating the very effect that supposedly triggers the stay. The stay inquiry turns on whether the earplug plaintiffs' "affirmative acts" seek to possess or control estate property, *Fulton*, 141 S. Ct. at 590, not whether 3M might seek such property in response. If 3M ever does

---

[16] The bankruptcy court thought "that indirect efforts may also fall under § 362(a)(3)." SA.25. True, if a third party exercises indirect control over estate property – such as through an agent – it would violate § 362(a)(3). But the court did not suggest that a mere *effect* on estate property is enough without some act "of control (or consumption)" of the property. *UAL*, 412 F.3d at 779.

so, the resulting effect on estate property "would not occur because of anything the [*earplug plaintiffs*] possessed or controlled." *UAL*, 412 F.3d at 778.

3M's future actions are also purely hypothetical. As the bankruptcy court observed, "3M has taken no action against the insurance policies other than to put insurers on notice." SA.24. If 3M refrains from doing more, the earplug lawsuits will not affect estate property even indirectly. And there is good reason to think no such effect will occur, because § 362(a)(3) likely would prohibit 3M itself from making[17] (or its insurers from paying on[18]) a coverage claim. It also might bar a plaintiff from enforcing (or insurers from paying) a future judgment against those policies. Those statutory prohibitions on future estate-impairing actions – which sever any causal link between the earplug lawsuits and Aearo's insurance policies – suffice to protect Aearo's estate.

*In re Diocese of Rochester*, 2022 WL 1638966 (Bankr. W.D.N.Y. May 23, 2022), illustrates the point. There, the court found the debtor failed to prove that shared insurance triggered § 362(a)(3), but it also clarified it was

---

[17] *See*, *e.g.*, *Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512, 516 (2d Cir. 1985) (automatic stay prohibited co-payee from taking insurance proceeds after debtor declared bankruptcy). 3M's contract rights would not trump the rights of Aearo's creditors to receive an equitable distribution of estate assets – especially not in this case, where 3M catapulted itself into Aearo's bankruptcy administration by engineering the funding agreement.

[18] *In re Youngstown Osteopathic Hosp. Ass'n*, 271 B.R. 544, 547 (Bankr. N.D. Ohio 2002) (if "[p]olicy proceeds are property of [the debtor's] estate, then any payment [the insurer] makes . . . is in violation of the automatic stay"); *In re Downey Fin. Corp.*, 428 B.R. 595, 602 (Bankr. D. Del. 2010) (similar).

"*prohibiting* [the parties] from attempting to execute against or gain access to the proceeds of any insurance policy naming the [debtor]." *Id*. at *5. The court below rightly took a similar tack. Litigation against 3M does not obtain or control estate property because 3M can pay the judgments from its own assets, as with the defense costs to date. CA.441-42 (186:23-187:4). It need not, and cannot under the Code, pay for plaintiffs' judgments by raiding Aearo's estate.

**3.**     The funding agreement reinforces that the earplug lawsuits seek neither to obtain nor control Aearo's insurance coverage. The bankruptcy court found that § 362(a)(3) does not apply because, "ultimately, 3M will fully fund any liability incurred by Aearo relating to the [earplug claims] pursuant to the Funding Agreement." SA.25-26. That funding obligation ensures that, if 3M does take value from Aearo's creditors by draining the assertedly shared insurance, 3M itself must replenish any shortfall. *Id*. Either way, the effect is the same: the earplug litigation will obtain only 3M's property. *Id*.

It thus makes no difference whether the "insurance proceeds" and the "right to funding from 3M" are "*separate* asset[s] of the estate," Aearo Br. 50, because the earplug lawsuits do not seek to possess or control either asset, *supra* pp. 45-46. In any event, the two are intertwined: if Aearo were right that 3M's future coverage claims will deplete the estate, the funding agreement would require 3M to make up the difference. That circularity likely explains why 3M currently has "taken no action against the insurance policies" – and

47

perhaps never will. SA.24. Aearo articulates no plausible reason 3M would go through the hassle of depleting an estate asset when the funding agreement would require 3M to "backstop" any resulting loss out of its own assets. SA.26. Without such a reason, earplug litigation will not "diminish [any] 'important asset'" at all. *Robins*, 788 F.2d at 1001. Rather, as with indemnification, the "net effect to Aearo" from 3M's insurance activities "is zero." SA.10.

A stay in those circumstances disserves § 362(a)(3)'s purpose. Judgments against 3M will not risk estate "dismemberment" or prejudice "individual creditors." *Fulton*, 141 S. Ct. at 589. As the bankruptcy court found, "there is no threat of inequitable distribution of insurance proceeds here as the Funding Agreement operates as a complete, uncapped backstop to the insurance policies." SA.26. This Court should not extend § 362(a)(3) to bar lawsuits that do not "affect[] [the] debtor's solvency and continuing operations." *Havlik*, 20 F.3d at 708; *see In re Yellow Cab Coop. Ass'n*, 132 F.3d 591, 598 (10th Cir. 1997) ("[A] number of courts narrowly interpret § 362(a)(3), consistent with its legislative history, to apply to prevent dismemberment of the estate and to assure its orderly distribution.") (quotations omitted).

**4.** Aearo's counterarguments lack merit. It faults (at 50) the bankruptcy court for considering the funding agreement, arguing that accounting for that agreement demands a "searching inquiry" into "other estate property, asset liquidity or collectability, additional funding sources, [or]

48

anything else." But the court's inquiry below was straightforward. It merely considered the effect on the estate given all the evidence before it, including the agreement that Aearo itself attached to its first-day declaration. A.275-302. Indeed, the funding agreement was the linchpin of Aearo's request for a stay under other Code sections. CA.148-50, CA.157. Aearo's suggestion that the court ignore the funding agreement under § 362(a)(3) but rely on it elsewhere makes little sense.

In fact, Aearo's arguments about the funding agreement sink its own test. Aearo attacks use of the agreement by extolling (at 50) the virtues of "administrability and clarity in complex and fast-moving Chapter 11 cases." But Aearo's proposed indirect-effect test is neither administrable nor clear. It entails the very thing Aearo decries (at 50): a "protracted examination" of hypothetical consequences, including predicting whether 3M will succeed in "replenishing [its own coffers]" by seizing "other assets" from a shared insurance policy. The simplest, most administrable approach is to shun that entire inquiry and instead focus solely on whether the lawsuits themselves seek estate property. *Supra* pp. 44-45. But if the Court does perform the predictive exercise Aearo requests, it should at least consider the entire record. As the bankruptcy court found, SA.25-26, the funding agreement is central to that record and neutralizes any effect on any estate asset.

49

Aearo also argues (at 52-53), for the first time on appeal, that 3M might be unable to honor the funding agreement.  But Aearo has not shown the bankruptcy court clearly erred in finding that "3M is more than able to honor the Funding Agreement."  SA.34.  Nor could it.  3M is one of the largest, most profitable companies in the world.  SA.4.  The court did not "ignore[]" testimony by Jeffrey Stein, an independent Aearo director, about 3M's funding resources not being "riskless."  Aearo Br. 17.  It credited Stein's *other* testimony "that he was confident of 3M's financial wherewithal and believed that the Funding Agreement provided a 'clear path' to restructuring [Aearo] even absent a stay."  SA.12.  The court's evaluation of his testimony, and credibility assessment, were not clearly erroneous.

### B.     Hypothetical Proceeds Under The Aearo Legacy And 3M Tower Insurance Policies Are Not Estate Property

Alternatively, the Court should affirm because the hypothetical insurance proceeds Aearo cites are not estate property.  *See Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001) ("An appellate court may affirm on any ground that has a basis in the record.").  While Aearo refers interchangeably to insurance policies, coverage, and proceeds throughout its brief, the only estate property even tangentially at issue is Aearo's right to receive future insurance proceeds.[19]  "The question" in a case like this one "is

---

[19] An insurance policy is simply a contractual right to indemnification under the policy terms.  *See Wilder Corp. of Delaware v. Thompson Drainage*

not who owns the policies, but who owns the liability proceeds." *In re Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993). Here, that is 3M, because only 3M has "'a right to receive and keep those proceeds when the insurer pa[ys] on a claim.'" *In re Stinnett*, 465 F.3d 309, 313 (7th Cir. 2006) (quoting *Edgeworth*, 993 F.2d at 55). Also, Aearo's argument fails because proceeds become property only once the insurer agrees to pay or "there is a judgment requiring that the insurers issue payment." *In re marchFIRST, Inc.*, 288 B.R. 526, 530 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Megliola v. Maxwell*, 293 B.R. 443 (N.D. Ill. 2003). Neither has happened here.

1. The insurance proceeds are not ones Aearo has "a right to receive and keep." *Stinnett*, 465 F.3d at 313; *see*, *e.g.*, *Edgeworth*, 993 F.2d at 56 (insurance proceeds not estate property when debtor had no right to retain them). The right is 3M's exclusively. Aearo gave its rights under the Aearo Legacy policy to 3M during the 2010 upstream. *Supra* p. 6; CA.221 (208:11-18) (transferring "assets" to 3M). That is why the Aearo Legacy insurer issued checks to 3M alone, despite receiving notice on both 3M's and Aearo's behalf. SA.12; CA.361-63; CA.243-44 (267:19-268:2). It is also why 3M asserts the right to hold the checks in its vault, with no evident intent to share the

---

& *Levee Dist.*, 658 F.3d 802, 803 (7th Cir. 2011). Nobody claims that the earplug lawsuits seek to control the policies themselves. *Cf. In re Minoco Grp. of Cos.*, 799 F.2d 517, 519 (9th Cir. 1986) (staying cancellation of policy).

proceeds with Aearo. SA.12-13. In short, Aearo handed over its insurance assets in the upstream, and 3M alone now controls them.

The same result ensues under the 3M Tower. 3M alone pays the premiums and is the primary insured under the 3M Tower. SA.12. Although Aearo is listed as an additional insured, *id.*, Aearo presented no evidence that it ever submitted a notice or sought money under the policy. That is for good reason: Aearo had no need to seek insurance coverage because Aearo itself bears no financial responsibility for defending the earplug lawsuits or for paying any judgments. *Supra* Part I.B.2. By contrast, 3M – which does bear responsibility for paying for the lawsuits – notified the insurers of the earplug claims against 3M in February 2019. CA.354-55. Because notice is a condition precedent to an insurer's obligations, *see* CA.321-22 (Art. V), Aearo has forfeited any right to payment for earplug claims under the 3M Tower.[20]

**2.** Even if Aearo did have some right to future insurance proceeds, that right "has not yet matured and may never mature" into "property of the estate." *marchFIRST*, 288 B.R. at 530. Courts hold that "[n]o one has a property interest in the proceeds of the insurance policies unless and until

---

[20] New York law governs the 3M Tower policy. CA.327 (Art. VI.O). It provides that "additional insureds" must "give[]" timely notice of the loss." *U.S. Underwriters Ins. Co. v. Kum Gang Inc.*, 443 F. Supp. 2d 348, 360 (E.D.N.Y. 2006) (collecting cases). "[N]otice by one insured will not be imputed as notice by another," and, "absent a valid excuse, the failure to satisfy the notice requirement vitiates the policy." *Id.*

there is a judgment requiring that the insurers issue payment" or "agreement by the insurer." *Id.*; *see, e.g.*, *In re NC12, Inc.*, 478 B.R. 820, 838 (Bankr. S.D. Tex. 2012) (insurance "proceeds do not become property of the estate until the contractual conditions are met"); *Mazzolin v. Lehman Bros. Real Est. Fund III, L.P.*, 2012 WL 245192, at *4 (N.D. Ill. Jan. 25, 2012) (similar).[21]   Because Aearo's insurers have neither agreed nor been ordered to pay, the insurance proceeds are not yet estate property.  *See In re Allied Digit. Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004) (when covered event "is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate").

## III. The Bankruptcy Court Properly Declined To Enjoin Earplug Claims Against 3M Under § 105(a)

### A. The Bankruptcy Court Did Not Abuse Its Discretion In Determining That It Was Not "Necessary" Or "Appropriate" To Enjoin Earplug Claims Against 3M

Section 105(a) empowers bankruptcy courts to exercise equitable powers – when "necessary" or "appropriate" – "to implement" other Code provisions. *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004).  Though "'expansively phrased, section 105(a) affords bankruptcy courts considerably less discretion than first meets the eye.'"  *Village of Rosemont v. Jaffe*, 482 F.3d 926, 935 (7th

---

[21] These cases do not conflict with the principle that estate property can include contingent interests.  *See, e.g.*, *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993).  Aearo's contingent interest in the insurance is simply its right to make claims pursuant to the policies.  The earplug lawsuits do not seek to interfere with those policy rights.  *Supra* pp. 50-51 & n.19.

Cir. 2007) (quoting *In re Ludlow Hosp. Soc'y, Inc.*, 124 F.3d 22, 27 (1st Cir. 1997)).  Courts "have carefully limited the circumstances in which [§ 105(a)] should be used." *Disch v. Rasmussen*, 417 F.3d 769, 777 (7th Cir. 2005).

Before a bankruptcy court "'can enjoin proceedings in other courts'" under § 105(a), it must find that (1) "'such proceedings would defeat or impair [the bankruptcy court's] jurisdiction over the case before it'"; (2) there is "'a likelihood of success on the merits'"; and (3) the "public interest" favors an injunction. *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (quoting *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993)).  No injunction should issue "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  The bankruptcy court did not clearly err in declining to award an injunction here.

1.     Courts use § 105(a) to stay actions that otherwise might defeat or impair the bankruptcy.  Actions meet that test only when they result in "less money for [the debtor's] creditors to recover in the bankruptcy proceeding." *In re Caesars Ent. Operating Co.*, 808 F.3d 1186, 1189 (7th Cir. 2015).

The earplug claims against 3M will neither defeat nor impair the bankruptcy because they will have no economic effect on Aearo's estate.  As shown above, *supra* pp. 29-30, the funding agreement precludes any such effect.  No earplug liabilities will harm Aearo's creditors because Aearo can call funding to cover those liabilities, and "3M must honor Aearo's funding

request." SA.31. Nor will any diminution in insurance harm Aearo's creditors "because the Funding Agreement covers all claims arising from the [earplug litigation against 3M] in the absence or exhaustion of the applicable insurance." SA.26. The bankruptcy court thus determined that a § 105(a) injunction was not "necessary or appropriate" because "a continuation of the [earplug litigation against 3M]" would have no "economic effect . . . on Aearo's bankruptcy estate and, ultimately, its distribution to creditors." SA.35.

**2.** Because the bankruptcy court's "ruling on [the] preliminary injunction motion concerns a factual finding," Aearo "must meet the demanding clear-error standard." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). Aearo instead skips past the court's reasoning and claims (at 71) that the court's explanation was so "insufficient" as to deprive this Court of the opportunity for "meaningful review." But in *Klein v. Perry*, which Aearo cites, the district court's entire analysis of the core legal issue ran "little more than one page, cite[d] only two cases, and glosse[d] over" relevant considerations. 216 F.3d 571, 575 (7th Cir. 2000). Here, the decision below contains many pages of findings, which provide ample basis for affirmance.

Aearo also argues (at 71) that the bankruptcy court's merits ruling was infected by its view of jurisdiction. That again misstates the court's reasoning. The court "f[ound] no basis upon which to invoke its § 105(a) powers" because "a continuation of the [earplug litigation against 3M] would have" "no . . .

effect" "on Aearo's bankruptcy estate and, ultimately, its distribution to creditors." SA.35. The court was clear that this component of its reasoning was independent of its jurisdictional analysis. *Id.*

Aearo also suggests (at 57) that an injunction is warranted because "continued proceedings against 3M distract from Aearo's restructuring proceedings." The bankruptcy court "put[] little stock on this claim" because it "heard no evidence to conclude that Aearo's operations or its administration of these bankruptcy cases will be impacted in the manner that Aearo argues." SA.34-35. Aearo ignores this factual finding.

**3.** The bankruptcy court also correctly declined to issue a preliminary injunction because Aearo failed to satisfy the other requirements for injunctive relief – showing a reasonable likelihood of a successful reorganization and that the injunction would serve the public interest. *See Fisher*, 155 F.3d at 882.[22]

To begin, Aearo provided no evidence that it would succeed on the merits. In bankruptcy proceedings, "a debtor seeking to stay an action against a non-debtor must show a reasonable likelihood of a successful reorganization." *Excel Innovations*, 502 F.3d at 1095. As the Ninth Circuit explained, "a successful reorganization" is impossible without negotiation "with [mass-tort] claimants . . . to set a plan that they would support." *In re Thorpe Insulation Co.*, 671

---

[22] The bankruptcy court "f[ound] no need to discuss these requirements," SA.35 n.17, but this Court may affirm "on any ground that has a basis in the record," *Anderson*, 274 F.3d at 478.

F.3d 1011, 1027 (9th Cir. 2012). Aearo presented no evidence of creditor support to the bankruptcy court and cites none in its opening brief.

Instead, Aearo flips (at 59) the burden of proof, decrying the lack of "evidence suggesting that Aearo could not" "use Chapter 11 to reorganize." This backwards argument fails to show that a successful reorganization is likely. *See Fisher*, 155 F.3d at 882 ("'[T]he *moving party* must . . . establish a likelihood of success on the merits.'") (quoting *L & S Indus.*, 989 F.2d at 932) (emphasis added).

Aearo likewise made no showing that the public interest would support injunctive relief. Enjoining the earplug claims against 3M will instead "harm the public interest," *id.*, by impeding the MDL court from adjudicating and resolving those claims. Congress intended MDLs to provide an efficient means to resolve mass tort litigation. *See* 28 U.S.C. § 1407. MDLs cannot achieve that purpose if defendants can effectively abolish any MDL they dislike by simply thrusting a subsidiary into bankruptcy and demanding a stay.

This case highlights the point. After using the MDL court as a central forum for "260 motions in limine, 109 *Daubert* challenges, 42 case-specific summary judgment motions, 47 choice of law disputes," "21 post-trial motions," and 16 bellwether trials, 3M decided "no more of this MDL nonsense." CA.558-59. So it "devised a scheme to oust the Congressionally-established system for resolving mass tort disputes in Article III courts and install its new favored

forum (for the moment, anyway), an Article I court, at the helm." CA.559.  This was "good old-fashioned litigation forum shopping, solely – and admittedly – designed to evade dissatisfactory legal rulings and verdicts in the MDL."  *Id.*  Such forum-shopping disserves the public interest.

## B.   The Bankruptcy Court Lacked Jurisdiction To Enjoin The Earplug Claims Against 3M

A bankruptcy court must have subject-matter jurisdiction to grant a § 105(a) injunction.  Section 105 "does not provide an independent source of federal subject matter jurisdiction."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 224-25 (3d Cir. 2004).   Bankruptcy jurisdiction exists for several categories of disputes, including those "related to" the bankruptcy proceeding. *See Bush v. United States*, 939 F.3d 839, 844 (7th Cir. 2019).  As Aearo concedes (at 61), only "related to" jurisdiction is at issue.   Related-to jurisdiction encompasses "suits between third parties" only if they "have an effect on the bankruptcy estate."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995).  A dispute is therefore "related to" the bankruptcy proceeding when its resolution might affect the amount of property for distribution to creditors or the allocation of property among creditors.  *See Fisher*, 155 F.3d at 882.

The earplug litigation against 3M is not "related to" Aearo's bankruptcy.  Under this Court's precedents, a bankruptcy judge must consider, from a before-the-fact perspective, whether resolving a dispute outside the bankruptcy would "ha[ve] a potential effect on other creditors."  *Bush*, 939 F.3d

at 846.  The court below did just that:  it could "not conclude that continuation of the [earplug claims against 3M] *will affect* the amount of property for distribution or the allocation of property among creditors."  SA.32 (emphasis added).

The earplug claims also are outside "related to" jurisdiction under any Circuit's articulation of the test.  Courts in other Circuits ask whether a matter "could conceivably have any effect on the estate being administered in bankruptcy."  *Celotex*, 514 U.S. at 308 n.6 (surveying Circuits) (emphasis omitted).  Despite the slightly different formulation, *Bush* clarified that this Circuit's test is "align[ed] . . . with the view widely held by our colleagues elsewhere."  939 F.3d at 846.  And there is no conceivable effect on Aearo's estate here because, as the bankruptcy court found, the circular funding agreement cannot affect "the amount of property for distribution or the allocation of property among creditors."  SA.32.

Aearo's contentions are unpersuasive.  It seizes (at 64) on the bankruptcy court's conclusion that the earplug litigation against 3M will have no "*actual* economic effect" on Aearo's estate.  SA.32.  Aearo suggests (at 65) that the court applied the wrong jurisdictional test, because *Bush* requires only a "potential" economic effect.  That distinction is purely semantic.  The bankruptcy court found that litigation against 3M "would have" no effect "on Aearo's bankruptcy estate and, ultimately, its distribution to creditors."  SA.35.  The before-the-

fact finding that litigation "would have" no "actual economic effect" on creditors, *id.*, necessarily rejects the possibility of any "potential effect" on them either.

## CONCLUSION

The bankruptcy court's judgment should be affirmed.

Respectfully submitted,

/s/ David C. Frederick
_____
David C. Frederick
Joshua D. Branson
Derek C. Reinbold
Eden M. Bernstein
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com

*Counsel for Appellee Official Committee of*
*Unsecured Creditors for Tort Claimants –*
*Related to Use of Combat Arms Version 2 Earplugs*

**KTBS LAW LLP**
Michael L. Tuchin
Robert J. Pfister
Sasha M. Gurvitz
Nir Maoz
1801 Century Park East, 26th
Floor
Los Angeles, CA 90067
Tel:  (310) 407-4000
Fax:  (310) 407-9090
*Co-Lead Counsel for*
*the CAE Committee*

**OTTERBOURG P.C.**
Melanie L. Cyganowski
Adam C. Silverstein
Jennifer S. Feeney
Pauline McTernan
230 Park Avenue
New York, NY 10169
Tel:  (212) 661-9100
Fax:  (212) 682-6104
*Co-Lead Counsel for*
*the CAE Committee*

**BROWN RUDNICK LLP**
David J. Molton
Jeffrey L. Jonas
Seven Times Square
New York, NY 10036
Tel:  (212) 209-4800
Fax:  (212) 209-4801
*Special Litigation Counsel for
the CAE Committee*

**CAPLIN & DRYSDALE,
CHARTERED**
Kevin C. Maclay
Todd E. Phillips
Kevin M. Davis
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
Tel:  (202) 862-5000
Fax:  (202) 429-3301
*Special Mass Tort and
Negotiation Counsel for the CAE
Committee*

**RUBIN & LEVIN, P.C.**
Deborah J. Caruso
Meredith R. Theisen
135 N. Pennsylvania Street
Suite 1400
Indianapolis, IN 46204
Tel:  (317) 634-0300
Fax:  (317) 263-9411
*Indiana Counsel for
the CAE Committee*

January 25, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Circuit Rule 32(c) because, according to the word-processing system used to prepare it (Microsoft Word 2016), it contains 13,985 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface (Century Schoolbook, 13 point).

/s/ David C. Frederick
David C. Frederick

### CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David C. Frederick
David C. Frederick