No. 22-2606

# In the United States Court of Appeals
# For the Seventh Circuit

_____

IN RE: AEARO TECHNOLOGIES, LLC, et al.,

_____

AEARO TECHNOLOGIES, LLC, et al.,

*Debtors-Appellants,*

v.

THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT AND
JOHN & JANE DOES, 1-1000,

*Appellees.*

_____

On Direct Appeal from the United States Bankruptcy Court
for the Southern District of Indiana, Indianapolis Division
No. 22-2890, Adv. No. 22-50059

_____

**BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE AS *AMICUS
CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

TAD THOMAS
*President*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(502) 387-0694
Tad.Thomas@justice.org

JEFFREY R. WHITE
*Counsel of Record*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(202) 944-2839
Jeffrey.White@justice.org

*Counsel for Amicus Curiae*

February 1, 2023

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2606</u>

Short Caption: <u>IN RE AEARO TECHNOLOGIES, LLC, et al. (Aearo Technologies, LLC v. Those Plaintiffs Listed on Appendix A)</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>American Association for Justice</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

   <u>N/A</u>

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>Debtors are wholly owned subsidiaries of non-debtor 3M Company</u>

Attorney's Signature: <u>/s/ Jeffrey R. White</u>    Date: <u>Feb. 1, 2023</u>

Attorney's Printed Name: <u>Jeffery R. White</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓] **No** [ ]

Address: <u>American Association for Justice, 777 6th Street NW, Suite 200, Washington, DC 20001</u>

Phone Number: <u>(202) 944-2839</u>    Fax Number: <u>N/A</u>

E-Mail Address: <u>jeffrey.white@justice.org</u>

rev. 12/19 AK

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus Curiae hereby provides the following disclosure statement:

The American Association for Justice ("AAJ") is a non-profit voluntary national bar association. There is no parent corporation or publicly owned corporation that owns ten percent or more of this entity's stock.

Respectfully submitted this 1st day of February, 2023.

/s/ Jeffrey White

Jeffrey R. White
*Attorney for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS................................................. iii

TABLE OF AUTHORITIES ............................................v

IDENTITY AND INTEREST OF AMICUS CURIAE...........................1

SUMMARY OF ARGUMENT ...........................................1

ARGUMENT ...........................................................5

I.      THE CIVIL JUSTICE SYSTEM IS NOT BROKEN. ...................................5

    A.      The Challenges Faced by MDLs Handling Mass Tort Litigation Do Not Support Forcing CAEv2 Victims to Resort to a 3M/Aearo Bankruptcy Trust as Their Exclusive Source of Personal Injury Compensation. .............................................6

    B.      MDLs Provide a Fair and Equitable Assessment of Liability and Damages. ............................................9

    C.      MDLs Are Capable of Minimizing the Number of Specious Claims............................................11

II.     MDL JUDGES POSSESS THE AUTHORITY AND APPROPRIATE TOOLS TO ADDRESS MASS TORT CIVIL ACTIONS. ..........................13

    A.      Discovery Tools. ...............................................14

    B.      Trial Tools. ...............................................15

    C.      Settlement Tools................................................16

III.    AEARO'S PROPOSAL TO EXTINGUISH COMMON-LAW CAUSES OF ACTION AGAINST 3M AND REPLACE THEM WITH CLAIMS AGAINST A BANKRUPTCY SETTLEMENT FUND DEPRIVES VICTIMS OF THEIR CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO TRIAL BY JURY....................................18

    A.      Extinguishing Claimants' Causes of Action Against 3M and Limiting Their Redress to Claims Against a Bankruptcy

Settlement Fund, Without Their Consent or Opportunity to Opt Out, Violates Claimants' Right to Due Process. ...................................18

B.  Replacing a Personal Injury Plaintiff's Common-Law Cause of Action Against the Alleged Tortfeasor with a Claim for Compensation from a Bankruptcy Trust Violates Their Seventh Amendment Right to a Jury Trial........................................................25

CONCLUSION ..............................................................................................29

CERTIFICATE OF COMPLIANCE......................................................................30

CERTIFICATE OF SERVICE ............................................................................31

# TABLE OF AUTHORITIES

## Cases

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ......................................22

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442 (1977) ..............................................................27

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) ......................................27

*Chauffeurs, Teamsters and Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558 (1990) .27

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ....................29

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) ..................................................25

*Dimmick v. Schiedt*, 293 U.S. 474 (1935) .............................................................26

*Georgine v. Amchem Products, Inc.*, 521 U.S. 591 (1996) ....................................22

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) .............................. 25, 26, 27

*In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989) ............................................20

*In re Aearo Techs. LLC*, 642 B.R. 891, 896 (Bankr. S.D. Ind. 2022) ..................5, 6

*In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019) ....................................................................24

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-MD-1871, 2021 WL 5178489 (E.D. Pa. July 12, 2021), *report and recommendation adopted*, No. 07-MD-1871, 2021 WL 4129426 (E.D. Pa. Sept. 10, 2021) .......................14

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No.2047, 2021 WL50455 (J.P.M.L. Jan. 5, 2021) ......................................................................16

*In re Combat Arms Earplug Products Liability Litig.*, MDL No. 19-2885 (N.D. Fla.) ..............................................................................5

*In re Digital Impact*, 223 B.R. 1 (Bankr. N.D. Okla. 1998) ..................................24

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912 (6th Cir. 2022) .......................................................................... 15, 16

*In re Hudson*, 170 B.R. 868 (E.D.N.C. 1994) .......................................................26

*In re LTL Mgmt, LLC*, Nos. 22-2003–22-2011 (3d Cir. Jan. 30, 2023) .......... 20, 21

*In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022) ...................................20

*In re Vioxx Prods. Liab. Litig.*, 650 F.Supp.2d 549 (E.D. La. 2009) .....................18

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4680242 (N.D. Cal. Oct. 18, 2017) .......14

*In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368 (J.P.M.L. 2019) .........................................................................................................7

*Jacob v. New York*, 315 U.S. 752 (1943) .................................................................27

*Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986) ....................................................................................................................21

*Logan v. Zimmerman Brush Co*., 455 U.S. 422 (1982) ...........................................21

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp)*, 837 F.2d 89 (2d Cir. 1988) .................................................................................................20

*Machinists v. Street*, 367 U.S. 740 (1961) ..............................................................29

*Martin v. Wilks*, 490 U.S. 755 (1989) ............................................................... 23, 24

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ........................................... passim

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979) .....................................26

*Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va. 2022) ..24

*Pepper v. Litton,* 308 U.S. 295 (1939).....................................................................26

*Pernell v. Southall Realty*, 416 U.S. 370 (1974)......................................................25

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ..................................... 21, 22

*Taylor v. Sturgell*, 553 U.S. 880 (2008)...................................................................24

*Trulis v. Barton*, 107 F.3d 685 (9th Cir. 1995)........................................................26

*Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ...........................21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).............................................22

*Weber v. Diversey Bldg. Corp. (In re Diversey Bldg. Corp.)*, 86 F.2d 456 (7th Cir. 1936) ...........................................................................................................19

*Young v. United States*, 535 U.S. 43 (2002) ............................................................26

**Statutes**

11 U.S.C. § 524(g) ................................................................. 24, 26

28 U.S.C. § 1407 .........................................................................8

U.S. Const., amend VII ..............................................................25

**Other Authorities**

Lynn A. Baker & Charles Silver, *In Defense of Private Claims Resolution Facilities*, 84 Law & Contemp. Probs. 45 (2021) ................................. 16, 17, 18

Lynn A. Baker, *Mass Tort Remedies and the Puzzle of the Disappearing Defendant*, 98 Tex. L. Rev. 1165 (2020).........................................17

Andrew Bradt, *"A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. Pa. L. Rev. 831 (2017)...........................................8

Lester Brickman, *Civil Rico: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40 Cardozo L. Rev. 2301 (2019) .....................................13

S. Todd Brown, *Specious Claims and Global Settlements*, 42 U. Mem. L. Rev. 559 (2012)................................................................. 12, 13, 15

Ralph Brubaker, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, 131 Yale L.J. Forum 960 (2022).....................................11

Sergio Campos & Samir D. Parikh, *Due Process Alignment in Mass Restructurings*, 91 Fordham L. Rev. 325 (2022)......................... 10, 11

STEPHEN J. CARROLL, ET AL., ASBESTOS LITIGATION (2005) ...................................15

Natalie R. Earles, *The Great Escape: Exploring Chapter 11's Allure to Mass Tort Defendants*, 82 La. L. Rev. 519 (2022) .......................................9

Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) ............................................................16

Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place in the Textbook Understandings of Procedure*, 165 U. Pa. L. Rev. 1669 (2017)........................................................... 14, 16

Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289 (1966)...................................................26

H.R. Rep. No. 103-835 (1994)..................................................24

Adam J. Levitin, *The Constitutional Problem of Nondebtor Releases in Bankruptcy*, 91 Fordham L. Rev. 429 (2022)......................................................19

MANUAL FOR COMPLEX LITIGATION (FOURTH) (2004) ..................................... 14, 15

Francis E. McGovern, *The What and Why of Claims Resolution Facilities*, 57 Stan. L. Rev. 1361 (2005).......................................................................................17

Francis McGovern, *Towards a Cooperative Strategy of Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867 (2000) .......................15

Thomas Metzloff, *The MDL Vortex Revisited*, Judicature, Fall 2015 ......................9

Samir Parikh, *The New Mass Torts Bargain*, 91 Fordham L. Rev. 447 (2022)..9, 10

Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials,* 88 N.Y.U. L. Rev. 439 (2013) ...............15

Victor E. Schwartz & Rochelle M. Tedesco, *The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline the Litigation Have Fueled More Claims*, 71 Miss. L.J. 531 (2001) .......................13

Lindsey D. Simon, *Bankruptcy Grifters*, 131 Yale L.J. 1154 (Feb. 2022)..............21

Douglas G. Smith, *The Myth of Settlement in MDL Proceedings*, 107 Ky. L.J. 467 (2018-2019)...................................................................................................12

Margaret S. Thomas, *Morphing Case Boundaries in Multidistrict Litigation Settlements,* 63 Emory L. J. 1339 (2014)...............................................................8

United States Judicial Panel on Multidistrict Litigation, Multidistrict Litigation Terminated Through September 30, 2021,.............................................................9

Jeffrey R. White, *The Civil Jury: 200 Years Under Siege*, Trial, June 2000 .........26

Thomas E. Willging & Emory G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation After* Ortiz, 58 U. Kan. L. Rev. 775 (2010) .......................................................................................................8

## IDENTITY AND INTEREST OF AMICUS CURIAE

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ's members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. For more than 75 years, AAJ has served as a leading advocate of the right of all Americans to seek legal recourse for wrongful injury.[1]

## SUMMARY OF ARGUMENT

The Aearo debtors' objective in moving the bankruptcy court to stay or enjoin CAEv2 litigation is to shield non-debtor 3M from all liability and limit injured claimants to a settlement trust as their only source of compensation for their wrongful injuries. The bankruptcy court properly denied the motion.

1.    Contrary to the assertions of Aearo's supporting *amici*, multidistrict litigation is no less capable than bankruptcy in handling large mass tort actions. Indeed, MDLs have a strong record of addressing and resolving mass tort cases. Nor is bankruptcy necessarily faster or more efficient than MDL. Although the MDL

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part. No person, other than amicus curiae, its members, and its counsel, contributed money that was intended to fund the preparation or submission of this brief.

system provides for return of individual cases to their district courts for trial, preserving claimants' rights to their day in court and trial by jury, the vast majority are resolved by dispositive motions or voluntary settlement.

Those cases that go before a jury, including bellwether trials, may yield differing results on liability and damages. The ability of juries to tailor their factfinding to the evidence and the parties before them is a virtue of our justice system.

By contrast, in mass tort cases, bankruptcy courts arrive at a valuation without any assessment of any plaintiff's actual harm, but often based on speculative and unreliable substitutes. One means of ensuring that an injured mass tort plaintiff's claim is valued fairly, the claimant's ability to opt out, is rejected by the Aearo debtors. Not only does undervaluation rob individual claimants of full redress, it risks insolvency for the entire trust.

*Amici* supporting Aearo also assert, without basis, that many of the MDL claims are meritless, or even fraudulent. Asbestos bankruptcy settlement trusts, which the Aearo debtors would replicate here, have been widely criticized for inadequate screening of meritless claims. Aearo's amici also acknowledge that MDL courts already have the means at their disposal to meet this challenge.

2.      In fact, MDL courts are well equipped with the appropriate tools to handle mass tort litigation. Some of these tools focus on reducing redundancy and

2

expense in discovery. These include centralized document repositories and discovery databases, as well as factsheets and other mandatory disclosures that streamline discovery.

MDL judges also employ bellwether trials that can resolve issues of law in one or a few proceedings rather than relitigate the same issues many times. Bellwether trials also provide the parties with actionable data regarding a jury's assessment of their cases, promoting settlement.

MDL courts make use of other settlement tools as well. These include "inventory settlements" in which counsel that plaintiffs themselves have retained allocate settlement funds. Private "claims resolution facilities" operate in a similar fashion, with a neutral party determining the amount from the aggregate settlement will be apportioned to each individual tort claimant. Both settlement tools preserve the tort plaintiff's right to reject the settlement offer in favor of trial against the defendant.

3.    A determination that the Bankruptcy Code authorizes releasing non-debtor 3M and channeling CAEv2 plaintiffs to a bankruptcy trust as their exclusive source of compensation, without their consent, raises serious constitutional concerns. Such involuntary "settlement" of causes of action against a non-debtor arising outside of the bankruptcy proceeding has never been recognized as consistent with due process. Nevertheless, prominent and highly solvent corporations have

sought to obtain the "fresh start" benefits available to debtors under the Bankruptcy Code without shouldering the burdens.

Common-law causes of action, including tort claims, are a species of property protected by the Due Process Clause. Involuntary discharge of tort claims is simply inconsistent with due process. Hence, the Supreme Court has repeatedly made clear that any aggregate settlement of claims for damages must afford nonconsenting claimants the opportunity to opt out.

It is true that a "limited fund" class action may be settled with no provision for opting out. However, the Court has emphasized that the fund in that circumstance must be constructed independently of the agreement of the parties and without allowing the defendant to hold back its own assets. That is not this case.

As well, Congress added to the Bankruptcy Code a provision for discharging the claims of asbestos injury victims against non-debtors and limiting their redress to claims against an asbestos trust. However, the Court made clear that such a scheme, limited to asbestos claims, must conform to the protections of the rights of claimants spelled out in the Bankruptcy Code. Again, that is not this case.

Extinguishing the veterans' claims also violates their constitutional right to trial by jury. Their claims for money damages fall squarely within the Seventh Amendment guarantee. Congress may not conjure away this right by transforming a traditional action before an Article III court into a claim before an Article I

4

bankruptcy court. Nor can the judicial branch do so by approving a manipulation of the Bankruptcy Code.

This Court should avoid these constitutional concerns by affirming the bankruptcy court's decision in this case.

## ARGUMENT

## I.     THE CIVIL JUSTICE SYSTEM IS NOT BROKEN.

Aearo[2] and 3M are co-defendants in a multidistrict litigation (MDL) in the Northern District of Florida involving claims by veterans that they suffered hearing loss caused by Combat Arms Earplugs version 2 ("CAEv2"), which were designed, manufactured, and marketed by defendants. *See In re Combat Arms Earplug Products Liability Litig.*, MDL No. 19-2885 (N.D. Fla.). Aearo filed for Chapter 11 protection on July 26, 2022. *In re Aearo Techs. LLC*, 642 B.R. 891, 896 (Bankr. S.D. Ind. 2022). On that same day, Aearo filed a motion in the bankruptcy court seeking: (1) a determination that the automatic stay of litigation against Aearo also applies to CAEv2 claims against 3M; or, in the alternative, (2) a preliminary injunction enjoining continued prosecution of that litigation. *Id.* at 901. Aearo made clear to the court:

> Aearo's ultimate objective is to confirm a plan of reorganization that resolves all Combat Arms-related claims against Aearo and 3M. That plan would have two cornerstones. The first would be a settlement trust

---

[2]  The debtors are five subsidiaries wholly owned by 3M. For clarity, this brief refers to the debtors as "Aearo."

for Combat Arms claims funded by Aearo, including from an uncapped commitment by 3M that will ensure sufficient resources to pay the true value of all claims filed against it. . . . The second cornerstone would be a permanent channeling injunction and a third-party release of 3M. This injunction would require that all Combat Arms-related claims be brought only against the settlement trust, and not the reorganized Aearo entities or their non-debtor affiliates. The injunction would apply to all potential Combat Arms plaintiffs.

Informational Brief of Aearo Technologies LLC at 57. On August 26, Bankruptcy Judge Jeffrey J. Graham denied Aearo's motion. 642 B.R. at 912.

AAJ respectfully submits that this ruling was correct. AAJ wholly agrees with the position advanced by the Appellees: Chapter 11 does not authorize the relief that Aearo and 3M seek here. *See* Brief for Appellee at 21.

Contrary to the contentions of Aearo and its supporting *amici*, AAJ further argues that the civil justice system — and multi-district litigation in particular — is no less capable than bankruptcy courts at handling mass tort actions.

## A. The Challenges Faced by MDLs Handling Mass Tort Litigation Do Not Support Forcing CAEv2 Victims to Resort to a 3M/Aearo Bankruptcy Trust as Their Exclusive Source of Personal Injury Compensation.

Aearo's supporting *amici* present this Court with essays highlighting the virtues of the bankruptcy system in allowing corporations experiencing financial distress due to mass tort liabilities to make a "fresh start." *See* Brief for the Chamber of Commerce of the United States of America and American Tort Reform Association as Amici Curiae Supporting Debtors-Appellants at 7, 15-16 [hereinafter

"U.S. Chamber Br."]; Brief for National Association of Manufacturers and Product Liability Advisory Council, Inc. as Amici Curiae Supporting Debtors-Appellants at 3-4, 7 [hereinafter "NAM Br."].

None of that is at issue before this Court. The motion that the bankruptcy court properly denied is an attempt by 3M, through its subsidiaries, to obtain the substantial benefits offered to a petitioner in bankruptcy without submitting to any of the obligations imposed by the Bankruptcy Code. 3M is eminently solvent and is not seeking a "fresh start." Instead, the multinational conglomerate is simply trying to evade accountability for its actions and shield its own assets with an immunity that is not authorized by Chapter 11.

In April 2019, the Judicial Panel on Multidistrict Litigation formed MDL No. 2885 to "promote the just and efficient conduct of this litigation." *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368, 1369 (J.P.M.L. 2019). The vast majority of the CAEv2 claims against 3M are within that MDL. Nevertheless, Aearo *amici* urge this Court to approve releasing non-debtor 3M in the name of efficiency. They contend that multidistrict litigation is incapable of handling large mass tort cases, does not award damages equitably, and is plagued by numerous specious claims. *See, e.g.*, U.S. Chamber Br. at 11 (arguing that "Chapter 11 provides a fair and expeditious alternative" for parties who "will waste years in the . . . the long and drawn-out MDL process, . . ."); *id.* at 8 ("[T]he MDL process will

not always have the capacity to resolve a massive docket of individualized personal injury claims"); NAM Br. at 28 (arguing that as compared to multi-district litigation, bankruptcy is "the far more efficient and equitable mechanism"); *id.* at 11 (stating that MDLs are "ill equipped to reliably achieve global resolution in mega mass-tort litigation").

To the contrary, AAJ submits, the MDL system is not broken in general or with respect to uniquely complex product liability suits. In fact, the creators of multidistrict litigation specifically intended to address the kind of mass tort situation presented to the Court in this case. *See generally* Andrew Bradt, *"A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. Pa. L. Rev. 831 (2017) (providing a detailed history of the origins, drafting, and enactment of the MDL statute, 28 U.S.C. § 1407).

In fact, MDL actions have become "the most important federal procedural device to aggregate (and settle) mass torts." Margaret S. Thomas, *Morphing Case Boundaries in Multidistrict Litigation Settlements,* 63 Emory L. J. 1339, 1346–47 (2014); *see also* Thomas E. Willging & Emory G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation After* Ortiz, 58 U. Kan. L. Rev. 775, 798 (2010) (tracing the "massive increase in MDL aggregate litigation" in federal courts). From the Panel's inception in 1968 until September 2021, MDL judges handled 1,587 MDLs, and during that period closed 275,627 civil

actions.[3] Historically, about a quarter of the MDL docket has consisted of mass tort cases. Samir D. Parikh, *The New Mass Torts Bargain*, 91 Fordham L. Rev. 447, 475 (2022) (citing Thomas Metzloff, *The MDL Vortex Revisited*, Judicature, Fall 2015, at 36, 41). Although Section 1407 provides for the return of cases for trial in their transferor courts, the vast majority are resolved without trial. From 1968 through September 30, 2018, transferee courts had received and resolved approximately 516,593 cases, about 97 percent of which were resolved in the MDL court by dispositive motion or voluntary settlement. *Id*.

As these statistics make abundantly clear, the MDL system is not only capable of resolving complex cases, but it is also "the dominant procedure for mass tort litigation." Natalie R. Earles, *The Great Escape: Exploring Chapter 11's Allure to Mass Tort Defendants*, 82 La. L. Rev. 519, 539 (2022).

## B. MDLs Provide a Fair and Equitable Assessment of Liability and Damages.

Aearo's *amici* are troubled by the fact that bellwether trials have yielded "widely divergent results." U.S. Chamber Br. at 10 (noting that juries have awarded varying amounts of compensatory damages for similar injuries and have returned defense verdicts in others). This is, of course, the purpose of bellwether trials: they

---

[3] United States Judicial Panel on Multidistrict Litigation, Multidistrict Litigation Terminated Through September 30, 2021, https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021%20Report%20Cumulative%20Terminated%20MDLs.pdf.

allow the parties to determine how juries react to the evidence of liability and how they might assess damages by mirroring the tort system. *See* Part II.B., *infra*. The ability of juries to tailor their verdict to the evidence and the parties before them is not a shortcoming; it is the ideal to which the civil justice system aspires.

Instead, the Aearo amici propose using the "claims estimation processes" of the Bankruptcy Code. U.S. Chamber Br. at 13. Section 502(c) affords broad discretion to the bankruptcy court in estimating the value of unliquidated claims, which has led bankruptcy courts to employ "a variety of unorthodox methodologies." *See* Sergio Campos & Samir D. Parikh, *Due Process Alignment in Mass Restructurings*, 91 Fordham L. Rev. 325, 337-3 (2022).

This "estimation" process has been the subject of much criticism. As one scholar has commented:

> [T]his essential process devolves to a battle of experts. Indeed, experts representing the debtor, the official committees, and other stakeholders present highly speculative assessments that happen to perfectly align with their client's interests. . . . But the idea that the bankruptcy court will, after a few days of hearings, estimate thousands of victims' claims totaling hundreds of millions of dollars is arguably absurd. . . .
>
> Some jurists have rejected the premise that bankruptcy judges can "accurately estimate the results of a series of extremely speculative problems" and have refused to undertake the task; all acknowledge the process's systemic flaws.

Parikh, *supra*, at 492–93 (internal citations omitted).

A reliable means of ensuring the accuracy and fairness of claim valuation is to preserve the claimants' right to opt out of the global settlement. If "settlement designers must purchase those rights by way of the benefits promised to [claimants] for remaining in the settlement," the right not to participate can furnish "a kind of market test of a settlement's fairness and adequacy, particularly of the specific compensation offers that will be made." Ralph Brubaker, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, 131 Yale L.J. Forum 960, 992–93 (2022). But the global settlement proposed here allows no opt-out.

The "ultimate doomsday scenario" is that predicted claims will be undervalued and that wrongdoers will be able to walk away from full accountability, protected by liability releases. *See* Campos & Parikh, *supra*, at 351–52 (pointing to the "most prominent example" of the Johns-Manville bankruptcy trust, which initially promised to pay full value of injury claims, faced insolvency within a few years, and was allowed to reduce that to 10 percent of full value in 1995, and to 5.1 percent by 2022).

## C. MDLs Are Capable of Minimizing the Number of Specious Claims.

In an exercise in pure speculation regarding the veterans' claims in this case, NAM and PLAC declare that "it is highly likely that there are an enormous number of meritless, or even fraudulent, claims lurking alongside the genuine ones." NAM

Br. at 26. NAM proffers no evidence that *any*, much less "an enormous number" of the plaintiffs' claims of hearing loss caused by CAEv2 are false. *Id.*

Instead, NAM cites an MDL defense attorney for the proposition that it "is no secret that the aggregation of an enormous number of claims under one judicial roof necessarily results in the filing of meritless claims or claims that would never have been brought otherwise." *Id.* at 23 (quoting Douglas G. Smith, *The Myth of Settlement in MDL Proceedings*, 107 Ky. L.J. 467, 471 (2018-2019)). But the author does not claim that such problems are unique to MDLs. They "arise in all proceedings in which claims are aggregated." Smith, *supra*, at 471. Moreover, author Smith points out, the MDL system already makes use of "a large diversity [of] ways in which such claims may be eliminated." *Id.* at 476. Routine "utilization of these and other procedures by MDL courts will only increase the effectiveness of the MDL procedure." *Id.* at 492.

NAM also cites an associate law professor in support of its claim that MDLs fall prey to meritless or fraudulent claims. *See* NAM Br. at 25 (citing S. Todd Brown, *Specious Claims and Global Settlements*, 42 U. Mem. L. Rev. 559 (2012)). But Professor Brown simply contends that "oversubscription, which, at times, appears to be fueled primarily by specious claims," is a disruptive problem that plagues "comprehensive mass tort settlements" generally. Brown, *supra*, at 560. One example, he explains, is the Johns Manville bankruptcy trust, which provides the

template for the bankruptcy settlement trust Aearo proposes here. *Id.* at 575–76. Other commentators have likewise criticized asbestos settlement trusts for failure to screen out possibly meritless claims. *See, e.g.*, Lester Brickman, *Civil Rico: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40 Cardozo L. Rev. 2301, 2390 (2019); Victor E. Schwartz & Rochelle M. Tedesco, *The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline the Litigation Have Fueled More Claims*, 71 Miss. L.J. 531, 533–34 (2001).

In any event, as the U.S. Chamber itself concedes, MDLs already have effective means of screening out specious claims. For example, "in large, personal injury MDLs, mandatory disclosure of basic factual information "prevents the complications caused by unrestrained filing of potentially frivolous claims." U.S. Chamber Br. at 8. Another "protection against the meritless filing of MDL claims is the small filing fee required by 28 U.S.C. § 1914." *Id.* at 9. *See also* Brown, *supra*, at 593 (pointing to the Silica MDL as example of success in warding off specious claims).

## II.    MDL JUDGES POSSESS THE AUTHORITY AND APPROPRIATE TOOLS TO ADDRESS MASS TORT CIVIL ACTIONS.

To address mass tort issues, MDL judges are vested with what one scholar has termed "procedural exceptionalism," which enables judges to remain "flexible and creative" in fashioning and employing innovative tools to address the challenges

presented by mass tort litigation. Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place in the Textbook Understandings of Procedure*, 165 U. Pa. L. Rev. 1669, 1689 (2017).

## A. Discovery Tools.

One highly effective option open to MDL judges is to order the creation and maintenance of centralized document repositories and discovery databases that vastly reduce the redundancy and expense in both document and deposition discovery. *See, e.g.*, *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-MD-1871, 2021 WL 5178489, at *1 (E.D. Pa. July 12, 2021), *report and recommendation adopted*, No. 07-MD-1871, 2021 WL 4129426 (E.D. Pa. Sept. 10, 2021); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4680242, at *1 (N.D. Cal. Oct. 18, 2017).

MDL judges also use "fact sheets," which are "questionnaires eliciting a wide range of information [from claimants], such as the circumstances of their exposures and the severity of their injuries, to facilitate settlement negotiations or improve claim administration following settlement." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.91 (2004). Indeed, the U.S. Chamber concedes that such fact sheets have become "a standard case management tool" in large, personal injury MDLs. U.S. Chamber Br. at 8.

MDL judges continue to make refinements, "including the use of staggered claim-specific discovery devices that generate far more information about not only the specific allegations underlying individual claims, but also the nature of the evidence supporting those allegations." Brown, *supra*, at 613.

Of particular import for the CAEv2 litigation, MDL federal judges have coordinated with state judges to handle an array of challenges in mass tort litigation, including discovery, pretrial orders, test trials, and bellwether trials, among others. *See* Manual for Complex Litigation § 20.312; *see generally* Francis McGovern, *Towards a Cooperative Strategy of Federal and State Judges in Mass Tort Litigation*, 148 U. Pa. L. Rev. 1867 (2000).

**B.  Trial Tools.**

MDL judges also employ "bellwether" trials to resolve particular issues that the parties will be precluded from relitigating over and over. *See generally* Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials,* 88 N.Y.U. L. Rev. 439 (2013). Such issue preclusion has been effective in assisting courts "to manage asbestos caseloads more efficiently in order to reduce private and public transaction costs." STEPHEN J. CARROLL, ET AL., ASBESTOS LITIGATION, 28-31 (2005). More recently, in *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912 (6th Cir. 2022), residents downriver from a DuPont plant alleged that the plant allowed a toxic chemical used

in making Teflon to contaminate their air and water. The MDL court ruled that DuPont would be estopped in future actions from relitigating issues of duty, breach of duty, and foreseeability that were decided adversely to DuPont in two bellwether jury trials. The Sixth Circuit upheld this use of collateral estoppel. *Id.* at 928.

MDL courts also use bellwether trials to allow the parties to assess the strength of their cases or the damage awards that might be realistically anticipated. *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No.2047, 2021 WL50455, at *2 (J.P.M.L. Jan. 5, 2021); *see generally* Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008).

### C. Settlement Tools.

Recognizing that "99% of all filed civil cases today are resolved without trial," it should be no surprise that MDL judges have developed innovative tools and combinations of procedures to move mass tort claims toward resolution. Gluck, *supra*, at 1674.

Perhaps one of the simplest of these tools is the inventory settlement, where a defendant "seeks to obtain closure by entering into (usually confidential) agreements with law firms that represent large numbers of claimants. Typically, these deals resolve each firm's entire inventory of qualifying claims for a lump-sum dollar amount." Lynn A. Baker & Charles Silver, *In Defense of Private Claims Resolution Facilities*, 84 Law & Contemp. Probs. 45, 56 (2021). It then falls to plaintiff's

counsel to allocate specific amounts to individual claimants. Plaintiffs' counsel generally has closer knowledge of their clients' personal injuries and situation than a trust administrator. Claimants may have greater confidence in the attorney they have chosen to represent them and will have greater transparency in knowing the amounts paid to other claimants and the total amount available for all of them. In the event they are dissatisfied, they can opt to litigate, a factor that motivates the defendant to offer a lump sum that will invite wide acceptance. *Id.* at 58. General Motors, for example, resolved many of the claims in its faulty ignition MDL in this fashion. *Id.* at 55–56. In fact, "[v]irtually all cases in every MDL are resolved through settlement, and the overwhelming majority of those settlements are confidential inventory settlements." Lynn A. Baker, *Mass Tort Remedies and the Puzzle of the Disappearing Defendant*, 98 Tex. L. Rev. 1165, 1185 (2020).

Private claims resolution facilities ("CRF") represent a more formal version of this settlement tool. *See* Francis E. McGovern, *The What and Why of Claims Resolution Facilities*, 57 Stan. L. Rev. 1361 (2005). CRF is a broad category encompassing an aggregation of claimants and an aggregation of funds to be distributed to them outside the court system but administered by a neutral party with an opt-out right for claimants. *Id.* at 1361-62, 1367. One example is the 9/11 fund administered by Kenneth Feinberg, created by Congress as an alternative to suits against the airline industry. *Id.* at 1363.

17

More recently, the Vioxx MDL arose in connection with claims against Merck and its once highly popular anti-inflammatory and analgesic drug, which was withdrawn from the market after it was linked to an increased risk of heart attack and stroke. *In re Vioxx Prods. Liab. Litig.*, 650 F.Supp.2d 549, 551 (E.D. La. 2009). The MDL transferee court conducted six bellwether trials and, based on those outcomes and results of other trials, the parties agreed upon a $4.85 billion global settlement fund, to compensate some 50,000 eligible claimants. *Id.* at 552–53. Judge Eldon Fallon, the MDL judge, agreed to serve as "chief administrator" overseeing the settlement. *See* Baker & Silver, *supra*, at 56. Again, because participation in the CRF is not forced on claimants, their individual rights are preserved.

In sum, the MDL system is not broken. To the extent that repairs or improvements are desirable, Congress, not the judicial branch, is the appropriate forum.

## III. AEARO'S PROPOSAL TO EXTINGUISH COMMON-LAW CAUSES OF ACTION AGAINST 3M AND REPLACE THEM WITH CLAIMS AGAINST A BANKRUPTCY SETTLEMENT FUND DEPRIVES VICTIMS OF THEIR CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO TRIAL BY JURY.

Additionally, a determination that the Bankruptcy Code authorizes the relief sought by Aearo brings to the fore serious constitutional concerns.

### A. Extinguishing Claimants' Causes of Action Against 3M and Limiting Their Redress to Claims Against a Bankruptcy Settlement Fund, Without Their Consent or Opportunity to Opt Out, Violates Claimants' Right to Due Process.

18

Aearo and 3M seek to achieve global peace for themselves from CAEv2 litigation by extinguishing plaintiffs' common-law causes against non-debtor 3M as well as the Aearo debtors. Injured veterans would instead be required to file claims for compensation with a bankruptcy trust as their exclusive redress.

Such involuntary "settlement" of a valid legal claim for damages is a novelty not encountered in the Anglo-American civil justice tradition. Indeed, "[t]he concept of a nonconsensual nondebtor release in bankruptcy would have been incomprehensible to the Framers." Adam J. Levitin, *The Constitutional Problem of Nondebtor Releases in Bankruptcy*, 91 Fordham L. Rev. 429, 436 (2022). It was universally accepted, in English bankruptcy law at that time, and in American statutory and decisional law until about the 1980s, that the discharge of debts in bankruptcy was available only to the debtor and only after the debtor's submission to the jurisdiction of the bankruptcy process and its substantial burdens. *Id.* at 438. *See, e.g.*, *Weber v. Diversey Bldg. Corp. (In re Diversey Bldg. Corp.)*, 86 F.2d 456, 457–58 (7th Cir. 1936) (holding that the district court lacked power to release a nondebtor guarantor under a bankruptcy plan).

Emergency, however, can be the enemy of due process. In 1989, the Second Circuit approved an aggregate settlement that channeled claims to a trust funded by the assets and securities of Chapter 11 debtor Johns-Manville Corporation to deal with a tragic and overwhelming flood of claims by asbestos victims. *MacArthur Co.*

19

*v. Johns-Manville Corp. (In re Johns-Manville Corp)*, 837 F.2d 89 (2d Cir. 1988). The court in that case also upheld releases of claims against Manville's insurers as necessary to put the reorganization plan into operation. *Id.* at 93. One year later, the Fourth Circuit in *In re A.H. Robins Co*. similarly held that the bankruptcy court had authority to enjoin related suits against parties other than the bankruptcy debtor. 880 F.2d 694, 701–02 (4th Cir. 1989).

In subsequent years, a number of very large and very solvent corporations have attempted to expand the potential benefits held out in the *Johns-Manville* and *A.H Robins* aggregate settlements into a global "Get Out of Court Free" card. Most recently, on January 30, 2023, the Third Circuit dismissed similar Chapter 11 proceedings of Johnson & Johnson subsidiary LTL Management, LLC, which the court characterized as "the bankruptcy filing of a company created to file for bankruptcy." *In re LTL Mgmt., LLC*, 637 B.R. 396, 429 (Bankr. D.N.J. 2022), *rev'd*, *In re LTL Mgmt, LLC*, Nos. 22-2003–22-2011 (3d Cir. Jan. 30, 2023) (reversing the Bankruptcy Court's order denying claimants' motions to dismiss and remanding with the instruction to dismiss LTL's Chapter 11 petition). In that case, as here, Johnson & Johnson entered into a funding agreement with LTL shortly before the subsidiary declared bankruptcy in an attempt to shield itself from full accountability for damages caused by its cancerous talc products. However, the Third Circuit thwarted that attempt, finding that LTL's right under the funding agreement to obtain

20

substantial funds from its parent corporation clearly indicated that LTL was not in financial distress to justify resort to Chapter 11. *In re LTL Mgmt., LLC* (3d Cir. Jan 30, 2023), at \*45–53; *see also id.* at \*18 ("Only a putative debtor in financial distress" can "access the Bankruptcy Code's safe harbor.").

As the Third Circuit's holding in *In re LTL Management, LLC* demonstrates, these parent corporations do not seek a fresh start by filing for bankruptcy; they want to escape accountability and preserve their own assets by *not* filing. They seek refuge in Chapter 11 reorganization plans, which "do not have the procedural protections that accompany Article III review in a class action or multidistrict litigation (MDL) proceeding," and which present "the gravest due-process threats facing mass-tort victims." Lindsey D. Simon, *Bankruptcy Grifters*, 131 Yale L.J. 1154, 1159 (Feb. 2022).[4]

Plaintiffs often voluntarily settle their claims, but settlement must be voluntary, and "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party . . . without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986). The

---

[4] Common-law causes of action, including tort claims, are "a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *see also Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("Little doubt remains that [a cause of action] is property protected by the Fourteenth Amendment."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985) ("[A] chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs.").

release of 3M from the claims of the CAEv2 victims in this case is simply inconsistent with this elemental principle of due process.

The Supreme Court has repeatedly made clear that this essential requirement also applies to any aggregate settlement of claims for damages. At a minimum, due process demands that plaintiffs who do not consent to a global "settlement" be afforded the opportunity to opt out. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011) ("In the context of a class action predominantly for money damages we have held that absence of notice and opt out violates due process."); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011) ("For a class-action money judgment to bind absentees in litigation, . . . absent members must be afforded . . . a right to opt out of the class.); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999) (holding that "before an absent class member's right of action was extinguishable due process required" an opportunity to opt out); *Shutts*, 472 U.S. at 812 ("[D]ue process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class."); *cf. Georgine v. Amchem Products, Inc.*, 521 U.S. 591, 628 (1996) (While rejecting a global asbestos settlement on Rule 23(b)(3) grounds of inadequate representation, the Court was also skeptical whether "under the Constitution," sufficient notice could be given to some class members for them to "decide, intelligently, whether to stay in or opt out.").

As Justice Souter noted for the Court in *Ortiz*, the right to opt out of a settlement, including an aggregate, global settlement, is firmly grounded in "our 'deep-rooted historic tradition that everyone should have his own day in court.'" 527 U.S. at 846 (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)).

Properly established, a Rule 23(b)(2) class action can achieve a global settlement of aggregated claims consistent with due process in the absence of an opt-out. The very practical rationale is that where a limited fund is inadequate to satisfy creditors, there exists no alternative source to satisfy those claims. *See Ortiz*, 527 U.S. at 838. However, as the Court in *Ortiz* made clear, this rationale does not apply where the fund is not genuinely "limited," but is simply the amount the parties have agreed to contribute to the settlement. In *Ortiz*, the settlement fund was not constructed "independently of the agreement of the parties," allowing Fibreboard to "hold back" its own assets and "retain virtually all of its entire net worth." 527 U.S. at 864. The *Ortiz* claimants therefore retained their due process right to remove themselves from the class. *Id.* at 848. The proposed CAEv2 settlement fund likewise is not a true limited fund independent of the parties' creation. Claimants therefore may not be deprived of the opportunity to opt out.

It is also true that the *Ortiz* Court recognized that non-debtor releases may be ordered under some circumstances in bankruptcy, which represents "a special remedial scheme" that "foreclose[es] successive litigation by nonlitigants." *Id.* at

23

846 (quoting *Martin*, 490 at 762 n.2). Significantly, the Court has made clear that non-debtor releases may only be permitted, "if the scheme is otherwise consistent with due process." *Martin*, 490 U.S. at 762 n.2; *see also Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); H.R. Rep. No. 103-835, at 41 (1994) (explaining that Congress drafted 11 U.S.C. § 524(g), authorizing asbestos trusts, to ensure that any non-debtor release would meet a "high standard[] with respect to regard for the rights of claimants").

Several courts have examined the impact of nonconsensual non-debtor releases on the victims of mass torts and have concluded that they cannot be squared with the guarantee of due process of law. *See Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va. 2022) (invalidating nonconsensual nondebtor releases approved by a bankruptcy court, on multiple grounds, including violation of the claimants' due-process rights); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723–26 (Bankr. S.D.N.Y. 2019) (holding that involuntary releases, while allowed in certain "extraordinary cases" "do not provide claimants with other procedural and substantive rights that they ordinarily would have" and are inconsistent with the requirements of the Due Process Clause.); *In re Digital Impact*, 223 B.R. 1, 13 n. 6 (Bankr. N.D. Okla. 1998) (a third-party release has "the effect of . . . a judgment against the claimant and in favor of the non-debtor, accomplished without due process."). This Court should agree.

**B. Replacing a Personal Injury Plaintiff's Common-Law Cause of Action Against the Alleged Tortfeasor with a Claim for Compensation from a Bankruptcy Trust Violates Their Seventh Amendment Right to a Jury Trial.**

The veterans seeking money damages for hearing loss caused by the CAEv2 undoubtedly have the right, guaranteed by the Seventh Amendment, to present their common-law action to a jury.[5] As in *Ortiz*, Aearo's proposal to wipe out the veterans' causes of action against 3M in the CAEv2 MDL in exchange for a claim for payment from a settlement trust "compromises their Seventh Amendment rights without their consent." 527 U.S. at 846.

The Seventh Amendment right to a jury trial applies to legal but not equitable claims. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989). An action for monetary damages is quintessentially an action at law to which the jury right attaches. *See Pernell v. Southall Realty*, 416 U.S. 370 (1974) ("[W]here an action is simply for . . . a money judgment, the action is one at law."); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 476 (1962) ("[I]nsofar as the complaint requests a money judgment it presents a claim which is unquestionably legal."). Conversely, bankruptcy courts "are courts of equity," which are not bound by the Seventh Amendment to grant a jury trial for claims against the estate. *Young v. United States*,

---

[5]  "In suits at common law . . . the right of trial by jury shall be preserved." U.S. Const., amend VII.

535 U.S. 43, 50 (2002); *see also Pepper v. Litton,* 308 U.S. 295, 304 (1939); *In re Hudson*, 170 B.R. 868, 873–74 (E.D.N.C. 1994) (applying *Granfinanciera*). A release of a claimant's legal cause of action constitutes a binding final judgment which, even if the claimant may apply for compensation from a bankruptcy trust, results in the loss of the claimant's Seventh Amendment right. *See* 11 U.S.C. § 1141(a); *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995).

The right to trial by jury is no mere procedural nicety among dispute resolution techniques. It looms large in America's history and governance. "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 343 (1979) (Rehnquist, C.J., dissenting); *see generally*, Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289, 293–99 (1966); Jeffrey R. White, *The Civil Jury: 200 Years Under Siege*, Trial, June 2000, at 18.

Mindful of this history, the Supreme Court has consistently emphasized:

Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

*Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). The Court had occasion to repeat and reaffirm this principle in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501

26

(1959), and in *Chauffeurs, Teamsters and Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 565 (1990). *See also Jacob v. New York*, 315 U.S. 752, 752-53 (1943) ("The right of jury trial in civil cases at common law . . . should be jealously guarded by the courts.").

It is no surprise, then, that the Supreme Court has declared that bankruptcy courts must also safeguard the Seventh Amendment jury right, even "in the face of Congress' decision to allow a non-Article III tribunal to adjudicate" claims involving private rights. *Granfinanciera*, 492 U.S. at 50. Justice Brennan, writing for the majority, reaffirmed that Congress may assign the adjudication of a statutory "public rights" claim, i.e., a matter in which the government is a party or which are closely intertwined with a federal regulatory program, to an Article I forum in which jury trials are unavailable. However, "[w]holly private tort, contract, and property cases . . . are not at all" within that constitutional authority. *Id.* at 51 (quoting *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 458 (1977)). "Congress [cannot] conjure away the Seventh Amendment by mandating that traditional legal claims be brought" in a non-Article III tribunal. *Id.* at 52.

Nor, AAJ contends, may the judicial branch do so.

Again, the Supreme Court's decision in *Ortiz* is most instructive. The parties in that case sought to achieve a global resolution of the rising tide of claims by asbestos victims through use of a mandatory settlement class action with no opt-out

27

rights, under Federal Rule of Civil Procedure 23(b)(1)(B). 527 U.S. at 824–25. Justice Souter, writing for the Court, emphasized that the proposed settlement plan implicated both the "Seventh Amendment jury trial rights of absent class members" and "the due process principle . . . that everyone should have his own day in court." *Id.* at 846 (internal citations and quotations marks omitted).

The historical rationale supporting limited fund actions is that "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Id.* at 838. However, to justify the suspension of the due process right of opt out of the aggregate settlement of claims against a limited fund, the Court cautioned, a court must take care to ensure that the forced settlement represents the best the claimants could expect from the assets available, and not simply the best deal for a defendant hoping to save money on damage awards.  For that reason the court must be assured that:

> [The] defendant or estate or constructive trustee with the inadequate assets had no opportunity to benefit himself or claimants of lower priority by holding back on the amount distributed to the class [and] that the class as a whole was given the best deal; they did not give a defendant a better deal than *seriatim* litigation would have produced.

527 U.S. at 839.

The settlement trust envisioned by Aearo in this case bears a striking resemblance to the limited fund trust the Court struck down in *Ortiz.* The due process

and Seventh Amendment deficiencies that proved fatal to the Fibreboard global settlement are equally fatal to 3M's maneuver here.

The provisions of the Bankruptcy Code must "be so construed as to avoid serious doubt of their constitutionality." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (quoting *Machinists v. Street*, 367 U.S. 740, 749 (1961)). In furtherance of that principle, AAJ urges this Court to uphold the bankruptcy court's determination that the Bankruptcy Code does not authorize the relief sought by Aearo and 3M.

## CONCLUSION

For these reasons, the judgment of the Bankruptcy Court in this case should be affirmed.

Respectfully submitted,

/s/ Jeffrey R. White
Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 Sixth Street NW, Suite 200
Washington, DC 20001
(202) 617-5620
Jeffrey.White@justice.org

*Counsel for Amicus Curiae*

Dated: February 1, 2023

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29 because this brief contains 6,935 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman type style.

Date: February 1, 2023

/s/ Jeffrey R. White
JEFFREY R. WHITE

# CERTIFICATE OF SERVICE

I, Jeffrey R. White, counsel for amicus curiae and a member of the Bar of this Court, certify that on February 1, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I also certify that the foregoing document is being served on this day on all counsel of record via transmission of the Notice of Electronic Filing generated by CM/ECF. All participants in this case are registered CM/ECF users.

/s/ Jeffrey R. White
JEFFREY R. WHITE