No. 22-2606

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

IN RE: AEARO TECHNOLOGIES, LLC, et al.,

———————

AEARO TECHNOLOGIES, LLC, et al.,

*Debtors-Appellants*,

v.

THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT and
JOHN & JANE DOES, 1–1000,

*Appellees*.

---

On Direct Appeal from the United States Bankruptcy Court
for the Southern District of Indiana, Indianapolis Division
No. 22-2890, Adv. No. 22-50059

---

### BRIEF FOR CERTAIN COMPLEX LITIGATION
### LAW PROFESSORS AS *AMICI CURIAE*
### IN SUPPORT OF APPELLEES

---

Ronald J. Tomassi, Jr.
Devin Weinberg
LEÓN COSGROVE JIMÉNEZ, LLP
999 18th St., Suite 1925N
Denver, CO 80202
(720) 617-7114

J. Maria Glover
Professor of Law
Georgetown University Law Center

*Counsel for Amici Curiae*
*Complex Litigation Law Professors*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2606

Short Caption: In re: Aearo Technologies, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)        The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
J. Maria Glover, Brooke D. Coleman, Robin Effron, William Hamilton, D. Theodore Rave, Alan M. Trammell, and

Adam Zimmerman

(2)        The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
León Cosgrove Jiménez, LLP

(3)        If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

N/A

ii)        list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)        Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)        Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Ronald J. Tomassi, Jr        Date: 2/01/2023

Attorney's Printed Name:  Ronald J. Tomassi, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).        **Yes** ☑   **No** ☐

Address:  999 18th Street, Suite 1925N, Denver, CO 80202

Phone Number: 720-617-7114        Fax Number:  305-351-4509

E-Mail Address: rtomassi@leoncosgrove.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-2606</u>

Short Caption: <u>In re: Aearo Technologies, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>J. Maria Glover, Brooke D. Coleman, Robin Effron, William Hamilton, D. Theodore Rave, Alan M. Trammell, and</u>

<u>Adam Zimmerman</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>León Cosgrove Jiménez, LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Devin Weinberg</u>    Date: <u>2/01/2023</u>

Attorney's Printed Name:  <u>Devin Weinberg</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  <u>999 18th Street, Suite 1925N, Denver, CO 80202</u>

Phone Number: <u>720-689-4762</u>    Fax Number:  <u>305-351-4509</u>

E-Mail Address: <u>dweinberg@leoncosgrove.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2606

Short Caption: In re: Aearo Technologies, LLC, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

J. Maria Glover, Brooke D. Coleman, Robin Effron, William Hamilton, D. Theodore Rave, Alan M. Trammell, and

Adam Zimmerman

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

León Cosgrove Jiménez, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Maria Glover      Date: 2/01/2023

Attorney's Printed Name:  Maria Glover

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  600 New Jersey Ave. NW, Washington, DC 20001

Phone Number: 202-662-4029      Fax Number:

E-Mail Address: mglover@law.georgetown.edu

rev. 12/19 AK

# <u>TABLE OF CONTENTS</u>

**Page**

DISCOSURE STATEMENTS ........................................................................i

TABLE OF AUTHORITIES ........................................................................v

INTEREST OF *AMICI CURIAE* ...............................................................1

INTRODUCTION ......................................................................................2

ARGUMENT .............................................................................................5

I.    The Flexibility and Adaptiveness of the MDL Device Enables it to Resolve Thousands of Mass-Tort Cases Every Year ....................................................5

II.   Staying the Litigation Against 3M Raises Concerns Under the Supreme Court's Longstanding Mass-Tort Due Process Jurisprudence ......................12

    A. Tort Claimants Have Not Received the Due Process Guarantee of "Adequate Representation" in the Transition to Bankruptcy ...........................................15

    B. Mandatory Resolution of the Earplug Litigation Against 3M Deprives Tort Claimants of the Due Process Right to a "Day in Court." ...........................19

CONCLUSION ........................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ...............................................................20

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................10, 13, 15–16, 21

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
  MDL No. 875 ...............................................................................6, 10

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
  718 F.3d 236 (3d Cir. 2013) .............................................................11

*In re Baycol Prods. Liab. Litig.*,
  MDL No. 1431 ...................................................................................10

*Bell v. Publix Super Markets, Inc.*,
  982 F.3d 468 (7th Cir. 2020) ...............................................................9

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
  2019 WL4458579 (S.D. W. Va. Mar. 12, 2019) .................................6

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004) ................................................13–15, 18

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*,
  MDL No. 1203..................................................................................6, 10

*Dzik v. Bayer Corp.*,
  846 F.3d 211 (7th Cir. 2017) .............................................................11

*In re Ephedra Prods. Liab. Litig.*,
  314 F. Supp. 2d 1375 (J.P.M.L. 2004) ..............................................10

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001) .............................................................6

*Fogel v. Zell*,
221 F.3d 955 (7th Cir. 2000) ...............................................................14

*In re Gen. Motors Corp. Engine Interchange Litig.*,
594 F.2d 1106 (7th Cir. 1979) .............................................................14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) .............................................................14, 17

*Hansberry v. Lee*,
311 U.S. 32 (1940)..............................................................................15

*Ill. Mun. Ret. Fund v. Citigroup, Inc.*,
391 F.3d 844 (7th Cir. 2004) .................................................................9

*Kamen v. Kemper Fin. Servs., Inc.*,
908 F.2d 1338 (7th Cir. 1990) .............................................................15

*Looper v. Cook Inc.*,
20 F.4th 387 (7th Cir. 2021) ..................................................................9

*In re LTL Mgmt., LLC*,
2023 WL 1098189 (3d Cir. Jan 30, 2023 2004)........................20–21

*Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*,
551 F.2d 340 (D.C. Cir. 1976)..............................................................16

*In re Nat'l Football League Players' Concussion Injury Litig.*,
MDL No. 2323......................................................................................8

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*,
MDL No. 2179......................................................................................8

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)........................................... 10, 13, 15–16, 19–21

*In re Phenylpropanolamine Prods. Liab. Litig.*,
    MDL No. 1407......................................................................................10

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)....................................................................13, 15, 19

*In re Prempro Prods. Liab. Litig.*,
    MDL No. 1507........................................................................................6

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ...............................................................13

*In re Richardson-Merrell, Inc., "Bendectin" Prods. Liab. Litig. (No. II)*,
    MDL No. 486.....................................................................................6, 10

*In re Silicone Breast Implants Prods. Liab. Litig.*,
    MDL No. 926........................................................................................10

*In re Sw. Airlines Voucher Litig.*,
    799 F.3d 701 (7th Cir. 2015) ...............................................................16

*Susman v. Lincoln Am. Corp.*,
    561 F.2d 86 (7th Cir. 1977) .................................................................16

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .................................................................7

*In re Vioxx Prods. Liab. Litig.*,
    MDL No. 1657........................................................................................10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    MDL No. 2672....................................................................................6, 8

## Statutes and Rules

28 U.S.C. § 1407 ....................................................................1, 3, 6, 9

Fed. R. Civ. P. 23 .......................................................................20

**Other Authorities**

American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010) ................................................................................................2

Appendix D: Individual Characteristics of Mass Torts Case Congregation, FEDERAL JUDICIAL CENTER (January 1999) ..........................................9

Bolch Judicial Institute, GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS (2d ed. 2018) ...................................................................3

Andrew D. Bradt, "*A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. PA. L. REV. 831 (2017) .......................................................3, 7

Andrew D. Bradt, *Something Less and Something More: MDL's Roots as a Class Action Alternative*, 165 U. PA. L. REV. 1711 (2017) .......................................6–8

Elizabeth Chamblee Burch & Margaret S. Williams, *Repeat Players in Multidistrict Litigation: The Social Network*, 102 CORNELL L. REV. 1445 (2017) ................................................................................................11

Zachary D. Clopton, *MDL as Category*, 105 CORNELL L. REV. 1297 (2020) ...........8

Zachary D. Clopton & Andrew D. Bradt, *Party Preferences in Multidistrict Litigation*, 107 CALIF. L. REV. 1713 (2019) ....................................................3, 8

Zachary D. Clopton & D. Theodore Rave, *MDL in the States*, 115 NW. U. L. REV. 1649 (2021) ................................................................................................3

Robin J. Effron, *Event Jurisdiction and Protective Coordination: Lessons from the September 11th Litigation*, 81 S. CAL. L. REV. 199 (2008) ...................................3

Eldon E. Fallon, Jeremy T. Grabill, & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323 (2008) .........................................6

Sean Farhang, THE LITIGATION STATE: PUBLIC REGULATION AND PRIVATE LAWSUITS IN THE U.S. (Princeton Univ. Press 2010) ...........................................2

Brian T. Fitzpatrick, *Many Minds, Many MDL Judges*, 84 LAW & CONTEMP. PROBS. 107 (2021) .............................................................................10

Myriam Gilles & Gary Friedman, *MDL Drano: Rule 23-Based Solutions to Mass Tort Buildup*, 84 LAW & CONTEMP. PROBS. 121 (2021).......................................4

J. Maria Glover, *Mass Litigation Governance in the Post-Class Action Era: The Problems and Promise of Non-Removable State Actions in Multi-District Litigation*, 5 J. TORT L. 3 (2014).......................................................................3, 7

J. Maria Glover, *The Structural Role of Private Enforcement Mechanisms in Public Law*, 53 WM. & MARY L. REV. 1137 (2012)............................................................2

Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. REV. 1 (2021)...............................................................................................................11

Geoffrey C. Hazard, Jr., *The Futures Problem*, 148 U. PA. L. REV. 1901 (2000)...12

Deborah R. Hensler, *Has the Fat Lady Sung? The Future of Mass Toxic Torts*, 26 REV. LITIG. 883 (2007) .....................................................................................3

Deborah R. Hensler, *Improving Our Understanding of Mass Claims Evolution, Management, and Resolution: A Research Agenda in Honor of Francis McGovern*, 84 LAW & CONTEMP. PROBS. 143 (2021) ........................................3, 8

Deborah R. Hensler, *The Role of Multi-Districting in Mass Tort Litigation: An Empirical Investigation*, 31 SETON HALL L. REV. 883 (2001).............................7

Alexandra D. Lahav, *The Continuum of Aggregation*, 53 GA. L. REV. 1393 (2019) .........................................................................................................................12

Richard Marcus, *A Legend in His Own Time, and a Fixer for Mass Tort Litigation*, 84 LAW & CONTEMP. PROBS. 183 (2021) ...........................................................4

Francis E. McGovern, *Judicial Centralization and Devolution in Mass Torts*, 95 MICH. L. REV. 2077 (1997).................................................................................10

Richard A. Nagareda, *Closure in Damage Class Settlements: The Godfather Guide to Opt-Out Rights*, 2003 U. CHI. LEGAL F. 141 .................................................21

Richard A. Nagareda, MASS TORTS IN A WORLD OF SETTLEMENT (Univ. of Chicago Press 2007) .......................................................................................2

Sam C. Pointer, Jr., *Reflections by a Federal Judge: A Comment on Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute*, 73 TEX. L. REV. 1569 (1995) ...........................................................................10

D. Theodore Rave & Zachary D. Clopton, *Texas MDL*, 24 LEWIS & CLARK L. REV. 367 (2020) .................................................................................3

D. Theodore Rave & Francis E. McGovern, *A Hub-and-Spoke Model of Multidistrict Litigation*, 84 LAW & CONTEMP. PROBS. 21 (2021) ..............3, 8, 10

Martin H. Redish & William J. Katt, Taylor v. Sturgell, *Procedural Due Process, and the Day-in-Court Ideal: Resolving the Virtual Representation Dilemma*, 84 NOTRE DAME L. REV. 1877 (2009) ...................................................19

Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?*, 23 WIDENER L.J. 97 (2013) ........................................................................................10

Charles Silver, *Some Questions About Lead Counsels' Appointment, Duties, and Compensation*, *available at* https://www.law.gwu.edu/sites/g/files/zaxdzs2351/f/downloads/silver.mdl%20paper.pdf ...................................................................................11

United States Judicial Panel on Multidistrict Litigation, MULTIDISTRICT LITIGATION TERMINATED THROUGH SEPTEMBER 30, 2021, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021%20Report%20Cumulative%20Terminated%20MDLs.pdf ...............................................8

Sean P. Wajert, *DES Plaintiff's Reach for Market Share Liability Rejected Again,* SHOOK, HARDY, & BACON (Jan. 30, 2013), *available at* https://www.masstortdefense.com/2013/01/articles/des-plaintiffs-reach-for-market-share-liability-rejected-again/ ...................................................9

Jack B. Weinstein, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION (Northwestern Univ. Press 1995) ...................................................................2

## INTEREST OF *AMICI CURIAE*[1]

The Amici Professors of Complex Litigation and Mass Torts (the "Complex Litigation Law Professors")[2] teach and write in the fields of complex litigation, mass torts, and the law of complex civil procedure. This experience is relevant to Aearo's Chapter 11 filing, by which a highly-solvent corporation, 3M, and its subsidiary, Aearo, seek unilaterally to move thousands of tort claims against 3M and Aearo out of ongoing multi-district litigation ("MDL") and into a bankruptcy proceeding that purports to encompass 3M.[3] Amici have a professional interest in ensuring that the Court is adequately informed about (1) the decades of experience that Article III courts have marshaled in managing and resolving complex mass torts, particularly by way of MDL proceedings, pursuant to 28 U.S.C. § 1407, which was designed and duly enacted by Congress as a mechanism for addressing mass torts; and (2) the

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. The institutional affiliations of Amici are listed for identification only.

[2] The Complex Litigation Law Professors are J. Maria Glover, Professor of Law, Georgetown University Law Center; Brooke D. Coleman, Frederic C. Tausend Professor of Law, Seattle University School of Law; Robin Effron, Professor of Law and Co-Director, Dennis J. Block Center for the Study of International Business Law, Brooklyn Law School; William Hamilton, Senior Legal Skills Professor, University of Florida Levin College of Law; D. Theodore Rave, Professor of Law, University of Texas School of Law; Alan M. Trammell, Associate Professor of Law, Washington & Lee University School of Law; and Adam Zimmerman, Professor of Law, Loyola Law School, Los Angeles.

[3] Amici refer to the Debtors-Appellants collectively as "Aearo" and to their non-debtor corporate parent as "3M."

1

significant due process issues that arise when corporate defendants attempt to sidestep mass-tort litigation in MDL that is not going their way by maneuvering a subsidiary into bankruptcy and seeking shelter under the subsidiary's automatic stay. If successful, 3M's bankruptcy maneuver would deprive hundreds of thousands of tort claimants of their constitutional rights to "adequate representation" and a "day in court," which are both essential due process protections.

## INTRODUCTION

Mass torts have long created some of the greatest legal challenges in the United States, especially for the judiciary, which is usually tasked with resolving them.[4] The key challenges of mass torts—numerosity, geographic dispersion, temporal dispersion (deriving from the passing of the latency period between exposure and impairment), and causal dispersion—challenge any procedural system.[5] Federal and state courts, however, have decades of experience handling

---

[4] *See, e.g.*, Richard A. Nagareda, MASS TORTS IN A WORLD OF SETTLEMENT (Univ. of Chicago Press 2007) (detailing the various challenges of mass torts); J. Maria Glover, *The Structural Role of Private Enforcement Mechanisms in Public Law*, 53 WM. & MARY L. REV. 1137, 1145–58 (2012) (tracing the substantial role of private procedural mechanisms in the resolution of claims and regulation of harm in the United States); Sean Farhang, THE LITIGATION STATE: PUBLIC REGULATION AND PRIVATE LAWSUITS IN THE U.S. (Princeton Univ. Press 2010) (providing an empirical and political account of the outsized role that private lawsuits play in the regulation of harm in the United States, particularly relative to public modes of regulation).

[5] *See, e.g.*, Nagareda, *supra* note 4; Jack B. Weinstein, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION (Northwestern Univ. Press 1995); American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010) (discussing the tendency in mass torts toward some level of claimant heterogeneity).

even the most complex mass torts, and they have developed and refined a number of

tools and techniques that enable them to successfully achieve global resolution of

mass-tort cases. Resolution of mass torts is often achieved by way of the Multi-

District Litigation ("MDL") device, pursuant to the MDL statute, 28 U.S.C. § 1407,

which was designed and enacted with an explicit eye towards the exigencies of mass

torts.[6] With the MDL device, courts routinely resolve mass torts, and often with little

fanfare.[7] Courts have also achieved resolution of even the most complex, difficult,

and headline-grabbing mass torts principally (but not exclusively[8]) by way of the

---

[6] *See, e.g.*, Andrew D. Bradt, *"A Radical Proposal": The Multidistrict Litigation Act of 1968*, 165 U. PA. L. REV. 831, 889–99 (2017).

[7] *Cf.* Bolch Judicial Institute, GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS (2d ed. 2018); Zachary D. Clopton & Andrew D. Bradt, *Party Preferences in Multidistrict Litigation*, 107 CALIF. L. REV. 1713, 1721 (2019); Deborah R. Hensler, *Improving Our Understanding of Mass Claims Evolution, Management, and Resolution: A Research Agenda in Honor of Francis McGovern*, 84 LAW & CONTEMP. PROBS. 143, 149 (2021); Deborah R. Hensler, *Has the Fat Lady Sung? The Future of Mass Toxic Torts*, 26 REV. LITIG. 883, 907 (2007); D. Theodore Rave & Francis E. McGovern, *A Hub-and-Spoke Model of Multidistrict Litigation*, 84 LAW & CONTEMP. PROBS. 21, 22 (2021); Robin J. Effron, *Event Jurisdiction and Protective Coordination: Lessons from the September 11th Litigation*, 81 S. CAL. L. REV. 199 (2008).

[8] *See, e.g.*, Bolch Judicial Institute, *supra* note 7; J. Maria Glover, *Mass Litigation Governance in the Post-Class Action Era: The Problems and Promise of Non-Removable State Actions in Multi-District Litigation*, 5 J. TORT L. 3, 10 (2014); Zachary D. Clopton & D. Theodore Rave, *MDL in the States*, 115 NW. U. L. REV. 1649, 1658–59 (2021) (discussing state-level multi-district litigation regimes); D. Theodore Rave & Zachary D. Clopton, *Texas MDL*, 24 LEWIS & CLARK L. REV. 367 (2020).

MDL device.[9] This is so not only because the MDL device was designed to be—and has proven to be—flexible enough to handle the challenges that mass torts present, but also because MDL judges and practitioners have developed and refined over the course of decades an extensive set of adaptive tools and techniques for meeting these challenges.

The MDL involving 3M and Aearo, which consolidates hundreds of thousands of separate lawsuits alleging personal injury related to the defendants' combat earplug products ("Earplug Litigation"), is a strong example of MDL's scale and potential. Since consolidation into the MDL in 2019, the number of claims has risen and fallen as claims have been vetted, the MDL court has adjudicated numerous evidentiary and substantive motions, bellwether trials have reached verdicts, and appeals have been briefed. The MDL court and the parties have made significant and hard-fought progress on the case. 3M and Aearo now insist that all of this progress, as well as the MDL device itself, must be abandoned. 3M and Aearo claim that "[t]he only available option to appropriately assess, resolve, and administer [their tort liability] in an efficient and equitable manner" is bankruptcy. CA.148. 3M took the

---

[9] *See, e.g.*, Richard Marcus, *A Legend in His Own Time, and a Fixer for Mass Tort Litigation*, 84 LAW & CONTEMP. PROBS. 183 (2021); Myriam Gilles & Gary Friedman, *MDL Drano: Rule 23-Based Solutions to Mass Tort Buildup*, 84 LAW & CONTEMP. PROBS. 121 (2021).

novel step of placing Aearo in bankruptcy and now seeks to freeze the Earplug
Litigation entirely through the automatic-stay statute.

Putting aside 3M's flawed reading of the automatic-stay statute, Amici
highlight two reasons the Court should refuse 3M's request. First, despite Aearo's
claims to the contrary, MDL has long been an effective and proven mechanism for
resolving mass-tort litigation. The Court should reject 3M's attempt to
mischaracterize and jettison a Congressionally-established mechanism for resolving
tort claims that 3M itself selected. Second, 3M's attempt to halt the MDL and resolve
its tort liability in bankruptcy raises serious constitutional due process concerns
related to (1) adequate representation of combat-earplug tort claimants, and
(2) unjustifiably depriving tort claimants of their right to a day in court. Because of
their complex litigation expertise, Amici are well positioned to present these
arguments to the Court.

## ARGUMENT

### I.    The Flexibility and Adaptiveness of the MDL Device Enables it to Resolve Thousands of Mass-Tort Cases Every Year.

Amici write first to defend MDL as a procedural mechanism for resolving
mass-tort litigation against the contention that "the status quo [in the MDL] is
untenable." CA.148. As complex litigation scholars have traced, mass-tort claims
are hard to resolve, wherever adjudicated, but MDL is a "remarkably effective"

tool[10] for securing "global peace" in mass-tort litigation. MDL courts have deployed a host of techniques to resolve mass-tort litigation, including: using the bellwether trial model, which involves jury resolution of a handful of selected cases to give the parties a sense of how the legal and factual issues play out in the different cases that make up the larger MDL[11]; ordering the creation and maintenance of centralized document repositories and discovery databases to combat voluminous, diffuse, and potentially duplicative discovery productions[12]; strategically disaggregating cases by way of remand[13]; implementing discovery tracks[14]; holding individual dismissal hearings[15]; and conducting consolidated trials,[16] among many other context-dependent tools and methods. Defendants often prefer the organized, coordinated, and unitary processes of federal MDL, which is less risky than class certification but

---

[10] Andrew D. Bradt, *Something Less and Something More: MDL's Roots as a Class Action Alternative*, 165 U. PA. L. REV. 1711, 1719 (2017).

[11] *See, e.g.*, Eldon E. Fallon, Jeremy T. Grabill, & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323 (2008).

[12] *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2672; *In re Prempro Prods. Liab. Litig.*, MDL No. 1507; *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, MDL No. 1203.

[13] *See* 28 U.S.C. § 1407(a).

[14] *See, e.g.*, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL No. 875.

[15] *See id.*

[16] *See, e.g.*, *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL4458579, *7 (S.D. W. Va. Mar. 12, 2019); *In re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001); *In re Richardson-Merrell, Inc., "Bendectin" Prods. Liab. Litig. (No. II)*, MDL No. 486.

comes with similar promise for global peace.[17] Indeed, 3M agreed to MDL consolidation back in 2019. CA.1.

Historical accounts of the MDL statute by prominent legal scholars reveal that it was drafted with the intent that the MDL device would be used as the principal mechanism for handling large volumes of complex cases, particularly mass torts.[18] The MDL device helps achieve resolution of even the most difficult mass torts by gathering "all of the involved parties in a single proceeding before a judge who can flexibly guide the case to a resolution."[19] MDL judges "regularly preside over dozens, if not hundreds or even thousands, of related cases in multidistrict litigation that present complicated questions of liability, not to mention supervising and implementing remedies over years if not decades." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 480 (7th Cir. 2020).

---

[17] *See* Bradt, *supra* note 6, at 836 ("Defendants recognize the opportunity to litigate all claims in a single forum where they can both efficiently perform discovery and motion practice and eventually achieve peace, whether through victory on a dispositive motion or through settlement."); *see also* Glover, *supra* note 8, at 43 (tracing situations in which defendants seek to put an end to parallel state litigation and consolidate in MDL).

[18] *See, e.g.*, Bradt, *supra* note 6, at 869 (describing how the reporters of the Civil Rules Advisory Committee, Professors Benjamin Kaplan and Albert Sacks of Harvard Law School, took the view that MDL "would be necessary . . . [for] widespread tort cases").

[19] Bradt, *supra* note 10, at 1718; *see also* Deborah R. Hensler, *The Role of Multi-Districting in Mass Tort Litigation: An Empirical Investigation*, 31 SETON HALL L. REV. 883, 903 (2001) ("When the JPML granted a multi-districting motion, a case was much more likely to reach a collective resolution than when the motion was denied.").

Year after year, the MDL device achieves global resolution of thousands of mass-tort cases.[20] The types of cases that have been resolved in MDL span the breadth of the mass tort and products liability landscape and involve some of the country's largest controversies, from the (relatively) simple (*e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2672), to the most challenging and complex mass torts[21]—what some legal commenters have called "mega" mass torts[22] (*e.g.*, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179; *In re Nat'l Football League Players' Concussion Injury Litig.*, MDL No. 2323). Indeed, in the asbestos

---

[20] *See* United States Judicial Panel on Multidistrict Litigation, MULTIDISTRICT LITIGATION TERMINATED THROUGH SEPTEMBER 30, 2021, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021%20Report%20Cumulative%20Terminated%20MDLs.pdf.

[21] *See, e.g.*, Bradt, *supra* note 10, at 1712.

[22] *See, e.g.*, Rave & McGovern, *supra* note 7, at 22 (defining "mega mass torts" as "involving multiple defendants and multiple products and activities over extended periods of time (for example, asbestos, silicone gel breast implants, opioids)" and suggesting "a 'hub-and-spoke' model of MDL case management for these sorts of mega mass torts . . . to relieve pressure at the bottleneck [in caseloads]"); Hensler, *supra* note 7, at 149 (observing that "[c]ollecting and centralizing cases under the MDL statute is an obvious example of a case management strategy that may incentivize claiming," such as in mega mass torts); Clopton & Bradt, *supra* note 7, at 1717, 1726 (referring to "'mega' MDLs involving widespread personal injury or mass disasters" and "very large numbers of cases ('blockbusters' or 'mega MDLs')"); Zachary D. Clopton, *MDL as Category*, 105 CORNELL L. REV. 1297, 1316 (2020) (noting that "although the mega-MDLs dominate the narrative, they are not representative of MDL as a whole").

litigation,[23] "the [latent disease claim] cases are routinely filed [in MDL] and, apparently, settled." *See* Appendix D: Individual Characteristics of Mass Torts Case Congregation, FEDERAL JUDICIAL CENTER, at 12 (January 1999).

One key reason that the MDL device has flourished as a mechanism for resolving mass-tort litigation is the flexible structure of the MDL process. As this Court has recognized, after "more than fifty years of multidistrict litigation under § 1407, federal courts have worked with parties and their counsel to develop 'specialized procedures to manage the pretrial proceedings in the related cases.'" *Looper v. Cook Inc.*, 20 F.4th 387, 390 (7th Cir. 2021) (quoting *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 488 (7th Cir. 2020)). MDL harnesses the efficiencies of consolidation of cases into a unitary package before a single judge through temporary coordination while *also* preserving the individual character of the cases destined for remand. *See* 28 U.S.C. § 1407; *see also Ill. Mun. Ret. Fund v. Citigroup, Inc.*, 391 F.3d 844, 852 (7th Cir. 2004) ("Undoubtedly, efficiency and consistency are goals of § 1407."). After cases are transferred by the Judicial Panel on Multidistrict Litigation ("JPML"), MDL transferee judges have the flexibility under the MDL statute to tailor the structure of the litigation to the particular exigencies of

---

[23] *See, e.g.*, Sean P. Wajert, *DES Plaintiff's Reach for Market Share Liability Rejected Again,* SHOOK, HARDY, & BACON (Jan. 30, 2013), *available at* https://www.masstortdefense.com/2013/01/articles/des-plaintiffs-reach-for-market-share-liability-rejected-again/ (referring to asbestos as the "grandfather" of mass torts).

the consolidated cases, including by way of strategic uses of coordination and decentralization to bring about resolution of claims.[24] Indeed, it is *because* the MDL device is not constrained by any single mechanism, or even any single deal, that it can respond adaptively to the particular exigencies of a given mass-tort litigation, as well as to any number of obstacles to global resolution, including the presence of multiple and/or differently situated defendants,[25] latent disease,[26] future claims,[27] as well as thorny issues of due process that mass torts tend to raise.[28] Recognizing the

---

[24] *See, e.g.*, Rave & McGovern, *supra* note 7; Francis E. McGovern, *Judicial Centralization and Devolution in Mass Torts*, 95 MICH. L. REV. 2077, 2088 (1997) (discussing Judge Pointer's strategic use of disaggregation and test cases in *In re Silicone Breast Implants Products Liability Litigation*, MDL No. 926); Brian T. Fitzpatrick, *Many Minds, Many MDL Judges*, 84 LAW & CONTEMP. PROBS. 107, 107 (2021) (contending that "decentralization" is "good for the legal decisionmaking that takes place in MDLs"); Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?*, 23 WIDENER L.J. 97 (2013); Sam C. Pointer, Jr., *Reflections by a Federal Judge: A Comment on Judicial Federalism: A Proposal to Amend the Multidistrict Litigation Statute*, 73 TEX. L. REV. 1569 (1995).

[25] *See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 314 F. Supp. 2d 1373, 1375–76 (J.P.M.L 2004); *In re Phenylpropanolamine Prods. Liab. Litig.*, MDL No. 1407; *In re Richardson-Merrell, Inc., "Bendectin" Prods. Liab. Litig. (No. II)*, MDL No. 486; *In re Silicone Breast Implants Prods. Liab. Litig.*, MDL No. 926; *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL No. 875.

[26] *See, e.g.*, *In re Asbestos Prods. Liab. Litig. (No. VI)*, MDL No. 875.

[27] *See, e.g.*, *id.*; *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, MDL No. 1203; *In re Baycol Prods. Liab. Litig.*, MDL No. 1431; *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657; *In re Richardson-Merrell, Inc., "Bendectin" Prods. Liab. Litig. (No. II)*, MDL No. 486.

[28] Indeed, one of the key lessons from the Supreme Court's landmark class-action due process decisions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), both involving proposed settlements of asbestos claims, was that prior to resolving claims by way of a class-

special province of MDL management and coordination, this Court has emphasized that "[d]istrict courts handling complex, multidistrict litigation 'must be given wide latitude with regard to case management' in order to achieve efficiency." *Dzik v. Bayer Corp.*, 846 F.3d 211, 216 (7th Cir. 2017) (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 247 (3d Cir. 2013)).

None of this is to say that MDL is the only mechanism for resolving mass torts. Nor is it to say that MDL is a perfect device for resolving mass claims, or to take the position that there is no room for refinement, as scholars have recognized.[29] Yet, as a large body of legal scholarship and decades of experience with mass-tort litigation demonstrate, resolution of cases involving large and complex mass torts is frequently aided by the wide-ranging toolbox of flexible, adaptive, and well-developed procedural mechanisms found in MDL and administered by specialized MDL judges and practitioners. Consolidation, pretrial adjudication, and remand have long provided an efficient blueprint for fair and effective bargaining between claimants and defendants.

---

wide settlement, there must be a fair way to represent the different interests of present and future claimants.

[29] *See, e.g.*, Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. REV. 1 (2021); Elizabeth Chamblee Burch & Margaret S. Williams, *Repeat Players in Multidistrict Litigation: The Social Network*, 102 CORNELL L. REV. 1445 (2017); Charles Silver, *Some Questions About Lead Counsels' Appointment, Duties, and Compensation*, *available at* https://www.law.gwu.edu/sites/g/files/zaxdzs2351/f/downloads/silver.mdl%20paper.pdf.

What is more, no mechanism for handling mass torts is perfect, including bankruptcy.[30] Bankruptcy hardly makes the challenges of mass torts disappear, as Aearo and its amici imply. As scholars have long recognized, the difficulties of resolving mass torts are inherent to mass torts.[31] That mass torts are hard does not mean that the solution is to ignore all the experience and benefits of a long-standing, Congressionally-established, and effective system for resolving them, especially where 3M agreed to participate in that system at the outset. CA.1. And that is certainly true where one side's attempt to leave the MDL behind *creates* significant due process problems of its own.

## II.    Staying the Litigation Against 3M Raises Concerns Under the Supreme Court's Longstanding Mass-Tort Due Process Jurisprudence.

Essential due process protections, such as the requirement of "adequate representation" and the right to a "day in court," apply to mass-tort plaintiffs like the combat-earplug claimants here. Resolving the Earplug Litigation claims in Aearo's bankruptcy by extending the automatic stay to 3M not only subverts the MDL, but threatens these due process protections.

---

[30] *See, e.g.*, Geoffrey C. Hazard, Jr., *The Futures Problem*, 148 U. PA. L. REV. 1901 (2000); Alexandra D. Lahav, *The Continuum of Aggregation*, 53 GA. L. REV. 1393 (2019).

[31] *See, e.g.*, Hazard, *supra* note 30, at 1909–10 (pointing out that the "futures" problem does not go away in bankruptcy, which raises its own concerns); Lahav, *supra* note 30, at 1394 ("Mass litigation is like water, the cases will move to the form of litigation that is the most available . . . .").

Processes and proposed arrangements for bringing about global resolution of mass-tort claims must be carefully scrutinized as a matter of due process. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Scrutiny must be particularly "rigorous" when the arrangement offered to achieve global peace would be mandatory for all claimants, as is the case when resolving claims in bankruptcy. *See Ortiz*, 527 U.S. at 848–49 ("When a district court, as here, certifies for class action settlement only, the moment of certification requires 'heightene[d] attention,' to the justifications for binding the class members.") (quoting *Amchem Prods., Inc.*, 521 U.S. at 620); *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279–80 (7th Cir. 2002).

Courts have spent decades developing and refining the contours of due process principles and protections for mass litigation. Plaintiffs in aggregate litigation are constitutionally entitled to adequate representation and the right to opt-out. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985). This is because mandatory arrangements for resolving claims risk running afoul of the longstanding "due process principle of general application in Anglo-American jurisprudence. . . that everyone should have his own day in court." *Ortiz*, 527 U.S. at 846 (cleaned up). And it has long been recognized that these "minimal due process requirements extend to bankruptcy proceedings." *In re Combustion Eng'g, Inc.*, 391

13

F.3d 190, 245 n.64 (3d Cir. 2004); *see also Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000).

Aearo's maneuver to bankruptcy bypasses these critical benchmarks and raises at least two serious constitutional due process concerns. First, combat-earplug tort claimants were not adequately represented in this litigation's transition into bankruptcy. Second, resolving the combat-earplug claims on a mandatory basis in bankruptcy deprives all claimants of the right to opt-out to pursue their own day in court against non-debtor MDL defendant 3M. In so doing, 3M and Aearo unilaterally shifted the bargaining dynamics in their own favor and placed combat-earplug claimants in a significant "position of weakness." *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 788 (3d Cir. 1995) (discussing due process issues related to adequate representation of claimants) (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1125 (7th Cir. 1979)).

To be clear, Amici do not question the bankruptcy court's ability to faithfully and fairly oversee Aearo's bankruptcy. Rather, Amici submit that these due process defects are introduced by the maneuver itself—3M's transition of Aearo into bankruptcy. Importantly, these due process defects and the bargaining advantages they generate for mass-tort defendants like 3M are not likely to be cured in the bankruptcy proceeding *ex post*. Instead, they would be baked into it. Indeed, Aearo's

bankruptcy maneuver, which is inextricably intertwined with both mass-tort MDL and mass-tort bankruptcy, occurred *outside* the purview of both MDL and bankruptcy. As such, it risks evading the scrutiny of both fora. Amici write to express concern that, should the Court extend the automatic stay in circumstances like these, 3M and other mass-tort defendants would have ample opportunity to end-run around fundamental and long-established constitutional strictures of due process in mass litigation.

### A. Tort Claimants Have Not Received the Due Process Guarantee of "Adequate Representation" in the Transition to Bankruptcy.

Among the most important due process protections for mass-tort claimants is the requirement that such claimants be "adequately represent[ed]" "at all times." *Phillips Petroleum Co.*, 472 U.S. at 812; s*ee also Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940) (adequate representation required by due process); *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1348 (7th Cir. 1990) (same), *rev'd on other grounds*, 500 U.S. 90 (1991). It is "a failure of due process . . . where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it." *Hansberry*, 311 U.S. at 42. These due-process protections extend to mass-tort claimants "under bankruptcy or otherwise," and claimants "must be adequately represented throughout the process." *See In re Combustion Eng'g, Inc.*, 391 F.3d at 245 (citing *Amchem Prods., Inc.*, 521 U.S. at 625–28; *Ortiz*, 527 U.S. at 856).

The adequate representation inquiry is exacting and necessarily spans the entirety of the underlying litigation. *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 715 (7th Cir. 2015) (finding that adequacy of representation in aggregate litigation "is an issue that can be examined *throughout* the litigation") (emphasis added). "Basic consideration of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives *at all stages of the litigation* where absent members will be bound by the court's judgment." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 89–90 (7th Cir. 1977) (emphasis added) (quoting *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 344–45 (D.C. Cir. 1976)). Adequate representation "at all times" is so fundamental to due process that the Supreme Court has struck down mass-tort settlements on due process grounds despite those settlements having been negotiated and designed, in apparent good faith, by plaintiffs' and defense counsel. See *Amchem Prods., Inc.*, 521 U.S. at 625–29; *Ortiz*, 527 U.S. at 864–65.

Aearo's transition into bankruptcy implicates fundamental due process concerns about adequacy of representation and calls for "[s]trict oversight." *Susman*, 561 F.2d at 90. Here, Amici urge the Court to consider the adequacy of tort claimants' representation in the *entire* context of the litigation—not just the bankruptcy proceeding below, but the MDL that launched it, as well as 3M's unilateral attempt to transition between the two. At no time during that transition

were claimants represented, adequately or otherwise. Plans to resolve Earplug
Litigation claims in bankruptcy were developed exclusively by 3M and Aearo, who
crafted the Funding Agreement and resultant bankruptcy petition in secret and
without insight from, or consultation with, claimants or claimants' counsel. 3M and
Aearo decided, unilaterally, to move all of the claims into bankruptcy; claimants had
no say in this decision at all. It is talismanic that one cannot be adequately
represented by their adversary. Yet that is precisely what occurred here.

As one would expect from a process in which combat-earplug claimants were
"represented" only by their adversaries, 3M and Aearo have shifted the bargaining
dynamics of the litigation in their own favor and put all claimants in a significant
"position of weakness." *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank
Prods. Liab. Litig.*, 55 F.3d at 788. One of the most significant advantages 3M
attempts to obtain by moving the Earplug Litigation into bankruptcy is escaping
adverse rulings in the MDL forum and therefore depriving claimants of the leverage
that inures from those rulings. Amici wish to stress two reasons that extending the
automatic stay to 3M will compound the due process problem of claimants'
inadequate representation.

First, once in bankruptcy, claimants will likely be forced to claim against a
settlement trust or not claim at all, a reality the bankruptcy court recognized. *See*
SA.36 (noting that extending the automatic stay would "provide Aearo and/or 3M

17

with additional leverage to negotiate a global settlement" and "provide certain tools that Aearo and 3M will lack outside of bankruptcy"). In its first-day filings, Aearo indicated its intention to establish such a trust, CA.124, and the bankruptcy court has recognized that such a trust will likely be formed. SA.15–16 ("[M]ost mass tort claims in a bankruptcy are resolved not through jury trials before a district court, but by consensual resolution through a plan of reorganization, often through a trust mechanism."). In unilaterally effectuating this change of forum from MDL to a mandatory claim structure in bankruptcy, 3M and Aearo unilaterally "bargained" away claimants' ability to extract settlement value by way of pursuing further litigation and trial on the merits. And claimants would have no recourse by way of an opt-out right to a process and deal made *for* them, but not *by* them.

Second, the Funding Agreement at the heart of Aearo's bankruptcy petition, drafted and negotiated entirely by 3M and Aearo with no input from claimants, would shield the corporate parent and principal MDL defendant, 3M, by channeling all Earplug Litigation claims into Aearo's bankruptcy, where they would be further channeled into a trust within that bankruptcy. A settlement trust shields a debtor by channeling the tort claims at issue into a trust and away from the debtor. *See, e.g.*, *In re Combustion Eng'g Inc.*, 391 F.3d at 206. Therefore, 3M and Aearo also "bargained" away claimants' direct access to 3M, reducing the agency and bargaining leverage claimants wielded as MDL litigants, including leverage related

to a number of merits-based rulings against 3M. Extending the automatic stay to 3M would further compromise claimants' rights to adequate representation.

### B. Mandatory Resolution of the Earplug Litigation Against 3M Deprives Tort Claimants of the Due Process Right to a "Day in Court."

Aearo's transition to bankruptcy and attempt to extend the automatic stay to 3M also call for "rigorous" scrutiny because they would impose a mandatory process for resolving combat-earplug claims. *Ortiz*, 527 U.S. at 849. Mandatory arrangements for resolving claims implicate the "deep-rooted historic tradition," grounded in due process, "that everyone should have his own day in court." *Id.* at 846 (cleaned up); *see also Phillips Petroleum Co.*, 472 U.S. at 812. As complex litigation scholars have traced, because mandatory resolution of claims comes at the expense of claimants' due process rights to opt out of a global deal, to pursue their own day in court, and to seek to maximize their own individual financial interests, exceptions to this right are narrow and few.[32] These limited historical exceptions largely tend to be characterized by their necessity; indeed, the core holding of *Ortiz* was that the creation of a mandatory arrangement for resolving claims cannot supply the necessity for departing from the longstanding right of claimants to their "day in

---

[32] *See, e.g.*, Martin H. Redish & William J. Katt, Taylor v. Sturgell, *Procedural Due Process, and the Day-in-Court Ideal: Resolving the Virtual Representation Dilemma*, 84 NOTRE DAME L. REV. 1877, 1881 (2009) (discussing "traditionally accepted limitations" that are "deemed to create an exception to the presumptive day-in-court ideal").

court." *Ortiz*, 527 U.S. at 839, 846–47; *see also, e.g.*, *In re LTL Mgmt., LLC*, 2023 WL 1098189, *17 (3d Cir. Jan. 30, 2023) (emphasizing that "pre-bankruptcy remedies" of tort claimants, such as "the chance to prove to a jury of their peers injuries claimed to be caused by a consumer product," must be "disrupted only when necessary"); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986); Fed. R. Civ. P. 23(b)(1), (b)(2).

Mindful of the exacting scrutiny appropriate in proposals for mandatory resolution of mass-tort claims, s*ee Ortiz*, 527 U.S. at 848–49, Amici draw the Court's attention to Aearo's proffered justifications for its bankruptcy maneuver. Doing so helps juxtapose this case against the rare scenarios that have traditionally permitted mandatory resolution. In his initial declaration filed in the bankruptcy court, Aearo's Chief Restructuring Officer made the purpose of Aearo's bankruptcy petition explicit:

> Debtors submit that the MDL cannot provide fair and efficient resolution of the Combat Arms Claims. The Debtors believe that these chapter 11 cases present the optimal path to resolve the Combat Arms Claims and compensate claimants who are entitled to compensation in an expeditious fashion. . . . The Debtors' decision to commence these chapter 11 cases stems from the lack of an alternative mechanism to efficiently and equitably address their alleged liabilities related to the sale and use of the Combat Arms and Respirators. After diligently considering the cost, burden, uncertainty, and anticipated duration of continuing with the Debtors' ongoing litigation through the tort system, the Debtors determined that the filing of these chapter 11 cases was prudent and necessary.

Decl. of John R. Castellano, No. 22-02890-JJG-11, Dkt. 11 at 5, 23–24 (Bankr. S.D. Ind. July 26, 2022); *see also id.* at 3, 6, 18.

What 3M and Aearo now view, *ex post*, as the most "optimal" road to mass-tort finality is not the one paved with due process protections. From the perspective of the Due Process Clause, the ends cannot justify the means. *See Amchem Prods, Inc.*, 521 U.S. at 628–29. Aearo's plan to force combat-earplug claimants into mandatory bankruptcy does not comport with the limited historical justifications for depriving plaintiffs of their due process right to a day in court. *Cf. Ortiz*, 527 U.S. at 839 ("The equity of the limitation is its necessity."); *accord In re LTL Mgmt., LLC*, 2023 WL 1098189 at *17 ("[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so."). The Court should decline to extend the automatic stay.

* * *

Due process protections of adequate representation and the right to a day in court help ensure that legal claims be "purchased, not appropriated."[33] Amici here are concerned that bankruptcy maneuvers like Aearo's would set a precedent under which mass-tort defendants could deprive claimants of fundamental constitutional due process protections. Global peace is too valuable to be so cheap.

---

[33] Richard A. Nagareda, *Closure in Damage Class Settlements: The Godfather Guide to Opt-Out Rights*, 2003 U. CHI. LEGAL F. 141, 166.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the bankruptcy court.

Dated: February 1, 2023

Respectfully submitted,

*/s/ Ronald J. Tomassi, Jr.*
Ronald J. Tomassi, Jr.
LEÓN COSGROVE JIMÉNEZ, LLP
999 18th St., Suite 1925N
Denver, CO 80202
(720) 617-7114
rtomassi@leoncosgrove.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), and 7th Cir. R. 29, because it contains 5666 words, excluding the content exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

*/s/ Ronald J. Tomassi, Jr.*
Ronald J. Tomassi, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Ronald J. Tomassi, Jr.*
Ronald J. Tomassi, Jr.